### In the Matter Of:

DAVID KUBIAK, et al. vs. S.W. COWBOY, et al.

# DEPOSITION OF

# RYAN E. MARCUM

*January 10, 2014*



**EXHIBIT**

tabbies

Q



**DISCOVERY**
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations

Suite 300, The Elks Building
207 North Laura Street
Jacksonville, FL 32202
904.783.3300

Case 3:12-cv-01306-MMH-JRK   Document 114   Filed 02/18/14   Page 2 of 79 PageID 3055

DAVID KUBIAK, et al. vs. S.W. COWBOY, et al.                    DEPOSITION OF
RYAN E. MARCUM on 01/10/2014                                           Page 1

```
 1              UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF FLORIDA
 2                 JACKSONVILLE DIVISION

 3
                CASE NO.: 3:12-cv-1306-J-34JRK
 4

 5   DAVID KUBIAK, JASON CROWLING
     and JOSEPH KEATING,
 6   Individually and on behalf of
     all other similarly situated
 7   employees,

 8          Plaintiffs,

 9   vs.

10   S.W. COWBOY, INC., a Florida
     corporation d/b/a SALTWATER
11   COWBOYS; CREEKSIDE DINERY,
     INC., a Florida corporation;
12   PETER LAWLOR, SCOTT SINGLETON,
     WILLIAM WHITE, TERRY
13   RICHARDSON, ROCHELLE
     DROVILLARD, JUDY WEGNER, and
14   JOHN WERDIA,

15          Defendants.
     _____/

16

17                 DEPOSITION OF

18              RYAN E. MARCUM

19        Taken on Behalf of the Plaintiffs

20      DATE TAKEN:         Friday, January 10, 2014
        TIME:               12:45 p.m.
21      PLACE:              Hilton St. Augustine
                            32 Avenida Menendez
22                          St. Augustine, Florida 32084

23

24      Examination of the witness taken before:

25          Joan T. Gomes, Registered Merit Reporter
                    and Notary Public
```



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

Suite 300, The Elks Building
207 North Laura Street
Jacksonville, FL 32202
904.783.3300
www.DiscoveryLit.com

Case 3:12-cv-01306-MMH-JRK   Document 114   Filed 02/18/14   Page 3 of 79 PageID 3056

DAVID KUBIAK, et al. vs. S.W. COWBOY, et al.                                    DEPOSITION OF
RYAN E. MARCUM on 01/10/2014                                                             Page 2

```
 1                    A P P E A R A N C E S

 2


 3    FOR THE PLAINTIFFS:

 4              BENJAMIN L. WILLIAMS, ESQUIRE
                Feldman Morgado, P.A.
 5              10151 Deerwood Park Boulevard
                Bldg. 200, Suite 250
 6              Jacksonville, Florida 32256
                904.240.4300
 7              bwilliams@ffmlawgroup.com

 8


 9    FOR THE DEFENDANTS:

10              MARQUIS W. HEILIG, ESQUIRE
                Thompson, Sizemore, Gonzalez & Hearing, P.A.
11              201 N. Franklin Street, Suite 1600
                Tampa, Florida 33602
12              813.273.0050
                mheilig@tsghlaw.com

13


14    ALSO PRESENT:

15              Scott Singleton, Defendant
                Judy Adam-Smith, Defendant
16

17

18

19

20

21

22

23

24

25
```



Suite 300, The Elks Building
207 North Laura Street
Jacksonville, FL 32202
904.783.3300
www.DiscoveryLit.com

Case 3:12-cv-01306-MMH-JRK   Document 114   Filed 02/18/14   Page 4 of 79 PageID 3057

DAVID KUBIAK, et al. vs. S.W. COWBOY, et al.                    DEPOSITION OF
RYAN E. MARCUM on 01/10/2014                                    Page 3

```
  1                           INDEX

  2

  3                                                   Page

  4   DEPOSITION OF RYAN E. MARCUM

  5

  6   Direct Examination by Mr. Williams             4

  7

  8

  9

 10

 11                  PLAINTIFFS' EXHIBIT INDEX

 12   No.        Description                          Page

 13

 14   1      Summary of Sales, 11/9/11, and Allocation  41
             Sheet

 15   2      Composite                                42

 16
      3      Summary of Sales reports and Tip         45
 17          Allocation Sheets, January 2009

 18   4      Summary of Sales Reports and Tip         48
             Allocation Sheets, May 2011
 19
      5      Summary of Sales Reports and Tip         49
 20          Allocation Sheets, March 2010

 21   6      Summary of Sales Reports and Tip         49
             Allocation Sheets, January 2010
 22

 23                          -   -   -

 24

 25
```



Suite 300, The Elks Building
207 North Laura Street
Jacksonville, FL 32202
904.783.3300
www.DiscoveryLit.com

DAVID KUBIAK, et al. vs. S.W. COWBOY, et al.
RYAN E. MARCUM on 01/10/2014

DEPOSITION OF
Page 4

```
 1                     RYAN E. MARCUM,

 2   having been produced and first duly sworn as a witness on

 3   behalf of the Plaintiffs, testified as follows:

 4                   DIRECT EXAMINATION

 5   BY MR. WILLIAMS:

 6        Q     Good afternoon, Mr. Marcum.  My name is Ben

 7   Williams, and I represent the plaintiffs, Mr. Kubiak,

 8   Mr. Crowling and Mr. Keating, along with several other

 9   opt-in employees in their lawsuit against Saltwater Cowboys,

10   Creekside Dinery and other defendants.

11        Have you ever taken a deposition before?

12        A     I have not.

13        Q     Okay.  Let me just kind of go over some of the

14   ground rules.  I'm going to be asking you a series of

15   questions, you're going to be answering them.  Let me remind

16   you that you are under oath, and the court reporter's here

17   to take everything that we say down.

18        A     Okay.

19        Q     Because it is a stenographer here, it's very

20   important that you let me finish a question before you start

21   answering, and I will let you fully answer a question before

22   I start asking you another one, just so that it's clear for

23   the record.

24        A     Okay.

25        Q     In addition, please refrain from nodding your head
```



DAVID KUBIAK, et al. vs. S.W. COWBOY, et al.
RYAN E. MARCUM on 01/10/2014

DEPOSITION OF
Page 5

1  or saying uh-huh (affirmative) or uh-uh (negative) in

2  response to any deposition question --

3      A    Okay.

4      Q    -- as that is not easily transcribable in the

5  record.

6      A    Okay.

7      Q    Do you have any questions before we begin?

8      A    No.

9      Q    If you need a break at any time, just let me know,

10 and we'll take a short recess and get back to it.  I don't

11 expect that this is going to take a full day.

12     A    Okay.

13     Q    Would you please state your full name for the

14 record.

15     A    Ryan Evans Marcum.

16     Q    Okay.  And have you ever been involved in a

17 lawsuit before this one?

18     A    No, sir.

19     Q    How were you -- how were you notified about your

20 appearance here at this deposition today?

21     A    I was first notified by a subpoena that was

22 delivered to my door.  That's how I was notified to be here

23 today.  I was served papers at my house.

24     Q    Prior to coming to the deposition today, did you

25 talk to anybody about the deposition?



Suite 300, The Elks Building
207 North Laura Street
Jacksonville, FL 32202
904.783.3300
www.DiscoveryLit.com

```
 1        A     No.
 2        Q     Did you talk to any of the former managers or
 3   owners of Saltwater Cowboys?
 4        A     No.
 5        Q     And prior to coming to this deposition today, did
 6   you review any documents?
 7        A     Yes.
 8        Q     What did you review?
 9        A     My original statement that I had made.
10        Q     Did you have that on hand or did someone provide
11   you a copy?
12        A     I have an e-mail copy of it.
13        Q     And Mr. Marcum, have you ever gone by any other
14   name?
15        A     No.
16        Q     What is your date of birth?
17        A     ████████████, 1988.
18        Q     And what is your current address?
19        A     ████████████.   That's in St. Augustine, 32086.
20        Q     And how long have you lived at that address?
21        A     Since I was in the fifth grade.
22        Q     Okay.
23              MR. HEILIG:  So it doesn't appear to have been
24   that long ago.
25        Q     Are you currently working?
```



DAVID KUBIAK, et al. vs. S.W. COWBOY, et al.
RYAN E. MARCUM on 01/10/2014

DEPOSITION OF
Page 7

1      A      Yes.

2      Q      Okay.  Where are you working?

3      A      I work for Target.

4      Q      And how long have you worked there?

5      A      Almost four months.

6      Q      And I believe that you worked for the defendants

7   from February 2008 through May 2001, 2012, is that correct?

8      A      Yes.

9      Q      And why did you leave your employment with

10   Saltwater Cowboys?

11      A      Just because I felt like it was time to move on.

12   There were some discrepancies that happened, but

13   everything's been taken care of, and I just decided it was

14   time to go, time to move on.

15      Q      Okay.  And were you terminated or did you resign?

16      A      I was terminated.

17      Q      Who terminated you?

18      A      It would have been Judy White -- or Judy -- Judy

19   White?  Judy Wegner.  Wegner, right?

20      Q      And why did she terminate you?

21      A      Because there was some -- I was accused of theft,

22   and that's why I was terminated.

23      Q      Okay.  And after you were terminated, have you

24   worked in any other restaurant subsequent to that?

25      A      Yes.



DAVID KUBIAK, et al. vs. S.W. COWBOY, et al.
RYAN E. MARCUM on 01/10/2014

DEPOSITION OF
Page 8

```
1          Q     Which restaurants did you work at?

2          A     Applebee's and Carrabba's.

3          Q     Okay.  What dates did you work for Applebee's?

4          A     I worked for Applebee's from December 2012 until

5    around April or May of 2013.

6          Q     And did you resign or were you terminated?

7          A     I resigned.

8          Q     Okay.  And then, when did you work for Carrabba's?

9          A     From just about a month after May 2013 until --

10   let's see -- September 2013.

11         Q     Okay.  And at Applebee's what was your job?

12         A     Food server.

13         Q     Okay.  And what about Carrabba's?

14         A     Food server.

15         Q     And while you were working for Saltwater Cowboys,

16   from February 2008 through May 2001 -- May 21st, 2012,

17   sorry, did you have any other job at the same time?

18         A     No.

19         Q     And prior to February 2008 had you worked at any

20   restaurant before that?

21         A     No, sir.

22         Q     What was the highest level of schooling that

23   you've achieved?

24         A     A year of college.

25         Q     And when did you complete that year of college?
```



Case 3:12-cv-01306-MMH-JRK   Document 114   Filed 02/18/14   Page 10 of 79 PageID 3063

DAVID KUBIAK, et al. vs. S.W. COWBOY, et al.                    DEPOSITION OF
RYAN E. MARCUM on 01/10/2014                                           Page 9

```
 1        A     In 2008.
 2        Q     And when did you graduate high school?
 3        A     2007.
 4        Q     Did you begin working at Saltwater Cowboys before
 5   or after you -- you took that year of college?
 6        A     It was after.
 7        Q     And who hired you at Saltwater Cowboys?
 8        A     Jennifer Bryant.
 9        Q     And had you ever worked at Fiddler's Green?
10        A     No, sir.
11        Q     And during your employment from 2008 through 2012
12   did you ever work over at Creekside Dinery?
13        A     Yes.
14        Q     Were you permanently assigned to Creekside Dinery
15   at any time?
16        A     Temporarily.  I was there to help train some new
17   servers.
18        Q     Do you remember the dates?
19        A     It would have been September-October 2011 until
20   January 2012.
21        Q     And why did they need help training new servers?
22        A     Because they had lost a few people who had to go
23   back to school, and they hired on some new people, and I was
24   asked to come over and assist with training and just making
25   sure that everybody knew the menu and learned everything
```



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

Suite 300, The Elks Building
207 North Laura Street
Jacksonville, FL 32202
904.783.3300
www.DiscoveryLit.com

DAVID KUBIAK, et al. vs. S.W. COWBOY, et al.
RYAN E. MARCUM on 01/10/2014

DEPOSITION OF
Page 10

1  like they were supposed to.

2       Q    Okay.  And who asked you to move over?

3       A    Shelly.

4       Q    That's Shelly who?

5       A    Shelly, one of the owners at Saltwater Cowboys.  I

6  don't remember her last name.

7       Q    Okay.  And when she instructed you to go over to

8  Creekside Dinery to help train the new servers, what did she

9  tell you that she wanted done?

10       A    She just knew -- she knows that I'm a good server,

11  she knows that I'm really good with people, I'm really good

12  with getting along with everybody, so she asked me to come

13  over and just, you know, open myself up to the new people

14  and make them feel welcome, make them feel like they are

15  learning, and just basically to come over and share my

16  expertise with the new servers.

17       Q    Did Shelly ask you to, you know, to do anything

18  differently with respect to the tip pooling procedures over

19  at Creekside Dinery?

20       A    No.  No, the tip pool was pretty much the same.

21       Q    Okay.  You said pretty much the same.  What were

22  the differences?

23       A    There were no differences.  It was the same.

24       Q    Was that part of the training process that you

25  were instructed to go over?



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

Suite 300, The Elks Building
207 North Laura Street
Jacksonville, FL 32202
904.783.3300
www.DiscoveryLit.com

1       A    Yes.

2       Q    When Shelly asked you to move over to Creekside

3  Dinery to train new servers, did she give you any

4  guidelines, lists, bullet points, handbooks, pamphlets,

5  anything written to go over with them?

6            MR. HEILIG:  Object to the form.

7       A    No, she just -- she made sure that I knew what I

8  was doing.  She asked if I knew about the -- how to explain

9  the tip pool, if it was the same at Cowboys and Creekside,

10  and I told her yes.  And she didn't give me any other

11  literature or anything like that.  I already knew what I was

12  supposed to be doing because I'd been working for Saltwater

13  Cowboys for so many years.

14      Q    Okay.  All right.  So when you went over to

15  Creekside Dinery, tell me about the training process that

16  you implemented.

17      A    Well, I guess at first, when you first train

18  someone you -- they are basically following you on the first

19  day of their training.  You're explaining to them how to

20  take orders, how to greet customers, how to put in food

21  orders, how to -- how the tables are numbered, you know,

22  just basic stuff on the first day.  And then, of course, at

23  the end of the day they stick around, and I -- they watch me

24  complete my tip allocation form, which I explained in depth

25  to every server.  I made sure that there weren't any



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

Suite 300, The Elks Building
207 North Laura Street
Jacksonville, FL 32202
904.783.3300
www.DiscoveryLit.com

1   questions.  I offered to make copies of my allocation

2   report, my tip sheet, so that they were well aware of how

3   they were supposed to tip out.

4        Q    Okay.  Any other areas of training that you would

5   cover?

6        A    Kitchen procedures, if something was to happen,

7   you know, if something came out wrong, how you would go

8   about getting it fixed, maybe how to order drinks from the

9   bar, how the hostess stand works, just different things

10  throughout the restaurant.  Depending on the level of --

11  depending on if the server had been, you know, a server

12  before or if this was their first time, that's how I would

13  base how much I would need to train that person.

14       Q    Would you as part of your training when you went

15  over to Creekside cover the expediter position?

16       A    Yes.

17       Q    Would you show the trainees how to be an

18  expediter?

19       A    If they were trainees, yes.

20       Q    And when you were going over the expo situation,

21  what were the topics that you covered as to how to be an

22  expo?

23       A    Just basically what sauces are supposed to go with

24  which dinner, how -- plate presentation, how many plates

25  were supposed to go on a tray for safety.  Basically it's



1  all about learning the food and knowing which sauces go with

2  what, and you make sure you do it in a quick manner because,

3  you know, once you get plates onto a tray, you have to get

4  it out to the table before the food gets cold.

5          Q     Okay.  And how does an expo get the food out to

6  the table?

7          A     By, you know, of course you check the ticket first

8  and you see whose -- whose dinners they are, who it belongs

9  to.  You get everything set up as quickly as possible.  You

10  yell out for the server's name, maybe twice, and you know,

11  you kind of glance around, and if you don't see the server,

12  if someone else is standing there, you would maybe ask

13  someone else to come run their food for them because that

14  was a part of, you know, your job.  If you have nothing to

15  do, you help run the food, you help get things out to the

16  table so the business runs smoothly.

17         Q     What about any other company policies?  Did you go

18  over any company policies with the trainees?

19         A     Really the only thing would be to like ensure

20  satisfaction, ensure that the food looks the way it was

21  supposed to, because sometimes we get busy and things might

22  have been overlooked, just to make sure the food quality is

23  up to standard.

24         Q     What about, you know, mundane policies such as,

25  you know, where to park your car?



1      A     You know, we would go over that.  I mean, it was

2   pretty straight forward where you parked your car.  There

3   was a certain -- certain area squared off for where we were

4   supposed to park.

5      Q     But you didn't necessarily go over that with every

6   trainee?

7      A     If they asked about it, yes.

8      Q     What about, you know, quizzing the trainees on the

9   menu?  Would you do that as part of your training process?

10     A     Sometimes I would.  There were -- we had a test

11  made out for new servers, and we would give them some time

12  to get to know the menu and to get to know everything, and

13  then they were given a test to take.

14     Q     Who administered that test?

15     A     Jennifer.  I was never a part of any test taking

16  at Creekside.  I wasn't there for that long.

17     Q     Was there a similar or concordant test for

18  Saltwater Cowboys?

19     A     Yes.

20     Q     And who administered the test over at Saltwater

21  Cowboys?

22     A     Jennifer -- at Creekside it would have been a

23  different manager.  I'm sorry.  I thought you meant -- I

24  only gave tests over at Saltwater Cowboys.  I only saw the

25  tests over at Saltwater Cowboys.  I never saw anything over



DAVID KUBIAK, et al. vs. S.W. COWBOY, et al.
RYAN E. MARCUM on 01/10/2014

DEPOSITION OF
Page 15

1    at Creekside.

2         Q    Okay.  And who were the managers over at Creekside

3    Dinery?

4         A    Sloan and Terri and Renee.

5         Q    What was Renee's last name?

6         A    I'm not sure.

7         Q    Okay.  And who were the front-of-the-house

8    managers in Saltwater Cowboys?

9         A    Jennifer Bryant, Jessica Barnes-Turner, and

10   Melissa Wolfe.

11        Q    And who were the back-of-the-house managers at

12   Saltwater Cowboys?

13        A    Brian Pannone, Dustin --

14        Q    Swilling?

15        A    Yes.

16        Q    Anyone else?

17        A    Prior to Dustin it would have been Tom -- I don't

18   know what his last name is.

19        Q    And what about over at Creekside Dinery, who are

20   the back-of-the-house managers?

21        A    Smokey and Booty.  I don't know their real names.

22        Q    That's okay.

23        A    Hey, it's a restaurant.

24        Q    During the course of your training over at --

25   earlier you testified that you went over to Creekside Dinery



DAVID KUBIAK, et al. vs. S.W. COWBOY, et al.
RYAN E. MARCUM on 01/10/2014

DEPOSITION OF
Page 16

```
 1   specifically to train, but you did training over at

 2   Saltwater Cowboys, too, correct?

 3        A    Yes.

 4        Q    I'm going to run through a list of people, and you

 5   tell me if you trained them or not.  Wally Kropacek or

 6   Kropacek?  Wally?

 7        A    No.

 8        Q    No.  Brian Reese?

 9        A    No.

10        Q    Lance Alexander?

11        A    No.

12        Q    Ryan Rossback?

13        A    No.

14        Q    Mike Canfield?

15        A    No.

16        Q    Amanda Carcaba?

17        A    No.

18        Q    Melissa Wolfe?

19        A    No.

20        Q    Chip McGraw?

21        A    No.

22        Q    Courtney Thompson?

23        A    No.

24        Q    Michael Hoolahan?

25        A    Yes.
```



DAVID KUBIAK, et al. vs. S.W. COWBOY, et al.
RYAN E. MARCUM on 01/10/2014

DEPOSITION OF
Page 17

1      Q      Kaley Graham?

2      A      No.

3      Q      Jonathan Thiele?

4      A      No.

5      Q      Sean Hernandez?

6      A      No.

7      Q      Kyle Allen?

8      A      No.

9      Q      Okay.  And when you first started in 2008, did you

10     undergo training?

11     A      Yes.

12     Q      Okay.  Who trained you?

13     A      Jessica Barnes.

14     Q      Anyone else?

15     A      J.D. Dixon.

16     Q      Anyone else?

17     A      No, that's it.

18     Q      And from your experience, you know, back in 2008

19     when you were trained, to your experience, you know, being

20     asked to train over at Creekside Dinery, was your training

21     more -- the training that you gave, was it more or less in

22     depth than the training you received?

23            MR. HEILIG:  Object to the form.

24     A      I would say it was about the same.

25     Q      When you were giving your training both at



1  Saltwater Cowboys and Creekside Dinery, did you specifically

2  talk to new trainees about double bumps?

3          MR. HEILIG:  Object to the form.

4      A    Not specifically.

5      Q    How were new servers supposed to learn about

6  double bumps?

7          MR. HEILIG:  Object to the form.

8      A    Well -- well, that would come back to a gratuity.

9  If there was gratuity left on a check, if the party was

10  seven or more, the gratuity was automatically included, and

11  we were told very specifically by the owners and by

12  Jennifer, everybody, to announce to the table, make sure

13  whoever is paying, here's -- you know, that the gratuity was

14  included.  And we were also told, which I also told my

15  trainees, to highlight where it says the tip was included.

16  So -- just to make sure that -- that whoever was paying was

17  aware that they were already paying a tip.

18          Now, anything that was left, of course, on the tip

19  would have been an extra tip, you know, for good service or

20  whatever.  So double bump -- double gratting, I don't

21  understand what you mean.

22      Q    Okay.  When did the owners first tell you or a

23  group of you included about double bumps?

24          MR. HEILIG:  Let me just object to the line of

25  questioning.



```
 1           A    I don't understand what double -- double --
 2                MR. HEILIG:  Hang on one second.  Let me object to
 3      the line of questioning.  The purpose of the depo is
 4      specifically limited by the Court to the voluntariness of
 5      the tip pool.  Well, I can see how the training and things
 6      would go to that, but double bump, the retaliation issue is
 7      not an issue you asked for permission to exceed the
 8      deposition limit on.
 9                MR. WILLIAMS:  I'm not asking about the double
10      bump and retaliation issue.  I'm asking about --
11                MR. HEILIG:  Is the double bump pertaining to the
12      voluntariness of the tip pool somehow?
13                MR. WILLIAMS:  I'm asking about training.  I'm
14      asking about training.
15                MR. HEILIG:  No, you're not.  You're asking about
16      a specific kind of training.
17                MR. WILLIAMS:  I'm asking about when Mr. Marcum
18      was trained about double bumps.
19                MR. HEILIG:  But what does that have to do with
20      the voluntariness of the tip pool?
21                MR. WILLIAMS:  It has to do with the training
22      procedure itself.
23                MR. HEILIG:  Now, this is -- this is well outside
24      the scope of the Court's order.
25                MR. WILLIAMS:  We'll come back to this.
```



Case 3:12-cv-01306-MMH-JRK   Document 114   Filed 02/18/14   Page 21 of 79 PageID 3074

DAVID KUBIAK, et al. vs. S.W. COWBOY, et al.                    DEPOSITION OF
RYAN E. MARCUM on 01/10/2014                                    Page 20

```
 1            MR. HEILIG:  Been at it for 15 minutes already, so
 2     let's move on.
 3        Q    Okay.  So when you were training at Saltwater
 4     Cowboys, you were actually serving tables, correct?
 5        A    Yes.
 6        Q    And --
 7        A    Depending on what day of training it was for the
 8     server.
 9        Q    Okay.  So during the shadowing phase they would
10     shadow you and just kind of follow you around the whole day,
11     correct?
12        A    Yes.
13        Q    And at the end of the night you would fill out
14     your tip allocation sheets, and the servers would watch you
15     do it?
16        A    Yes.
17        Q    Okay.  What other additional information would you
18     specifically tell every server as you were filling out the
19     tip allocation sheets?
20        A    Well, I told everyone that on the tip allocation
21     form the bar and bus tips were already calculated, and you
22     just had to add them up together.  And the kitchen tips and
23     the expediter tips were kept separate from that for a
24     reason, because that was voluntary.  Whether we decided to
25     tip the expediter or the kitchen staff was to our
```



Case 3:12-cv-01306-MMH-JRK   Document 114   Filed 02/18/14   Page 22 of 79 PageID 3075

DAVID KUBIAK, et al. vs. S.W. COWBOY, et al.                    DEPOSITION OF
RYAN E. MARCUM on 01/10/2014                                           Page 21

1    discretion, whether we felt that they performed their job as

2    well as they should have.

3              So that I would -- I always informed all of my

4    trainees that expediter and kitchen tips can be modified,

5    and that's why at the end of the night -- at the end of the

6    night when we did that, those things were kept separate

7    because they could be modified.  And that was not printed

8    out on the printout from the computer for a reason, because

9    that was based on what we decided to give the expediters and

10   the kitchen staff.

11        Q    And the Saltwater Cowboys tip allocation sheet,

12   did it say voluntary for kitchen tips?

13        A    It did not.

14             MR. HEILIG:  Object to the form.

15        Q    On the tip allocation sheet, did the kitchen tip

16   form say can be modified?

17             MR. HEILIG:  Object to the form.

18        A    It did not, but it was kept separate from the

19   bar/bus tipout for a reason, because that was separate.

20   That was based on what we decided to give them.

21        Q    Okay.

22        A    That was not something that was automatically --

23   automatically configured for us like the bar/bus tipout.

24        Q    Were you involved in programming the printout or

25   the form of the printout for the Summary of Sales report?



```
 1        A     No.
 2        Q     And on the tip allocation sheet did it say
 3   voluntary by the expediter kitchen tip allocation?
 4              MR. HEILIG:  Object to the form.
 5        A     It did not.
 6        Q     On the tip allocation form for Saltwater Cowboys,
 7   did it say by the expediter can be modified?
 8        A     It did not.
 9        Q     When you were training new servers how to be a
10   server at Saltwater Cowboys, did you tell the new servers
11   that, you know, you recommended a certain tip for the
12   kitchen?
13        A     Well, I mean, as with tipping with anything else,
14   you know, 10 -- at least 10 percent is acceptable, 20
15   percent would be if the person went above and beyond for
16   you.  So if they asked, you know, well, what should I tip,
17   what is the -- what does everybody else usually tip, I would
18   say, Well, everyone else usually gives at least 10 or 20
19   percent because that's what's acceptable.  And the expediter
20   works very hard.
21        Q     So you're talking about 10 or 20 percent for the
22   expediter?
23        A     We would recommend 10 percent.  I would -- I would
24   recommend 10 percent to them.
25        Q     Okay.  And then what was the recommendation for
```



1    the kitchen tip?

2         A    The recommendation would be 20 cents per plate,

3    depending on how many meals were produced on our printout at

4    the end of the night.

5         Q    And is that something that you learned from your

6    training?

7         A    Yes.

8         Q    And when you informed the new servers that we

9    recommend it, or that we recommend 20 cents per plate, how

10   sure are you that you stated that every time?

11             MR. HEILIG:   Object to the form.   Misstates his

12   prior testimony.

13        A    I -- I said that to everyone.

14        Q    Okay.   And when you said, you know -- do you

15   remember signing an affidavit with respect to this case?

16        A    Yes.

17        Q    And that's the affidavit that you signed August

18   20th, 2013, is that correct?

19        A    Yes.

20        Q    Was that before or after you had left your

21   employment with Saltwater Cowboys?

22        A    That was after.

23        Q    Who approached you and asked you to write an

24   affidavit?

25        A    Judy.



DAVID KUBIAK, et al. vs. S.W. COWBOY, et al.                        DEPOSITION OF
RYAN E. MARCUM on 01/10/2014                                        Page 24

```
 1        Q    What did she tell you about why she -- why you
 2   were writing an affidavit?
 3        A    She told me basically what was going on, that --
 4   but prior I had heard from -- I had heard from Jose telling
 5   me about it, you know, pretty much promising me money and
 6   all this stuff, and I decided that I did not want to join
 7   their side of the lawsuit, that I felt, when I found out
 8   with what they were suing for, I just found it to be
 9   ridiculous because they knew that -- they knew what -- how
10   the tip allocation sheet worked.  They worked there for long
11   enough, and if they were so concerned about the money that
12   they were tipping out, they should have said something
13   before they were fired or let go.
14        Q    Do you know if anyone's ever made a complaint
15   about the tip allocation to the managers or the owners?
16             MR. HEILIG:  Object to the form.
17        A    I can't recall.
18        Q    Do you have any knowledge of whether or not Jose
19   Farinos or David Kubiak made a complaint about the tipping
20   to the owners?
21             MR. HEILIG:  Object to the form.
22        A    Not that I can recall.  But I remember being an
23   expediter, and they would always say, "Oh, well, if you
24   don't give my dinners out fast enough, I don't have to tip
25   you."  Those are exact words coming out of Jason Crowling's
```



Case 3:12-cv-01306-MMH-JRK   Document 114   Filed 02/18/14   Page 26 of 79 PageID 3079

DAVID KUBIAK, et al. vs. S.W. COWBOY, et al.                                    DEPOSITION OF
RYAN E. MARCUM on 01/10/2014                                                         Page 25

1    mouth.

2         Q    And when did he make that statement?

3         A    Numerous times.

4         Q    When was the first time?

5         A    I really can't recall.  Mostly probably during the

6    busy season, towards the end of me working there.  I would

7    say 2011, 2012, mostly during the summer.  Sometimes during

8    the winter we wouldn't be as busy, so really nothing like

9    that would ever be said.

10        Q    That's when you were working as an expediter?

11        A    Uh-huh (affirmative).  And the same thing was also

12   said to the kitchen staff.

13        Q    Who said it?

14        A    Jason Crowling and David Kubiak.

15        Q    And when did Jason Crowling say that?

16             MR. HEILIG:  Object to the form.  You just asked

17   him that.  That was the whole --

18             MR. WILLIAMS:  No, that was for the expediter.

19   I'm asking for when Jason Crowling --

20        A    I can remember one time during Florida-Georgia

21   weekend.  It was really busy, and I was very stressed out,

22   and Jason kept on coming up and bothering me about

23   something, and I was doing the best I could, and I told him

24   that, and he then proceeded to tell me, you know, If you

25   don't get my dinners out fast enough, if you forget



Case 3:12-cv-01306-MMH-JRK   Document 114   Filed 02/18/14   Page 27 of 79 PageID 3080

DAVID KUBIAK, et al. vs. S.W. COWBOY, et al.                    DEPOSITION OF
RYAN E. MARCUM on 01/10/2014                                    Page 26

1   something, I don't have to give you as good of a tip.

2       Q    Okay.  Did he say that I don't have to give you as

3   good of a tip, or I don't have to tip you at all?

4            MR. HEILIG:  Object to the form.

5       A    I think his -- really his words would have been, I

6   don't have to tip you.  You know, it's -- it's up to me what

7   I -- what I tip you.  So really it could have went either

8   way, I don't have to tip you, I don't have to give you a

9   lot.

10      Q    And who else heard Mr. Crowling make this

11  statement?

12      A    Brian Pannone.

13      Q    Who else?

14      A    Dustin Swilling.

15      Q    Anyone else?

16      A    Not that I can recall.

17      Q    And you said that he made numerous -- Mr. Crowling

18  or Key Lime made numerous comments.  You mentioned one

19  comment he made on Florida-Georgia weekend.  Any other

20  comments that he made that you can recall specifically?

21      A    There were numerous times that he did it, but I

22  can't trace back specifically.

23      Q    Okay.  And you stated earlier that he also made

24  similar -- Mr. Crowling also made similar statements about

25  his kitchen tips, is that correct?



1      A     Yes.

2      Q     Do you remember a specific instance when he made a

3    comment about his tip to kitchen staff?

4            MR. HEILIG:   Object to the form.

5      A     Not that I can recall specifically.

6      Q     Okay.  Do you remember in your affidavit that you

7    made the allegation that Jose Farinos would also tell

8    kitchen employees that he was not required to share tips?

9      A     Yes.

10     Q     Okay.  Do you remember any specific instance where

11   you heard Mr. Farinos?

12     A     Pretty much every day.

13     Q     Okay.  When was the last time you heard

14   Mr. Farinos make a statement like that to the kitchen?

15     A     I mean, I can't recall any time specifically.

16     Q     Do you remember --

17     A     I would say towards the end of my working at

18   Saltwater Cowboys Jose was not working that much, but there

19   were a few busy nights towards the end in 2011, during the

20   summer where I remember him getting really bad about it

21   because he had been working there for so long, so he started

22   to get mouthy.

23     Q     Okay.  And which kitchen staff member did he

24   specifically tell that to?

25     A     Brian Pannone.



```
 1          Q     And do you remember what Mr. Farinos's statements
 2   were precisely to Mr. Pannone?
 3          A     If you don't get my dinners out fast enough or if
 4   you ruin something on my dinners, I'm not going to tip you,
 5   and I don't have to.
 6          Q     Do you know if Mr. Farinos ever decided not to tip
 7   the kitchen?
 8                MR. HEILIG:  Object to the form.
 9          A     Not that I can recall.
10          Q     Do you know if Mr. Farinos ever decided not to tip
11   the expo?
12                MR. HEILIG:  Object to the form.
13          A     Not that he did not tip the expo but that he may
14   have given like a dollar just -- just to be, you know --
15   just to prove a point.
16          Q     When did Mr. Farinos give a dollar?
17          A     He did it to me one time.  I think it was spring
18   break in 2009 or -- 2010.
19          Q     Do you know if Mr. Crowling ever decided not to
20   tip the expediter?
21                MR. HEILIG:  Object to the form.
22          A     Not that I can recall.
23          Q     Do you know if Mr. Crowling ever decided not to
24   tip the kitchen?
25                MR. HEILIG:  Object to the form.
```



```
 1        A     Not that I can recall.

 2        Q     Do you remember in your affidavit making a

 3   statement, "I did tell them we recommended a tipout of 20

 4   cents per dinner for the kitchen and 10 percent of tips for

 5   the expediter."

 6        A     Yes.

 7        Q     In that statement who did you mean by we?

 8        A     The trainees, everyone who's been -- who's been

 9   working there for a long time.  We all decided that that was

10   the rule because the expediter worked so hard and the

11   kitchen staff worked so hard, and we were always, you know,

12   close like family members there, so we agreed to, you know,

13   share a little extra money for the people who worked hard at

14   the restaurant.

15              MR. HEILIG:  Object to the form of that last

16   question, please.

17        Q     And what was the date that the senior servers got

18   together and made that decision?

19        A     That was -- that decision was made prior to my

20   employment at Saltwater Cowboys.

21        Q     And who made that decision?

22        A     I can't recall.

23        Q     Okay.  So were you told during your training that

24   other servers had made the decision to 20 cents per plate?

25              MR. HEILIG:  Object to the form.
```



Case 3:12-cv-01306-MMH-JRK   Document 114   Filed 02/18/14   Page 31 of 79 PageID 3084

DAVID KUBIAK, et al. vs. S.W. COWBOY, et al.                    DEPOSITION OF
RYAN E. MARCUM on 01/10/2014                                           Page 30

1       A    Not that I can recall.

2       Q    Okay.  And do you have any independent knowledge

3   as to where the 20 cents per plate recommendation came from?

4            MR. HEILIG:  Object to the form.

5       A    No, not that I can recall.

6       Q    So then, your activities as a server, did you

7   typically tip out the kitchen 20 cents per plate?

8       A    Yes.

9       Q    Did you ever deviate from that 20 cents per plate?

10      A    No.

11      Q    Why not?

12      A    Because I always felt like the kitchen staff

13  worked really hard.  You know, as an expediter I always saw

14  that they worked very hard, and they were there all the time

15  for usually longer hours than we were, and, you know,

16  obviously the kitchen staff has been working there for a

17  long time, they perform very well, so I always gave them

18  what I felt they deserved.

19      Q    Did you ever tip the kitchen more than 20 cents

20  per plate?

21           MR. HEILIG:  Object to the form.

22      A    No.

23      Q    Why not?

24      A    Just because I felt like 20 percent was a

25  reasonable amount.



Case 3:12-cv-01306-MMH-JRK   Document 114   Filed 02/18/14   Page 32 of 79 PageID 3085

DAVID KUBIAK, et al. vs. S.W. COWBOY, et al.                    DEPOSITION OF
RYAN E. MARCUM on 01/10/2014                                    Page 31

1       Q      Okay.  You said 20 percent?

2       A      Or 20 cents per plate, I'm sorry.  Even though it

3   wasn't very much money, it always meant a lot to them at the

4   end of the month, so --

5       Q      Back in 2008 when you were trained by J.D. Dixon

6   and Jessica Barnes-Turner, what did they tell you about how

7   the kitchen tips were distributed?

8       A      The kitchen -- they told me, as I said before, the

9   bar/bus was pre-configured in our reading, and there were

10  separate sections for food, liquor, beer, wine.  We added

11  that up for the bar/bus, and then, like I said, expediter,

12  kitchen tips were kept separate on the allocation sheet for

13  a reason, because that was something that we modified

14  ourselves.  It was not modified in the reading.  You know,

15  we based it on how many dinners the kitchen put out for us,

16  you know.  We just -- basically that was a -- like -- like

17  to give them an idea of what they should tip every night, an

18  easy way to figure it out, like however many dinners came

19  out.

20      Q      And when you were training servers at Saltwater

21  Cowboys during the shadowing process, did you ever have the

22  new trainer -- or the new trainee fill out the tip

23  allocation sheet for you?

24      A      No.

25      Q      Did you ever monitor -- monitor the new trainee in



1   filling out the tip allocation sheet?

2        A    Yes, yes.

3        Q    Would that happen during -- while they were

4   shadowing you or afterwards?

5        A    Both.  Towards the end, of course, they would be

6   waiting the tables and I would be shadowing them.  So at the

7   end of their shift, you know, before I put them out on the

8   floor by themselves, I made sure that they knew how to

9   accurately complete their tip allocation form.

10       Q    Okay.  And would you -- after you've trained a new

11  trainee, would you tell the manager that they were

12  proficient?

13       A    Yes.

14       Q    At Saltwater Cowboys who would that be?

15       A    Jennifer.

16       Q    Do you know if Jen would monitor their performance

17  alongside you monitoring their performance?

18       A    Yes.

19            MR. HEILIG:  Object to the form.

20       Q    That happened with every training?

21       A    Yes.

22       Q    Do you know if Jen monitored the tip allocation

23  sheets of a new trainee?

24       A    Yes, just to ensure that they were filling out

25  everything accurately and, you know, accounting for all the



Case 3:12-cv-01306-MMH-JRK  Document 114  Filed 02/18/14  Page 34 of 79 PageID 3087

DAVID KUBIAK, et al. vs. S.W. COWBOY, et al.                    DEPOSITION OF
RYAN E. MARCUM on 01/10/2014                                        Page 33

1   tips that they made for, you know, legal purposes.

2       Q    When a server is filling out the tip allocation

3   sheet at the end of the evening, is it acceptable to leave

4   any of the boxes blank?

5            MR. HEILIG:  Object to the form.

6       A    Yes, it would be acceptable, the kitchen and

7   expediter, but, you know, that -- it would always be, you

8   know -- Jennifer wanted to make sure that she was accounting

9   everything appropriately, and she wanted to make sure, you

10  know, that the server forgot to write down how much they

11  were giving the expediter or the kitchen tip.  So if

12  anything was ever left blank, it was Jen making sure she was

13  accurately recording all of the numbers.

14      Q    Okay.  So as a server did you ever turn in a tip

15  allocation sheet with a form that's blank?

16      A    No.

17      Q    Do you have any independent recollection of

18  anybody who did fill out a tip allocation sheet with a blank

19  form on it?

20           MR. HEILIG:  Object to the form.

21      A    No.

22      Q    Did you ever hear Ms. Barnes -- or, sorry,

23  Ms. Bryant tell a server to go back and fill out the

24  remainder of the boxes that they left blank?

25      A    No.



1      Q    When you were originally trained back in 2008,

2   what were you told about how the kitchen money was

3   distributed?

4      A    The kitchen money was kept separate from

5   everything else.  At the end of the night all of the -- for

6   what everyone wrote down what they were giving the kitchen

7   staff, Jen would then add it up from everyone's sheet, and

8   that total would have to match -- or, yeah, she would write

9   it down on one sheet of paper, she would add everything up,

10  and that money would be kept separate and distributed

11  equally between the kitchen staff at the end of the month.

12     Q    Okay.  Was that part of your training back in 2008

13  that you learned that?

14     A    No.

15     Q    And when you train new servers, would you explain

16  to them how the kitchen tips were going to be distributed

17  among the kitchen employees?

18     A    Yes.

19     Q    What did you say?

20     A    I told them that whatever we decided to tip the

21  kitchen staff would be collected for the whole month.  Then

22  at the end of the month it would be equally distributed.

23     Q    Equally distributed among whom?

24     A    Among any of the kitchen staff who had been

25  working for that month.



Suite 300, The Elks Building
207 North Laura Street
Jacksonville, FL 32202
904.783.3300
www.DiscoveryLit.com

1       Q    Okay.  Who were included as the kitchen staff that

2  were working that month?

3       A    Anybody who worked -- any part of the kitchen who

4  worked the nights, the night shifts.  Not the day prep

5  shifts, just the night shift, as far as I know.

6       Q    And what are some of the job titles when in the

7  kitchen working the night shift?

8       A    Grill cook, fry cook, floater -- honestly, I can't

9  recall if the dishwashers got any of that tip, any of that

10  tip, but I don't think they did.

11       Q    Were you ever made aware that the tips to some of

12  the kitchen staff would be withheld?

13       A    No.

14       Q    When you were filling out your own tip allocation

15  sheets for the night as a server at Saltwater Cowboys, did

16  you ever request that somebody give an extra amount of tips?

17       MR. HEILIG:  Object to the form.

18       A    No.

19       Q    When you were filling out your tip allocation

20  sheet as a server at Saltwater Cowboys, did you ever request

21  that one of the kitchen staff receive none of that tip?

22       A    No.

23       Q    Was it possible to separate the tip -- the kitchen

24  tips in any manner whatsoever?

25       A    No.



Case 3:12-cv-01306-MMH-JRK   Document 114   Filed 02/18/14   Page 37 of 79 PageID 3090

DAVID KUBIAK, et al. vs. S.W. COWBOY, et al.                    DEPOSITION OF
RYAN E. MARCUM on 01/10/2014                                        Page 36

1          MR. HEILIG:  Object to the form.

2     Q    At the end of the night did you ever go to any of

3  the kitchen staff and give them an extra couple of bucks?

4     A    No.

5     Q    Why not?

6     A    Because that would have had to have been recorded

7  for legal purposes.  If I decided to modify that tip, I

8  would have told Jen to correct it on my sheet.

9     Q    Okay.  So in order to change the tip, you would

10  have needed Jen's input?

11          MR. HEILIG:  Object to the form.

12     A    Not her -- not her input.  I would need to

13  re-collect my allocation sheet and change how much I decided

14  to tip the kitchen staff.  I would never just go back and

15  hand them a couple of dollars.

16     Q    Did you ever do that?

17     A    No.

18          MR. HEILIG:  Object to the form.

19     Q    At the end of the night when you were doing your

20  tip allocation and your checkout process, did the manager

21  collect the expo tips, too?

22     A    No.

23     Q    Okay.  What were servers supposed to do with the

24  expo tips?

25     A    They were supposed to bring it directly to the



1   expediter.

2        Q    Why, then, would you write down the expo tips on

3   the tip allocation sheet?

4        A    Just so Jen would have it for accuracy.  And at

5   the end of the night the expediter would go and tell Jen how

6   much he or she made, and Jen would make sure it was accurate

7   based on what the servers wrote down so she, you know, knew

8   that she was accurately recording everything that was tipped

9   out.

10       Q    Okay.  Was there ever a problem or a discrepancy

11  between the amount of money -- strike that.  When you were

12  working as an expo, was there ever a discrepancy between the

13  money that you actually received and the money that was

14  supposed to be given to the expo?

15            MR. HEILIG:  Object to the form.

16       A    No.

17       Q    While you were working at Saltwater Cowboys from

18  2008 to 2012, you worked as a server and an expediter.  Did

19  you work any other positions?

20       A    Yes.

21       Q    Which positions did you work?

22       A    Pretty much everything.  Bartender, busser, host,

23  server, expediter, everything except for kitchen.  Well, I

24  did wash dishes.

25       Q    Did you wash dishes a lot or --



Case 3:12-cv-01306-MMH-JRK   Document 114   Filed 02/18/14   Page 39 of 79 PageID 3092

DAVID KUBIAK, et al. vs. S.W. COWBOY, et al.                    DEPOSITION OF
RYAN E. MARCUM on 01/10/2014                                           Page 38

1       A    Occasionally.

2       Q    And when you were washing dishes, did you receive

3   tips?

4       A    No.

5       Q    Why didn't you receive tips for washing dishes?

6            MR. HEILIG:  Object to the form.

7       A    I really don't know.  I always received -- I

8   always received, you know, whatever the base pay for a

9   kitchen member would be.

10      Q    Do you know if other dishwashers received tips

11  from the kitchen tip pool?

12           MR. HEILIG:  Object to the form.

13      A    I don't believe so.

14      Q    If it were that other dishwashers did receive tips

15  from the kitchen pool, why -- why would you being a

16  dishwasher be different?

17           MR. HEILIG:  Object to the form.

18      A    I don't understand.

19      Q    If you assume for a second that other dishwashers

20  who are regular dishwashers did receive kitchen tips, why

21  would it be different when you were working as a dishwasher

22  not to receive kitchen tips?

23           MR. HEILIG:  Object to the form.

24      A    I really honestly didn't think that the

25  dishwashers did receive tips.  And if they did, that was



1    something that they -- they were -- they were kitchen staff

2    members.  I was a server, you know, willing to wash dishes

3    for a night to help out, and I wasn't given any tips.

4         Q    Has anyone in management or owners -- ownership of

5    the restaurants ever told you that there was a vote taken

6    with respect -- with respect to the kitchen tips?

7              MR. HEILIG:  Object to the form.

8         A    No, not that I can recall.

9         Q    And at the end of the night when you're handing

10   in -- during the checkout process when you were handing in

11   your tip allocation form and your cash, did the manager on

12   duty ever double check your tip allocation form?

13             MR. HEILIG:  Object to the form.

14        A    Only for accuracy for her recording.

15        Q    What would happen if there was some inaccuracy on

16   the form?

17        A    Jen would just double check with the server to

18   make sure that whatever information wrote down was -- was

19   accurate.

20        Q    And if it was inaccurate, what would happen?

21        A    Depending on what it was.  I mean, the kitchen and

22   expediter tips, that -- you know, that was voluntary, so if

23   you, you know, wrote down your cash sales wrong or if it

24   didn't look like it added up right, Jen would make sure she

25   was accurately recording all of the data every night.



1      Q      Do you know if Jen ever asked a server to give

2   more in kitchen tips?

3      A      Absolutely not.

4      Q      You don't know or --

5      A      Absolutely not.  No, she would never.

6      Q      Do you know if Jen ever told a server to go back

7   and fill out the kitchen tip box?

8      A      No.

9             MR. HEILIG:  Object to the form.

10     Q      Do you know if any manager on duty ever did a

11  checkout for a server at the end of the night?

12     A      No.

13     Q      You don't know or that never happened?

14     A      No, that never happened.

15     Q      Did a manager on duty ever run a Summary of Sales

16  report for a server?

17     A      No, sir.  We always did that on our -- we always

18  printed out our cash report at the end of the night on our

19  own.  The tip allocation sheets were something that we were

20  supposed to fill out.

21            MR. HEILIG:  It's right at an hour.  Do you want

22  to take five minutes to --

23            MR. WILLIAMS:  Sure.  Let me get my exhibits

24  together a little bit, and we'll go ahead, use the bathroom

25  and --



```
 1              MR. HEILIG:  How much more do you think you've

 2   got?

 3              MR. WILLIAMS:  We'll see.

 4              MR. HEILIG:  Okay.

 5              (Recess)

 6              (Plaintiffs' Exhibit No. 1 was marked for

 7   identification.)

 8              MR. WILLIAMS:  Back on the record.

 9              MR. HEILIG:  Ready to go.

10   BY MR. WILLIAMS:

11       Q    When you were working over at Creekside Dinery

12   during the fall of 2011, did any manager ever check out for

13   a server at the end of the night?

14       A    No.

15       Q    How would you know if a manager checked out for a

16   server?

17              MR. HEILIG:  Object to the form.

18       A    I -- I don't -- I mean, it never happened, so I

19   guess there would have really never been a way for me to

20   know.

21       Q    I show you Plaintiffs' Exhibit 1.  Does this

22   appear to be a Creekside Dinery Summary of Sales report?

23       A    Yes.

24       Q    Is it dated November 9th, 2011?

25       A    Yes.
```



1        Q        Okay.  And it's for a server number 51 named

2    Johnny?

3        A        Uh-huh (affirmative).

4        Q        Do you know who Johnny is?

5        A        No.

6        Q        And underneath it says "By MOD."  What does that

7    stand for?

8        A        Manager on duty.

9        Q        Okay.  Does this indicate to you that the manager

10   on duty printed out this Summary of Sales report?

11       A        I suppose so.

12                MR. HEILIG:  Object to the form.

13       Q        When you printed out your own Summary of Sales

14   reports, did it say, you know, by Marcum or by Ryan or by

15   anybody?

16       A        I mean, I can't recall, but I guess it would say

17   that if -- if it was me who printed it out.  If -- if a

18   manager ever printed out a sales report for someone, it

19   would be because they were voiding some things off or fixing

20   a check for someone, and then, you know, the manager would

21   ask, Are you ready to do your checkout, and the manager

22   would print it for them and hand it to them.

23                (Plaintiffs' Exhibit No. 2 was marked for

24   identification.)

25       Q        Mr. Marcum, I'd like to present this to you as



1    Plaintiffs' Exhibit 2.  Do you recognize these?

2        A    Yes.

3        Q    Okay.  I'd like you to take a minute to go through

4    the entire pamphlet here, all the pages, ensuring that the

5    Summary of Sales report behind each tip allocation sheet is

6    correct.

7             MR. HEILIG:  Object to the form.

8        Q    Is applicable to this tip allocation sheet.

9             (Witness complies)

10       A    Yes.

11       Q    Okay.  Does this appear that you used the 20 cents

12   per meal for each -- for completing each of these tip

13   allocation sheets?

14       A    Yes.

15            MR. HEILIG:  Object to the form of that last

16   question.

17       Q    Mr. Marcum, do you know who Amanda Scobee is?

18       A    If I saw her face, I might, but I don't recall the

19   name.

20       Q    All right.  Do you know who Beverly Hughes or

21   Beverly Ginn is?

22       A    Yes.

23       Q    Who is she?

24       A    She is the daytime food prep manager, as far as I

25   recall.



1       Q    Okay.  And who is Chad Levelle?

2       A    He is a member of the Saltwater Cowboys kitchen

3 staff.

4       Q    What is his primary duties?

5       A    Basically wherever in the kitchen he was assigned

6 to, grill, broiler, fryer.

7       Q    Could he be a -- I'm sorry.  Didn't mean to cut

8 you off.

9       A    That's okay.

10      Q    So Mr. Levelle, Chad Levelle would be a floater?

11      A    Yes.

12      Q    And what about Johnny Martin, are you familiar

13 with him?

14      A    Yes.

15      Q    And what was his job duties at Saltwater Cowboys?

16      A    He would mostly wash dishes and be a floater.  I

17 don't recall ever seeing him -- he might have worked on the

18 line for the fryers maybe a few times.

19      Q    What about Lee Tillman, who's that?

20      A    I do not know.  If you had their nicknames, I

21 might.

22      Q    Who is Richie Evland?

23      A    Richie is also a member of Saltwater Cowboys

24 kitchen staff.

25      Q    What job -- what job does he do for the kitchen



1    staff?

2          A    He would, towards the end of my employment at

3    Saltwater Cowboys, he started working on the grill, but

4    mostly he would be a floater or working on the fryers.

5          Q    What about Tom Rossback?

6          A    Tom Rossback, when I first started working at

7    Saltwater Cowboys, was the lead head manager of the night --

8    the night crew kitchen staff, and I briefly -- I moved to

9    Atlanta and came back, got my job back, and while I was gone

10   he, I guess, had some medical problems and was unable to

11   work.

12         Q    And who is Tom Ward?

13         A    Tom --

14         Q    Ward, W-a-r-d?

15         A    I do not know.

16              (Plaintiffs' Exhibit No. 3 was marked for

17   identification.)

18              MR. WILLIAMS:  I'd like to introduce Plaintiffs'

19   Exhibit 3.

20         Q    Does this appear to be your tip allocation sheets

21   and corresponding Summary of Sales reports for a few weeks

22   in January 2009?

23         A    Yes.

24         Q    Okay.  Just for clarity, that's at Saltwater

25   Cowboys, correct?



Case 3:12-cv-01306-MMH-JRK   Document 114   Filed 02/18/14   Page 47 of 79 PageID 3100

DAVID KUBIAK, et al. vs. S.W. COWBOY, et al.                    DEPOSITION OF
RYAN E. MARCUM on 01/10/2014                                    Page 46

```
 1        A    Yes.
 2        Q    And from looking at these Summary of Sales reports
 3   and tip allocation sheets, does it appear that you used the
 4   20 cents per entree calculation in creating the kitchen
 5   tips?
 6        A    Yes.
 7        Q    Turning to six pages back, to tip allocation sheet
 8   for the day of January 17th, 2009, the net tips that you
 9   received that day appear to be $90.02.
10             MR. HEILIG:  I got -- my sixth page is a
11   summary -- seventh page maybe, Ben.
12             MR. WILLIAMS:  It might be the seventh.
13        A    Where it says "Expo" on Sunday?
14        Q    It's just crossed out on Sunday?  It doesn't
15   say -- oh, it says "Expo" on Sunday?
16        A    Yes, yes, yes.
17        Q    Okay.  Are you looking at the same sheet?
18        A    Yes.
19        Q    Okay.  Looking at the entry for Saturday, is that
20   your handwriting?
21        A    On Bar, Bus?
22        Q    Throughout the entire --
23        A    Yes.
24        Q    Okay.  And where it's crossed out there under Bar,
25   Bus, "18.55" is crossed out.  Do you see a number below it,
```



Case 3:12-cv-01306-MMH-JRK   Document 114   Filed 02/18/14   Page 48 of 79 PageID 3101

DAVID KUBIAK, et al. vs. S.W. COWBOY, et al.                          DEPOSITION OF
RYAN E. MARCUM on 01/10/2014                                         Page 47

1    "17.64"?

2         A    Yes.

3         Q    Is that your handwriting?

4         A    No.

5         Q    Who's handwriting is that?

6         A    I believe it would be Jennifer's.

7         Q    Okay.  Is this an example where she would check

8    and make corrections to your tip allocation sheets?

9              MR. HEILIG:  Object to the form.

10        A    Only if I gave her permission to, because I may

11   have -- I must have added my bar/bus tips -- I must have

12   calculated it wrong.  So she double checks everything just

13   to make sure, like I said, like she's accounting everything

14   accordingly.  And the bar/bus was something that I could not

15   modify, so, of course, she would then change it.

16        Q    Okay.  And going to --

17        A    With my permission.

18        Q    And going to the front, the third page -- starting

19   from the beginning, the third page in appears to be your tip

20   allocation form for -- over the week of January 9th, 2009,

21   is that right?

22        A    Uh-huh (affirmative).

23        Q    Your first net tip on Friday is 56.12?

24        A    Oh, yes, yes.

25        Q    Okay.  Going down to Wednesday, is that your



1    handwriting in that Wednesday block?

2        A    Yes.

3        Q    Okay.  Going over to the Expo, it appears that the

4    expo number was changed from 8 to 9.  Is that your

5    handwriting?

6        A    Yes.

7        Q    Okay.  So that "9" is your handwriting?

8        A    Yes.

9        Q    Do you remember this date specifically?

10           MR. HEILIG:  Object to the form.

11       A    No, I don't.  It may have been to where I had a

12   few extra ones in my other pocket, so I decided to, you

13   know, modify my tip and change it.

14           (Plaintiffs' Exhibit No. 4 was marked for

15   identification.)

16           MR. WILLIAMS:  Introduce Plaintiffs' Exhibit 4.

17       Q    Does this appear to be your tip allocation sheets

18   and Summary of Sales reports for two weeks of May 2011?

19       A    Yes.

20       Q    And again, you used the 20 cents per entree

21   calculation for all the kitchen tips?

22       A    Yes.

23       Q    Turning to the front page, do you see on the

24   Friday where your net tips were $9?

25       A    Uh-huh (affirmative).



1      Q      There seems to be a cross out in the Expo portion.

2      A      Right.

3      Q      Is that your handwriting underneath it?

4      A      Yes.

5      Q      Okay.  Why did you cross that out?

6      A      I may have just decided to change -- change the

7  tip.  I might have, you know, added up my money wrong that I

8  had in my pocket.  Obviously, it looked like it wasn't a

9  very good day, but I still feel like the expo deserved a

10  good tip, but maybe not as good as I had written before.

11             (Plaintiffs' Exhibit No. 5 was marked for

12  identification.)

13             MR. WILLIAMS:  I'd like to introduce Plaintiffs'

14  Number 5.

15      Q      And briefly look through this and make sure they

16  are tip allocation sheets and corresponding Summary of Sales

17  reports for several weeks of March 2010.

18      A      Okay.

19      Q      And, again, does it appear that you used the 20

20  cents per entree in completing each of the kitchen tip

21  allocations for each of the weeks?

22      A      Yes.

23      Q      That was Exhibit 5, correct?

24      A      Yes, that was 5.

25             (Plaintiffs' Exhibit No. 6 was marked for



Case 3:12-cv-01306-MMH-JRK   Document 114   Filed 02/18/14   Page 51 of 79 PageID 3104

DAVID KUBIAK, et al. vs. S.W. COWBOY, et al.                    DEPOSITION OF
RYAN E. MARCUM on 01/10/2014                                         Page 50

```
 1   identification.)
 2       Q    Mr. Marcum, I'd like to show you Plaintiffs'
 3   Exhibit 6.  Does this appear to be tip allocation forms with
 4   corresponding Summary of Sales reports for several weeks of
 5   January 2010?
 6       A    Yes.
 7       Q    And in completing each of the tip allocation forms
 8   did you use the 20 cents per entree calculation for kitchen
 9   tips?
10       A    Yes.
11       Q    Now, looking through Exhibits 1 through 6 and all
12   of the different tip allocation sheets that are yours,
13   obviously note that Exhibit 1 does not count, in here does
14   it appear that you ever left any of the tip boxes blank?
15       A    No.
16       Q    And turning to -- I believe it's Exhibit 2.  I
17   don't have it marked on my sheet -- the Creekside Dinery
18   allocation forms.
19       A    I believe it's 2.
20       Q    Yeah, number 2.
21            MR. HEILIG:  That's right.
22       Q    Going through this, it appears on several
23   occasions you wrote a circle with a line through it.  What
24   was that intended to mean?
25       A    On Expo?
```



DAVID KUBIAK, et al. vs. S.W. COWBOY, et al.
RYAN E. MARCUM on 01/10/2014

DEPOSITION OF
Page 51

```
1        Q    Well, looking at the first tip allocation sheet
2   that we have here, on Saturday you wrote a circle with a
3   line through it under Cash Tips/Cash Sale.  What is that
4   supposed to mean?
5        A    That would have meant that throughout the night I
6   only received payments by credit card.  So that night I
7   didn't receive any cash sales and no cash tips.
8        Q    Okay.  Then the following day, Sunday, in the Expo
9   box you have a circle with a line through it.  What does
10  that mean?
11       A    That would mean that there was not an expo working
12  that day.  And if it was in January, that would make sense,
13  or even November.  On busy nights -- you know, on slower
14  nights there may not have been an expediter working.
15       Q    Now, when you were training servers at Creekside
16  Dinery, do you have any paperwork that you complete after
17  you've trained new servers?
18            MR. HEILIG:  Object to the form.
19       A    No.
20       Q    Okay.  Earlier you testified that after you're
21  done training somebody you shadow them and review their
22  work, is that right?
23       A    Yes.
24       Q    Okay.  And in reviewing their work, did you ever
25  correct anybody's kitchen tips?
```



Suite 300, The Elks Building
207 North Laura Street
Jacksonville, FL 32202
904.783.3300
www.DiscoveryLit.com

```
 1        A    No.

 2        Q    Do you remember if the kitchen tips were ever

 3   outside of the 20 cents per entree guideline?

 4        A    Not that I can recall.

 5             MR. HEILIG:  Object to the form.

 6        Q    And in reviewing new trainees' tip allocation

 7   sheets when you were shadowing them, did you ever change

 8   anybody's expo tips?

 9        A    No.

10        Q    Do you remember if any of the trainees put in more

11   or less than 10 percent --

12             MR. HEILIG:  Object to the form.

13        Q     -- of the tips for the expo?

14        A    Yes, but that was up to their discretion, what

15   they decided to tip.

16             MR. HEILIG:  Sorry to interrupt, Ben.

17        Q    Is it possible that servers that you trained were

18   not aware that the kitchen tip was voluntary?

19             MR. HEILIG:  Object to the form.

20        A    No.  No, because I -- it was always explained to

21   everyone that the kitchen and expo tips were kept separate

22   on the thing.  They were not -- if they were meant to be --

23   you know, if it was not voluntary, obviously I think that it

24   would have been configured all together and then distributed

25   by the manager.  Because there's a separate box for kitchen
```



1  and a separate box for expo, we explain because that is

2  something that you can figure out on your own, what you feel

3  like the kitchen deserves, what you feel like the expo

4  deserves based on their performance through the night.

5      Q    If Jessica Barnes-Turner testified that she was

6  unaware that the kitchen tip was voluntary until December

7  2012, how is it that she would be unaware but all of the

8  other servers that you trained were aware of it?

9           MR. HEILIG:  Object to the form.

10     A    Whoever trained her may have not -- may have not

11 added that.  Jessica Barnes-Turner was working -- has been

12 employed there for a lot longer than I have, but the way I

13 was taught to train servers was to tell them that the

14 kitchen and expo tip was voluntary, and it was based on what

15 you felt like they deserved.

16     Q    And who taught you how to train servers?

17     A    Jessica and J.D. and Jennifer.

18     Q    If Jessica was unaware that the kitchen tip pool

19 was voluntary, how would she tell you anything different?

20          MR. HEILIG:  Object to the form.

21     A    I can't recall whether she told me that or not

22 specifically, but I do know that the way I learned it was

23 that it was voluntary.

24     Q    Earlier you testified that you trained Michael

25 Hoolahan, is that correct?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

Suite 300, The Elks Building
207 North Laura Street
Jacksonville, FL 32202
904.783.3300
www.DiscoveryLit.com

1        A    Uh-huh (affirmative).

2        Q    If Michael Hoolahan has testified that he was

3   unaware that the kitchen tip pool was voluntary, how would

4   that be if you told it to every server that you trained?

5             MR. HEILIG:  Object to the form.

6        A    I honestly wouldn't -- I don't think I believe

7   that because I definitely told everyone, you know, exactly

8   how it was supposed to be.  They knew that if they were, you

9   know, questioning anything of how much they should tip that

10  there was always someone available to help them.  You know,

11  usually the expediter was not doing anything at the end of

12  the night.  The bartender or whoever, there was always

13  someone that could help them, and I always offered to make

14  copies of my allocation sheets and, you know, write and

15  explain, just so they can go home and make sure they get it

16  right.  So if Michael Hoolahan was to say that he was

17  unaware, then that would mean that he wasn't paying

18  attention to what I was saying to him.

19       Q    And earlier you testified that you have not

20  deviated from the 20 cents per meal calculation, is that

21  right?

22            MR. HEILIG:  Object to the form.

23       A    Right.

24       Q    So if you made copies for people that emulate your

25  tip allocation forms, wouldn't they be copying the 20 cents



Case 3:12-cv-01306-MMH-JRK   Document 114   Filed 02/18/14   Page 56 of 79 PageID 3109

DAVID KUBIAK, et al. vs. S.W. COWBOY, et al.                    DEPOSITION OF
RYAN E. MARCUM on 01/10/2014                                           Page 55

1    per meal calculation?

2             MR. HEILIG:  Object to the form.

3        A    They would only be copying what I decided to tip

4    the kitchen staff, which is what I would explain to them.  I

5    would say, This is what I give them, 20 cents a plate, and

6    this is what, you know, mostly everyone else decides to give

7    the kitchen.  So this is an easy way to explain it to you

8    because this is the way that I do it, and this is, you

9    know -- this is in my opinion a correct way to tip the

10   kitchen and expediter tip.

11       Q    And as a senior server, do you think that your

12   recommendation of 20 cents per plate is -- carries some

13   weight?

14            MR. HEILIG:  Object to the form.

15       A    I'm sorry.  What do you mean by that?

16       Q    Well, do you think that, you know, it would be

17   influential to a server who's never worked in a restaurant

18   before?

19            MR. HEILIG:  Object to the form.

20       A    No.

21       Q    Why not?

22            MR. HEILIG:  Object to the form.

23       A    I mean, I really don't know.  I just think that,

24   you know, this -- that they got a job, this is the

25   restaurant they are working at, and this is the way that I



1   explain it to them, this is how we do things.  And, you

2   know, like I said, I always told them that it was voluntary,

3   the kitchen and expo tip was voluntary.  And even though I

4   showed them the way I did it, I would always explain to

5   them, you know, This is not what you have to tip the

6   kitchen, you do not have to give them as much as I gave

7   them.

8       Because I'm an expediter, I know how hard the job is,

9   so I always, you know, tip very well to the expediter.  So I

10   would always explain, you know, you don't have to tip what I

11   tip, but you do have to.  That's why I would always circle

12   the "Food, Wine, Beer, Liquor."  I would always circle that

13   and tell them that's already been pre-configured for you,

14   and if you want to tip the kitchen staff, I recommend that

15   you base it on how many dinners.  And I would always circle

16   however many dinners I had on my sheet because that's the

17   way I always did it.

18      Q    And a new server wouldn't feel any peer pressure

19   to emulate the way you did your tip allocation sheets?

20      A    I think that if they did, then --

21         MR. HEILIG:  Object to the form.

22      A    -- maybe they should have, you know -- you know,

23   they always have the right to, you know, speak up and say

24   something, and if they didn't, then, I mean -- if they were

25   so concerned about how much money they were giving or



Case 3:12-cv-01306-MMH-JRK   Document 114   Filed 02/18/14   Page 58 of 79 PageID 3111

DAVID KUBIAK, et al. vs. S.W. COWBOY, et al.                    DEPOSITION OF
RYAN E. MARCUM on 01/10/2014                                         Page 57

1   whether it was legal or not, you know, why wasn't this

2   brought up before?  Why didn't you say something while I was

3   training you?

4       Q    And earlier I believe you testified that at the

5   end of the night during the checkout process the manager on

6   duty would write down the amount of money that each person

7   gave the kitchen tips, is that correct?

8       A    Yes.

9       Q    And would that be accompanied by a name?

10      A    I'm sorry.  Would that be accompanied by which

11  manager did that?

12      Q    Let me strike that.  That was a bad question.

13  When Jennifer was doing all the checkouts, you testified

14  that she would write down the amount of money that was

15  allocated to the kitchen, is that right?

16      A    Yes.

17      Q    Okay.  Do you ever remember seeing her do that?

18      A    Yes.

19      Q    Okay.  What kind of paper would she write it on?

20      A    She would write it on something that was, you

21  know, created by Saltwater Cowboys, and she would write down

22  however much -- it was basically broken apart by the week, I

23  think it was -- by the week, and each server's name and

24  whatever day it was, she would write down how much they

25  decided to give them.  There was never a set number that



1  should have matched up in the end because that was -- you

2  know, the number could be whatever it's going to be.

3      Q    Okay.  So the sheet would say, Ryan Marcum,

4  bar/bus, X amount, kitchen, Y amount, and expo, Z amount, is

5  that right?

6      A    Yes.

7      Q    What would Ms. -- what would Jennifer do with that

8  sheet at the end of the night?

9          MR. HEILIG:  Object to the form.

10     A    At the end of the night I believe it would go --

11  it would stay in -- on -- on her clipboard or wherever she

12  had it, and at the end of the week she would turn it in, and

13  at the end of the month, I guess, however much money was in

14  the tip pool for the kitchen should match up to whatever she

15  had written down based on what we decided to tip.

16         MR. WILLIAMS:  Mr. Marcum, I've got no further

17  questions.

18         MR. HEILIG:  He'll read.  No questions.

19         (The deposition was concluded at 2:06 p.m.)

20              -    -    -    -    -

21

22

23

24

25

**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

Suite 300, The Elks Building
207 North Laura Street
Jacksonville, FL 32202
904.783.3300
www.DiscoveryLit.com

Case 3:12-cv-01306-MMH-JRK   Document 114   Filed 02/18/14   Page 60 of 79 PageID 3113

DAVID KUBIAK, et al. vs. S.W. COWBOY, et al.                    DEPOSITION OF
RYAN E. MARCUM on 01/10/2014                                         Page 59

1

2                          CERTIFICATE OF OATH

3

4    STATE OF FLORIDA )

5    COUNTY OF DUVAL  )

6

7

8            I, the undersigned authority, certify that Ryan E.

9    Marcum personally appeared before me and was duly sworn.

10

11           WITNESS my hand and official seal this 15th day

12   of January, 2014.

13                              *Joan T. Gomes*

14

15           _____

16           JOAN T. GOMES, RMR

17

18

19

20

21

22

23

24

25



Suite 300, The Elks Building
207 North Laura Street
Jacksonville, FL 32202
904.783.3300
www.DiscoveryLit.com

Case 3:12-cv-01306-MMH-JRK   Document 114   Filed 02/18/14   Page 61 of 79 PageID 3114

DAVID KUBIAK, et al. vs. S.W. COWBOY, et al.          DEPOSITION OF
RYAN E. MARCUM on 01/10/2014                                Page 60

1          C E R T I F I C A T E

2

3     STATE OF FLORIDA )

4     COUNTY OF DUVAL)

5

6          I, Joan T. Gomes, Registered Merit Reporter,
      certify that I was authorized to and did stenographically
7     report the deposition of Ryan E. Marcum; that a review of
      the transcript was requested; and that the transcript is a
8     true and complete record of my stenographic notes.

9          I further certify that I am not a relative,
      employee, attorney or counsel of any of the parties, nor am
10    I a relative or employee of any of the parties' attorney or
      counsel connected with this action, nor am I financially
11    interested in the action.

12         I further certify that the original deposition
      will be delivered to Benjamin L. Williams, Esq., attorney
13    for Plaintiffs, for filing with the court or his
      safekeeping.

14         Dated this 15th day of January, 2014.

15

16                         *Joan T. Gomes*

17         _____

18                         JOAN T. GOMES, RMR

19

20

21

22

23

24

25



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

Suite 300, The Elks Building
207 North Laura Street
Jacksonville, FL 32202
904.783.3300
www.DiscoveryLit.com

Case 3:12-cv-01306-MMH-JRK   Document 114   Filed 02/18/14   Page 62 of 79 PageID 3115

DAVID KUBIAK, et al. vs. S.W. COWBOY, et al.                    DEPOSITION OF
RYAN E. MARCUM on 01/10/2014                                          Page 61

1    DEPOSITION ERRATA SHEET

2    Assignment No.  13364

3    Case Caption:  DAVID KUBIAK, et al.

4    vs.  S.W. COWBOY, INC., et al.

5    Witness: RYAN E. MARCUM - January 10, 2014

6        DECLARATION UNDER PENALTY OF PERJURY

7          I declare under penalty of perjury

8    that I have read the entire transcript of

9    my Deposition taken in the captioned matter

10   or the same has been read to me, and

11   the same is true and accurate, save and

12   except for changes and/or corrections, if

13   any, as indicated by me on the DEPOSITION

14   ERRATA SHEET hereof, with the understanding

15   that I offer these changes as if still under

16   oath.

17        Signed on the _____ day of

18   _____, 20____.

19   _____

20        RYAN E. MARCUM

21   Sworn to and subscribed before me this _____ day

22   of _____, 20___.

23   _____

24   Notary Public

25   My commission expires_____



DAVID KUBIAK, et al. vs. S.W. COWBOY, et al.
RYAN E. MARCUM on 01/10/2014

DEPOSITION OF
Page 62

```
 1              DEPOSITION ERRATA SHEET

 2    Page No._____Line No._____Change to:_____

 3    _____

 4    Reason for change:_____

 5    Page No._____Line No._____Change to:_____

 6    _____

 7    Reason for change:_____

 8    Page No._____Line No._____Change to:_____

 9    _____

10    Reason for change:_____

11    Page No._____Line No._____Change to:_____

12    _____

13    Reason for change:_____

14    Page No._____Line No._____Change to:_____

15    _____

16    Reason for change:_____

17    Page No._____Line No._____Change to:_____

18    _____

19    Reason for change:_____

20    Page No._____Line No._____Change to:_____

21    _____

22    Reason for change:_____

23

24    SIGNATURE:_____DATE:_____

25              RYAN E. MARCUM
```



Suite 300, The Elks Building
207 North Laura Street
Jacksonville, FL 32202
904.783.3300
www.DiscoveryLit.com

DAVID KUBIAK, et al. vs. S.W. COWBOY, et al.
RYAN E. MARCUM on 01/10/2014

DEPOSITION OF
Page 63

```
 1               DEPOSITION ERRATA SHEET

 2     Page No._____Line No._____Change to:_____

 3     _____

 4     Reason for change:_____

 5     Page No._____Line No._____Change to:_____

 6     _____

 7     Reason for change:_____

 8     Page No._____Line No._____Change to:_____

 9     _____

10     Reason for change:_____

11     Page No._____Line No._____Change to:_____

12     _____

13     Reason for change:_____

14     Page No._____Line No._____Change to:_____

15     _____

16     Reason for change:_____

17     Page No._____Line No._____Change to:_____

18     _____

19     Reason for change:_____

20     Page No._____Line No._____Change to:_____

21     _____

22     Reason for change:_____

23

24     SIGNATURE:_____DATE:_____

25            RYAN E. MARCUM
```







DAVID KUBIAK, et al. vs. S.W. COWBOY, et al.
RYAN E. MARCUM on 01/10/2014

DEPOSITION OF
Index: also..broiler

**also** 18:14 25:11 26:23,24 27:7 44:23

**always** 21:3 24:23 29:11 30:12,13,17 31:3 38:7,8 40:17 52:20 54:10,12,13 56:2,4,9,10,11, 12,15,17,23

**Amanda** 16:16 43:17

**among** 34:17, 23,24

**amount** 30:25 35:16 37:11 57:6,14 58:4

**announce** 18:12

**another** 4:22

**answer** 4:21

**answering** 4:15,21

**anybody** 5:25 33:18 35:3 42:15

**anybody's** 51:25 52:8

**anyone** 15:16 17:14,16 26:15 39:4

**anyone's** 24:14

**anything** 10:17 11:5,11 14:25 18:18 22:13 33:12 53:19 54:9,11

**apart** 57:22

**appear** 6:23 41:22 43:11 45:20 46:3,9 48:17 49:19 50:3,14

**appearance** 5:20

**appears** 47:19 48:3 50:22

**Applebee's** 8:2, 3,4,11

**applicable** 43:8

**approached** 23:23

**appropriately** 33:9

**April** 8:5

**area** 14:3

**areas** 12:4

**around** 8:5 11:23 13:11 20:10

**ask** 10:17 13:12 42:21

**asked** 9:24 10:2,12 11:2,8 14:7 17:20 19:7 22:16 23:23 25:16 40:1

**asking** 4:14,22 19:9,10,13,14, 15,17 25:19

**assigned** 9:14 44:5

**assist** 9:24

**assume** 38:19

**Atlanta** 45:9

**attention** 54:18

**August** 23:17

**Augustine** 6:19

**automatically** 18:10 21:22,23

**available** 54:10

**aware** 12:2 18:17 35:11 52:18 53:8

――――――――

**B**

**back** 5:10 9:23 17:18 18:8 19:25 26:22 31:5 33:23 34:1,12 36:14 40:6 41:8 45:9 46:7

**back-of-the-house** 15:11,20

**bad** 27:20 57:12

**bar** 12:9 46:21, 24

**bar/bus** 21:19, 23 31:9, 47:11, 14 58:4

**Barnes** 17:13 33:22

**Barnes-turner** 15:9 31:6 53:5, 11

**bartender** 37:22 54:12

**base** 12:13

38:8 56:15

**based** 21:9,20 31:15 37:7 53:4,14 58:15

**basic** 11:22

**basically** 10:15 11:18 12:23,25 24:3 31:16 44:5 57:22

**bathroom** 40:24

**because** 4:19 7:11,21 9:22 11:12 13:2,13, 21 20:24 21:7, 8, 22:19 24:9 27:21 29:10 30:12,24 31:13 36:6 42:19 47:10 52:20,25 53:1 54:7 56:8, 16 58:1

**beer** 31:10 56:12

**before** 4:11,20, 21 5:7,17 8:20 9:4 12:12 13:4 23:20 24:13 31:8 32:7 49:10 55:18 57:2

**begin** 5:7 9:4

**beginning** 47:19

**behalf** 4:3

**behind** 43:5

**being** 17:19 24:22 38:15

**believe** 7:6

38:13 47:6 50:16,19 54:6 57:4 58:10

**belongs** 13:8

**below** 46:25

**Ben** 4:6 46:11 52:16

**best** 25:23

**between** 37:11, 12

**Beverly** 43:20, 21

**beyond** 22:15

**birth** 6:16

**bit** 40:24

**blank** 33:4,12, 15,18,24 50:14

**block** 48:1

**Booty** 15:21

**both** 17:25 32:5

**bothering** 25:22

**box** 40:7 51:9 52:25 53:1

**boxes** 33:4,24 50:14

**break** 5:9 28:18

**Brian** 15:13 16:8 26:12 27:25

**briefly** 45:8 49:15

**bring** 36:25

**broiler** 44:6



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

Suite 300, The Elks Building
207 North Laura Street
Jacksonville, FL 32202
904.783.3300
www.DiscoveryLit.com

DAVID KUBIAK, et al. vs. S.W. COWBOY, et al.
RYAN E. MARCUM on 01/10/2014

DEPOSITION OF
Index: broken..cut

broken 57:22

brought 57:2

Bryant 9:8 15:9 33:23

bucks 36:3

bullet 11:4

bump 18:20 19:6,10,11

bumps 18:2,6, 23 19:18

bus 46:21,25

business 13:16

busser 37:22

busy 13:21 25:6,8,21 27:19 51:13

---

**C**

calculated 20:21 47:12

calculation 46:4 48:21 50:8 54:20 55:1

came 12:7 30:3 31:18 45:9

can't 24:17 25:5 26:22 27:15 29:22 35:8 42:16 53:21

Canfield 16:14

car 13:25 14:2

Carcaba 16:16

card 51:6

care 7:13

Carrabba's 8:2, 8,13

carries 55:12

case 23:15

cash 39:11,23 40:18 51:3,7

cents 23:2,9 29:4,24 30:3,7, 9,19 31:2 43:11 46:4 49:20 50:8 52:3 54:20,25 55:5,12

certain 14:3 22:11

Chad 44:1,10

change 36:9,13 47:15 48:13 49:6 52:7

changed 48:4

check 13:7 18:9 39:12,17 41:12 42:20 47:7

checked 41:15

checkout 36:20 39:10 40:11 42:21 57:5

checkouts 57:13

checks 47:12

Chip 16:20

circle 50:23 51:2,9 56:11, 12,15

clarity 45:24

clear 4:22

clipboard 58:11

close 29:12

cold 13:4

collect 36:21

collected 34:21

college 8:24,25 9:5

come 9:24 10:12,15 13:13 18:8 19:25

coming 5:24 6:5 24:25 25:22

comment 26:19 27:3

comments 26:18,20

company 13:17,18

complaint 24:14,19

complete 8:25 11:24 32:9 51:16

completing 43:12 49:20 50:7

complies 43:9

computer 21:8

concerned 24:11 56:25

concluded 58:19

concordant 14:17

configured 21:23 52:24

cook 35:8

copies 12:1 54:14,24

copy 6:11,12

copying 54:25 55:3

correct 7:7 16:2 20:4,11 23:18 26:25 36:8 43:6 45:25 49:23 53:25 55:9 57:7

corrections 47:8

corresponding 45:21 49:16 50:4

could 21:7 25:23 44:7 47:14 54:13 58:2

count 50:13

couple 36:3,15

course 11:22 13:7 15:24 18:18 32:5 47:15

court 4:16 19:4

Court's 19:24

Courtney 16:22

cover 12:5,15

covered 12:21

Cowboys 4:9 6:3 7:10 8:15

9:4,7 10:5 11:9,13 14:18, 21,24,25 15:8, 12 16:2 18:1 20:4 21:11 22:6,10 23:21 27:18 29:20 31:21 32:14 35:15,20 37:17 44:2,15,23 45:3,7,25 57:21

created 57:21

creating 46:4

credit 51:6

Creekside 4:10 9:12,14 10:8, 19 11:2,9, 12:15 14:16,22 15:1,2,19,25 17:20 18:1 41:11,22 50:17 51:15

crew 45:8

cross 49:1,5

crossed 46:14, 24,25

Crowling 4:8 25:14,15,19 26:10,17,24 28:19,23

Crowling's 24:25

current 6:18

currently 6:25

customers 11:20

cut 44:7







Nationwide Coverage

Suite 300, The Elks Building
207 North Laura Street
Jacksonville, FL 32202
904.783.3300
www.DiscoveryLit.com

Case 3:12-cv-01306-MMH-JRK   Document 114   Filed 02/18/14   Page 69 of 79 PageID 3122

DAVID KUBIAK, et al. vs. S.W. COWBOY, et al.                    DEPOSITION OF
RYAN E. MARCUM on 01/10/2014                                    Index: even..full

**even** 31:2
51:13 56:3

**evening** 33:3

**ever** 4:11 5:16
6:13 9:9,12
24:14 25:9
28:6,10,19,23
30:9,19 31:21,
25 33:12,14,22
35:11,16,20
36:2,16 37:10,
12 39:5,12
40:1,6,10,15
41:12 42:18
44:17 50:14
51:24 52:2,7
57:17

**every** 11:25
14:5 20:18
23:10 27:12
31:17 32:20
39:25 54:4

**everybody** 9:25
18:12 22:17

**everyone** 20:20
22:18 23:13
29:8 34:6
52:21 54:7
55:6

**everyone's**
34:7

**everything** 4:17
9:25 13:9
14:12 32:25
33:9 34:5,9
37:8,22,23
47:12,13

**everything's**
7:13

**Evland** 44:22

**exact** 24:25

**exactly** 54:7

**EXAMINATION**
4:4

**example** 47:7

**exceed** 19:7

**except** 37:23

**Exhibit** 41:6,21
42:23 43:1
45:16,19
48:14,16
49:11,23,25
50:3,13,16

**exhibits** 40:23
50:11

**expect** 5:11

**expediter**
12:15,18
20:23,25 21:4
22:3,7,19,22
24:23 25:10,18
28:20 29:5,10
30:13 31:11
33:7,11 37:1,5,
18,23 39:22
51:14 54:11
55:10 56:8,9

**expediters** 21:9

**experience**
17:18,19

**expertise** 10:16

**explain** 11:8
34:15 53:1
54:15 55:4,7
56:1,4,10

**explained**
11:24 52:20

**explaining**

11:19

**expo** 12:20,22
13:5 28:11,13
36:21,24 37:2,
12,14 46:13,15
48:3,4 49:1,9
50:25 51:8,11
52:8,13,21
53:1,3,14 56:3
58:4

**extra** 18:19
29:13 35:16
36:3 48:12

———————

**F**

**face** 43:18

**fall** 41:12

**familiar** 44:12

**family** 29:12

**far** 35:5 43:24

**Farinos** 24:19
27:7,11,14
28:6,10,16

**Farinos's** 28:1

**fast** 24:24
25:25 28:3

**February** 7:7
8:16,19

**feel** 10:14 49:9
53:2,3 56:18

**felt** 7:11 21:1
24:7 30:12,18,
24 53:15

**few** 9:22 27:19
44:18 45:21
48:12

**Fiddler's** 9:9

**fifth** 6:21

**figure** 31:18
53:2

**fill** 20:13 31:22
33:18,23 40:7,
20

**filling** 20:18
32:1,24 33:2
35:14,19

**finish** 4:20

**fired** 24:13

**first** 4:2 5:21
11:17,18,22
12:12 13:7
17:9 18:22
25:4 45:6
47:23 51:1

**five** 40:22

**fixed** 12:8

**fixing** 42:19

**floater** 35:8
44:10,16 45:4

**floor** 32:8

**Florida-georgia**
25:20 26:19

**follow** 20:10

**following** 11:18
51:8

**follows** 4:3

**food** 8:12,14
11:20 13:1,4,5,
13,15,20,22
31:10 43:24
56:12

**forget** 25:25

**forgot** 33:10

**form** 11:6,24
17:23 18:3,7
20:21 21:14,
16,17,25 22:4,
6 23:11 24:16,
21 25:16 27:4
28:8,12,21,25
29:15,25 30:4,
21 32:9,19
33:5,15,19,20
35:17 36:1,11,
18 37:15 38:6,
12,17,23 39:7,
11,12,13,16
40:9 41:17
42:12 43:7,15
47:9,20 48:10
51:18 52:5,12,
19 53:9,20
54:5,22 55:2,
14,19,22 56:21
58:9

**former** 6:2

**forms** 50:3,7,
18 54:25

**forward** 14:2

**found** 24:7,8

**four** 7:5

**Friday** 47:23
48:24

**front** 47:18
48:23

**front-of-the-
house** 15:7

**fry** 35:8

**fryer** 44:6

**fryers** 44:18
45:4

**full** 5:11,13



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

Suite 300, The Elks Building
207 North Laura Street
Jacksonville, FL 32202
904.783.3300
www.DiscoveryLit.com

DAVID KUBIAK, et al. vs. S.W. COWBOY, et al.
RYAN E. MARCUM on 01/10/2014

DEPOSITION OF
Index: fully..input

fully 4:21

further 58:16

_____

### G

gave 14:24
17:21 30:17
47:10 56:6
57:7

gets 13:4

getting 10:12
12:8 27:20

Ginn 43:21

give 11:3,10
14:11 21:9,20
24:24 26:1,2,8
28:16 31:17
35:16 36:3
40:1 55:5, 56:6
57:25

given 14:13
37:14 39:3

gives 22:18

giving 17:25
33:11 34:6
56:25

glance 13:11

going 4:14,15
5:11 12:20
16:4 24:3 28:4
47:16,18,25
48:3 50:22
58:2

gone 6:13 45:9

good 4:6
10:10,11 18:19
26:1,3 49:9,10

got 29:17 35:9
41:2 45:9

46:10 55:24
58:16

grade 6:21

graduate 9:2

Graham 17:1

gratting 18:20

gratuity 18:8,9,
10,13

Green 9:9

greet 11:20

grill 35:8 44:6
45:3

ground 4:14

group 18:23

guess 11:17
41:19 42:16
45:10 58:13

guideline 52:3

guidelines 11:4

_____

### H

hand 6:10
36:15 42:22

handbooks
11:4

handing 39:9,
10

handwriting
46:20 47:3,5
48:1,5,7 49:3

Hang 19:2

happen 12:6
32:3 39:15,20

happened 7:12
32:20 40:13,14

41:18

hard 22:20
29:10,11,
30:13,14 56:8

having 4:2

He'll 58:18

head 4:25 45:7

hear 33:22

heard 24:4
26:10 27:11,13

HEILIG 6:23
11:6 17:23
18:3,7,24 19:2,
11,15,19,23
20:1 21:14,17
22:4 23:11
24:16,21 25:16
27:4 28:8,12,
21,25 29:15,25
30:4,21 32:19
33:5,20 35:17
36:1,11,18
37:15 38:6,12,
17,23 39:7,13
40:9,21 41:1,4,
9,17 42:12
43:7,15 46:10
47:9 48:10
50:21 51:18
52:5,12,16,19
53:9,20 54:5,
22 55:2,14,19,
22 56:21 58:9,
18

help 9:16,21
10:8 13:15
39:3 54:10,13

here 4:16,19
5:20,22 43:4
50:13 51:2

here's 18:13

Hernandez 17:5

Hey 15:23

high 9:2

highest 8:22

highlight 18:15

hired 9:7,23

home 54:15

honestly 35:8
38:24 54:6

Hoolahan 16:24
53:25 54:2,16

host 37:22

hostess 12:9

hour 40:21

hours 30:15

house 5:23

how 5:19,22
6:20 7:4 11:8,
19,20,21 12:2,
7,8,9,12,13,17,
21,24 19:5
22:9 23:3, 24:9
31:6,15 32:8
33:10 34:2,16
36:13 37:5
41:1,15 53:7,
16,19 54:3,8,9
56:1,8,15,25
57:24

however 31:18
56:16 57:22
58:13

Hughes 43:20

_____

### I

I'd 11:12 42:25
43:3 45:18
49:13 50:2

I'm 4:14 10:10,
11 14:23 15:6
16:4 19:9,10,
13,17 25:19
28:4 31:2 44:7
55:15 56:8
57:10

I've 58:16

idea 31:17

identification
41:7 42:24
45:17 48:15
49:12 50:1

implemented
11:16

important 4:20

inaccuracy
39:15

inaccurate
39:20

included 18:10,
14,15,23 35:1

independent
30:2 33:17

indicate 42:9

influential
55:17

information
20:17 39:18

informed 21:3
23:8

input 36:10,12



DAVID KUBIAK, et al. vs. S.W. COWBOY, et al.
RYAN E. MARCUM on 01/10/2014

DEPOSITION OF
Index: instance..limit

**instance** 27:2, 10

**instructed** 10:7, 25

**intended** 50:24

**interrupt** 52:16

**introduce** 45:18 48:16 49:13

**involved** 5:16 21:24

**issue** 19:6,7,10

**it's** 4:19,22 12:25 15:23 26:6 40:21 42:1 46:14,24 50:16,19 58:2

**itself** 19:22

———————

**J**

———————

**J.D.** 17:15 31:5 53:17

**January** 9:20 45:22 46:8 47:20 50:5 51:12

**Jason** 24:25 25:14,15,19,22

**Jen** 32:16,22 33:12 34:7 36:8 37:4,5,6 39:17,24 40:1, 6

**Jen's** 36:10

**Jennifer** 9:8 14:15,22 15:9 18:12 32:15 33:8 53:17 57:13 58:7

**Jennifer's** 47:6

**Jessica** 15:9 17:13 31:6 53:5,11,17,18

**job** 8:11,17 13:14 21:1 35:6 44:15,25 45:9 55:24 56:8

**Johnny** 42:2,4 44:12

**join** 24:6

**Jonathan** 17:3

**Jose** 24:4,18 27:7,18

**Judy** 7:18,19 23:25

**just** 4:13,22 5:9 7:11,13 8:9 9:24 10:10,13, 15 11:7,22 12:9,23 13:22 18:16,24 20:10,22 24:8 25:16 28:14,15 30:24 31:16 32:24 35:5 36:14 37:4 39:17 45:24 46:14 47:12 49:6 54:15 55:23

———————

**K**

———————

**Kaley** 17:1

**Keating** 4:8

**kept** 20:23 21:6,18 25:22 31:12 34:4,10

52:21

**Key** 26:18

**kind** 4:13 13:11 19:16 20:10 57:19

**kitchen** 12:6 20:22,25 21:4, 10,12,15 22:3, 12 23:1 25:12 26:25 27:3,8, 14,23 28:7,24 29:4,11 30:7, 12,16,19 31:7, 8,12,15 33:6, 11 34:2,4,6,11, 16,17,21,24 35:1,3,7,12,21, 23 36:3,14 37:23 38:9,11, 15,20,22 39:1, 6,21 40:2,7 44:2,5,24,25 45:8 46:4 48:21 49:20 50:8 51:25 52:2,18,21,25 53:3,6,14,18 54:3 55:4,7,10 56:3,6,14 57:7, 15 58:4,14

**knew** 9:25 10:10 11:7,8, 11 24:9 32:8 37:7 54:8

**know** 5:9 10:13,17 11:21 12:7,11 13:3,7, 10,14,24,25 14:1,8,12 15:18,21 17:18,19 18:13,19

22:11,14,16 23:14 24:5,14 25:24 28:6,10, 14,19,23 29:11,12 30:13,15 31:14,16 32:7, 16,22,25 33:1, 7,8,10 35:5 38:7,8,10 39:2, 22,23 40:1,4,6, 10,13 41:15,20 42:4,14,20 43:17, 44:20 45:15 48:13 49:7 51:13 52:23 53:22 54:7,9,10,14 55:6,9,16,23, 24 56:2,5,8,9, 10,22,23 57:1, 21 58:2

**knowing** 13:1

**knowledge** 24:18 30:2

**knows** 10:10, 11

**Kropacek** 16:5, 6

**Kubiak** 4:7 24:19 25:14

**Kyle** 17:7

———————

**L**

———————

**Lance** 16:10

**last** 10:6 15:5, 18 27:13 43:15

**lawsuit** 4:9 5:17 24:7

**lead** 45:7

**learn** 18:5

**learned** 9:25 23:5 34:13 53:22

**learning** 10:15 13:1

**least** 22:14,18

**leave** 7:9 33:3

**Lee** 44:19

**left** 18:9,18 23:20 33:12,24 50:14

**legal** 33:1 36:7 57:1

**less** 17:21 52:11

**let** 4:13,15,20, 21 5:9 18:24 19:2 24:13 40:23 57:12

**let's** 8:10 20:2

**level** 8:22 12:10

**Levelle** 44:1,10

**like** 7:11 10:1, 14 11:11 13:19 21:23 25:8 28:14 30:12,24 31:11,16,18 39:24 42:25 43:3 45:18 47:13 49:8,9, 13 50:2 53:3, 15 56:2

**Lime** 26:18

**limit** 19:8



**DISCOVERY LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations

Nationwide Coverage

Suite 300, The Elks Building
207 North Laura Street
Jacksonville, FL 32202
904.783.3300
www.DiscoveryLit.com

DAVID KUBIAK, et al. vs. S.W. COWBOY, et al.
RYAN E. MARCUM on 01/10/2014

DEPOSITION OF
Index: limited..much

**limited** 19:4

**line** 18:24 19:3
44:18 50:23
51:3,9

**liquor** 31:10
56:12

**list** 16:4

**lists** 11:4

**literature** 11:11

**little** 29:13
40:24

**lived** 6:20

**long** 6:20,24
7:4 14:16
24:10 27:21
29:9 30:17

**longer** 30:15
53:12

**look** 39:24
49:15

**looked** 49:8

**looking** 46:2,
17,19 50:11
51:1

**looks** 13:20

**lost** 9:22

**lot** 26:9 31:3
37:25 53:12

—————

**M**

**made** 6:9 11:7,
25 14:11
24:14,19
26:17,18,19,
20,23,24 27:2,
7 29:18,19,21,
24 32:8 33:1

35:11 37:6
54:24

**make** 10:14
12:1 13:2,22
18:12,16 25:2
26:10 27:14
33:8,9 37:6
39:18,24 47:8,
13 49:15 51:12
54:13,15

**making** 9:24
29:2 33:12

**management**
39:4

**manager** 14:23
32:11 36:20
39:11 40:10,15
41:12,15 42:8,
9,18,20,21
43:24 45:7
52:25 57:5,11

**managers** 15:2,
8,11,20 24:15

**manner** 13:2
35:24

**many** 11:13
12:24 23:3
31:15,18
56:15,16

**March** 49:17

**Marcum** 4:1,6
5:15 6:13
19:17 42:14,25
43:17 50:2
58:3,16

**marked** 41:6
42:23 45:16
48:14 49:11,25
50:17

**Martin** 44:12

**match** 34:8
58:14

**matched** 58:1

**may** 7:7 8:5,9,
16 28:13 47:10
48:11,18 49:6
51:14 53:10

**maybe** 12:8
13:10,12 44:18
46:11 49:10
56:22

**Mcgraw** 16:20

**meal** 43:12
54:20 55:1

**meals** 23:3

**mean** 14:1
18:21 22:13
27:15 29:7
39:21 41:18
42:16 44:7
50:24 51:4,10,
11 54:17
55:15,23 56:24

**meant** 14:23
31:3 51:5
52:22

**medical** 45:10

**Melissa** 15:10
16:18

**member** 27:23
38:9 44:2,23

**members** 29:12
39:2

**mentioned**
26:18

**menu** 9:25
14:9,12

**Martin** continued—

**Michael** 53:24
54:2,16

**might** 13:21
43:18 44:17,21
46:12 49:7

**Mike** 16:14

**minute** 43:3

**minutes** 20:1
40:22

**Misstates** 23:11

**MOD** 42:6

**modified** 21:4,
7,16 22:7
31:13,14

**modify** 36:7
47:15 48:13

**money** 24:5,11
29:13 31:3
34:2,4,10
37:11,13 49:7
56:25 57:6,14
58:13

**monitor** 31:25
32:16

**monitored**
32:22

**monitoring**
32:17

**month** 8:9 31:4
34:11,21,22,25
35:2 58:13

**months** 7:5

**more** 17:21
18:10 30:19
40:2 41:1
52:10

**mostly** 25:5,7
44:16 45:4

**55:6**

**mouth** 25:1

**mouthy** 27:22

**move** 7:11,14
20:2

**moved** 45:8

**Mr** 4:5,6,7,8
6:13,23 11:6
17:23 18:3,7,
24 19:2,9,11,
13,15,17,19,
21,23,25 20:1
21:14,17 22:4
23:11 24:16,21
25:16,18 26:4,
10,17,24 27:4,
11,14 28:1,2,6,
8,10,12,16,19,
21,23,25
29:15,25 30:4,
21 32:19 33:5,
20 35:17 36:1,
11,18 37:15
38:6,12,17,23
39:7,13 40:9,
21,23 41:1,3,4,
8,9,10,17
42:12,25 43:7,
15,17 44:10
45:18 46:10,12
47:9 48:10,16
49:13 50:2,21
51:18 52:5,12,
16,19 53:9,20
54:5,22 55:2,
14,19,22 56:21
58:9,16,18

**Ms** 33:22,23
58:7

**much** 10:20,21
12:13 24:5
27:12,18 31:3



DAVID KUBIAK, et al. vs. S.W. COWBOY, et al.
RYAN E. MARCUM on 01/10/2014

DEPOSITION OF
Index: mundane..ownership

33:10 36:13 37:6,22 41:1 54:9 56:6,25 57:22,24 58:13

**mundane** 13:24

**must** 47:11

**myself** 10:13

_____

**N**

_____

**name** 4:6 5:13 6:14 10:6 13:10 15:5,18 43:19 57:9,23

**named** 42:1

**names** 15:21

**necessarily** 14:5

**need** 5:9 9:21 12:13 36:12

**needed** 36:10

**negative** 5:1

**net** 46:8 47:23 48:24

**never** 14:15,25 36:14 40:5,13, 14 41:18,19 55:17 57:25

**new** 9:16,21,23 10:8,13,16 11:3 14:11 18:2,5 22:9,10 23:8 31:22,25 32:10,23 34:15 51:17 52:6 56:18

**nicknames** 44:20

**night** 20:13 21:5,6 23:4 31:17 34:5 35:4,5,7,15 36:2,19 37:5 39:3,9,25 40:11,18 41:13 45:7,8 51:5,6 53:4 54:12 57:5 58:8,10

**nights** 27:19 35:4 51:13,14

**nodding** 4:25

**none** 35:21

**note** 50:13

**nothing** 13:14 25:8

**notified** 5:19, 21,22

**November** 6:17 41:24 51:13

**Now** 18:18 19:23 50:11 51:15

**number** 42:1 46:25 48:4 49:14 50:20 57:25 58:2

**numbered** 11:21

**numbers** 33:13

**numerous** 25:3 26:17,18,21

_____

**O**

_____

**oath** 4:16

**object** 11:6 17:23 18:3,7,

24 19:2 21:14, 17 22:4 23:11 24:16,21 25:16 27:4 28:8,7,12, 21,25 29:15,25 30:4,21 32:19 33:5,20 35:17 36:1,11,18 37:15 38:6,12, 17,23 39:7,13 40:9 41:17 42:12 43:7,15 47:9 48:10 51:18 52:5,12, 19 53:9,20 54:5,22 55:2, 14,19,22 56:21 58:9

**obviously** 30:16 49:8 50:13 52:23

**Occasionally** 38:1

**occasions** 50:23

**off** 14:3 42:19 44:8

**offered** 12:1 54:13

**oh** 24:23 46:15 47:24

**okay** 4:13,18, 24 5:3,6,12,16 6:22 7:2,15,23 8:3,8,11,13 10:2,7,21 11:14 12:4 13:5 15:2,7,22 17:9,12 18:22 20:3,9,17 21:21 22:25 23:14 26:2,23

27:6,10,13, 29:23 30:2 31:1 32:10 33:14 34:12 35:1 36:9,23 37:10 41:4 42:1,9 43:3,11 44:1,9 45:24 46:17,19,24 47:7,16,25 48:3,7 49:5,18 51:8,20,24 57:17,19 58:3

**once** 13:3

**one** 4:22 5:17 10:5 19:2 25:20 26:18 28:17 34:9 35:21

**ones** 48:12

**only** 13:19 14:24 39:14 47:10 51:6 55:3

**onto** 13:3

**open** 10:13

**opinion** 55:9

**opt-in** 4:9

**order** 12:8 19:24 36:9

**orders** 11:20, 21

**original** 6:9

**originally** 34:1

**other** 4:8,10 6:13 7:24 8:17 11:10 12:4 20:17 26:19 29:24 37:19

38:10,14,19 48:12 53:8

**our** 20:25 23:3 31:9 40:17,18

**ourselves** 31:14

**out** 12:3,7 13:4,5,10,15 14:11 20:13,18 21:8 24:7,12, 24,25 25:21,25 28:3 30:7 31:15,18,19,22 32:1,7,24 33:2, 18,23 35:14,19 37:9 39:3 40:7, 18,20 41:12,15 42:10,13,17,18 46:14,24,25 49:1,5 53:2

**outside** 19:23 52:3

**over** 4:13 9:12, 24 10:2,7,13, 15,18,25 11:2, 5,14 12:15,20 13:18 14:1,5, 20,24,25 15:2, 19,24,25 16:1 17:20 41:11 47:20 48:3

**overlooked** 13:22

**own** 35:14 40:19 42:13 53:2

**owners** 6:3 10:5 18:11,22 24:15,20 39:4

**ownership** 39:4



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
**Nationwide Coverage**

Suite 300, The Elks Building
207 North Laura Street
Jacksonville, FL 32202
904.783.3300
www.DiscoveryLit.com

DAVID KUBIAK, et al. vs. S.W. COWBOY, et al.
RYAN E. MARCUM on 01/10/2014

DEPOSITION OF
Index: p.m....received

---

**P**

p.m. 58:19

page 46:10,11 47:18,19 48:23

pages 43:4 46:7

pamphlet 43:4

pamphlets 11:4

Pannone 15:13 26:12 27:25 28:2

paper 34:9 57:19

papers 5:23

paperwork 51:16

park 13:25 14:4

parked 14:2

part 10:24 13:14 14:9,15 34:12 35:3

party 18:9

pay 38:8

paying 18:13, 16, 54:17

payments 51:6

peer 56:18

people 9:22,23 10:11,13 16:4 29:13 54:24

per 23:2,9 29:4,24 30:3,7, 9,20 31:2 43:12 46:4 49:20 50:8

---

52:3 54:20 55:1,12

percent 22:14, 15,19,21,23,24 29:4 30:24 31:1 52:11

perform 30:17

performance 32:16,17 53:4

performed 21:1

permanently 9:14

permission 19:7 47:10,17

person 12:13 22:15 57:6

pertaining 19:11

phase 20:9

plaintiffs 4:3,7

plaintiffs' 41:6, 21 42:23 43:1 45:16,18 48:14,16 49:11,13,25 50:2

plate 12:24 23:2,9 29:24 30:3,7,9,20 31:2 55:5,12

plates 12:24 13:3

please 4:25 5:13 29:16

pocket 48:12 49:8

point 28:15

---

points 11:4

policies 13:17, 18,24

pool 10:20 11:9 19:5,12,20 38:11,15 53:18 54:3 58:14

pooling 10:18

portion 49:1

position 12:15

positions 37:19,21

possible 13:9 35:23 52:17

pre-configured 31:9 56:13

precisely 28:2

prep 35:4 43:24

present 42:25

presentation 12:24

pressure 56:18

pretty 10:20,21 14:2 24:5 27:12 37:22

primary 44:4

print 42:22

printed 21:7 40:18 42:10, 13,17,18

printout 21:8, 24,25 23:3

prior 5:24 6:5 8:19 15:17 23:12 24:4

---

29:19

probably 25:5

problem 37:10

problems 45:10

procedure 19:22

procedures 10:18 12:6

proceeded 25:24

process 10:24 11:15 14:9 31:21 36:20 39:10 57:5

produced 4:2 23:3

proficient 32:12

programming 21:24

promising 24:5

prove 28:15

provide 6:10

purpose 19:3

purposes 33:1 36:7

put 11:20 31:15 32:7 52:10

---

**Q**

quality 13:22

question 4:20, 21 5:2 43:16 57:12

questioning 18:25 19:3

---

54:9

questions 4:15 5:7 12:1 58:17, 18

quick 13:2

quickly 13:9

quizzing 14:8

---

**R**

re-collect 36:13

read 58:18

reading 31:9,14

ready 41:9 42:21

real 15:21

really 10:11 13:19 25:5,8, 21 26:5,7 27:20 30:13 38:7,24 41:19 55:23

reason 20:24 21:8,19 31:13

reasonable 30:25

recall 24:17,22 25:5 26:16,20 27:5,15 28:9, 22 29:1,22 30:1,5 35:9 39:8 42:16 43:18,25 44:17 52:4 53:21

receive 35:21 38:2,5,14,20, 22,25 51:7

received 17:22

---



**DISCOVERY LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

DAVID KUBIAK, et al. vs. S.W. COWBOY, et al.
RYAN E. MARCUM on 01/10/2014

DEPOSITION OF
Index: recess..seventh

37:13 38:7,8,
10 46:9 51:6

**recess** 5:10
41:5

**recognize** 43:1

**recollection**
33:17

**recommend**
22:23,24 23:9
56:14

**recommendatio
n** 22:25 23:2
30:3 55:12

**recommended**
22:11 29:3

**record** 4:23
5:5,14 41:8

**recorded** 36:6

**recording**
33:13 37:8
39:14,25

**Reese** 16:8

**refrain** 4:25

**regular** 38:20

**remainder**
33:24

**remember** 9:18
10:6 23:15
24:22 25:20
27:2,6,10,16,
20 28:1 29:2
48:9 52:2,10
57:17

**remind** 4:15

**Renee** 15:4

**Renee's** 15:5

**report** 12:2
21:25 40:16,18
41:22 42:10,18
43:5

**reporter's** 4:16

**reports** 42:14
45:21 46:2
48:18 49:17
50:4

**represent** 4:7

**request** 35:16,
20

**required** 27:8

**resign** 7:15 8:6

**resigned** 8:7

**respect** 10:18
23:15 39:6

**response** 5:2

**restaurant** 7:24
8:20 12:10
15:23 29:14
55:17,25

**restaurants** 8:1
39:5

**retaliation** 19:6,
10

**review** 6:6,8
51:21

**reviewing**
51:24 52:6

**Richie** 44:22,23

**ridiculous** 24:9

**right** 7:19
11:14 39:24
40:21 43:20
47:21 49:2
50:21 51:22

54:16,21,
56:23 57:15
58:5

**Rossback**
16:12 45:5,6

**ruin** 28:4

**rule** 29:10

**rules** 4:14

**run** 13:13,15
16:4 40:15

**runs** 13:16

**Ryan** 4:1 5:15
16:12 42:14
58:3

---

**S**

**safety** 12:25

**said** 10:21
23:13,14 24:12
25:9,12,13
26:17 31:1,8,
11 47:13 56:2

**Sale** 51:3

**sales** 21:25
39:23 40:15
41:22 42:10,
13,18 43:5
45:21 46:2
48:18 49:16
50:4 51:7

**Saltwater** 4:9
6:3 7:10 8:15
9:4,7 10:5
11:12 14:18,
20,24,25 15:8,
12 16:2 18:1
20:3 21:11
22:6,10 23:21
27:18 31:20

32:14 35:15,20
37:17 44:2,15,
23 45:3,7,24
57:21

**same** 8:17
10:20,21,23
11:9 17:24
25:11 46:17

**satisfaction**
13:20

**Saturday** 46:19
51:2

**sauces** 12:23
13:1

**saw** 14:24,25
30:13 43:18

**saying** 5:1
54:18

**says** 18:15
42:6 46:13,15

**school** 9:2,23

**schooling** 8:22

**Scobee** 43:17

**scope** 19:24

**Sean** 17:5

**season** 25:6

**second** 19:2
38:19

**sections** 31:10

**see** 8:10 13:8,
11 19:5 41:3
46:25 48:23

**seeing** 57:17

**seems** 49:1

**senior** 29:17
55:11

**sense** 51:12

**separate** 20:23
21:6,18,19
31:10,12 34:4,
10 35:23
52:21,25 53:1

**September** 8:10

**September-
october** 9:19

**series** 4:14

**served** 5:23

**server** 8:12,14
10:10 11:25
13:11 20:8,18
22:10 30:6
33:2,10,14,23
35:15,20
37:18,23 39:2,
17 40:1,6,11,
16 41:13,16
42:1 54:4
55:11,17 56:18

**server's** 13:10
57:23

**servers** 9:17,21
10:8,16 11:3
14:11 18:5
20:14 22:9,10
23:8 29:17,24
31:20 34:15
36:23 37:7
51:15, 52:17
53:8,13,16

**service** 18:19

**serving** 20:4

**set** 13:9 57:25

**seven** 18:10

**seventh** 46:11,
12





33:23 37:5
53:13,19 56:13

**telling** 24:4

**Temporarily**
9:16

**terminate** 7:20

**terminated**
7:15,16,17,22,
23 8:6

**Terri** 15:4

**test** 14:10,13,
14,15,17,20

**testified** 4:3
15:25 51:20
53:5,24 54:2,
19 57:4,13

**testimony**
23:12

**tests** 14:24,25

**than** 17:22
30:15,19 52:11
53:12

**that's** 5:22 6:19
7:22 10:4
12:12 15:22
17:17 21:5
22:19 23:17
25:10 33:15
44:9 45:24
50:21 56:11,
13,16

**theft** 7:21

**their** 4:9 11:19
12:12 13:13
15:21 21:1
32:7,9,16,17
44:20 51:21,24
52:14 53:4

**themselves**
32:8

**there's** 52:25

**these** 43:1,12
46:2

**Thiele** 17:3

**thing** 13:19
25:11 52:22

**things** 12:9
13:15,21 19:5
21:6 42:19
56:1

**think** 26:5
28:17 35:10
38:24 41:1
52:23 54:6
55:11,16,23
56:20 57:23

**third** 47:18,19

**Thompson**
16:22

**those** 21:6
24:25

**though** 31:2
56:3

**thought** 14:23

**through** 7:7
8:16 9:11 16:4
43:3 49:15
50:11,22,23
51:3,9 53:4

**throughout**
12:10 46:22
51:5

**ticket** 13:7

**Tillman** 44:19

**time** 5:9 7:11,
14 8:17 9:15

12:12 14:11
23:10 25:4,20
27:13,15 28:17
29:9 30:14,17

**times** 25:3
26:21 44:18

**tip** 10:18,20
11:9,24 12:2,3
18:15,17,18,19
19:5,12,20
20:14,19,20,25
21:11,15 22:2,
3,6,11,16,17
23:1 24:10,15,
24 26:1,3,6,7,8
27:3 28:4,6,10,
13,20,24 30:7,
19 31:17,22
32:1,9,22 33:2,
11,14,18 34:20
35:9,10,14,19,
21,23 36:7,9,
14,20 37:3
39:11,12 40:7,
19 43:5,8,12
45:20 46:3,7
47:8,19,23
48:13,17 49:7,
10,16,20 50:3,
7,12,14 51:1
52:6,15,18
53:6,14,18
54:3,9,25 55:3,
9,10 56:3,5,9,
10,11,14,19
58:14,15

**tipout** 21:19,23
29:3

**tipped** 37:8

**tipping** 22:13
24:12,19

**tips** 20:21,22,

23 21:4,12
26:25 27:8
29:4 31:7,12
33:1 34:16
35:11,16,24
36:21,24 37:2
38:3,5,10,14,
20,22,25 39:3,
6,22 40:2 46:5,
8 47:11 48:21,
24 50:9 51:7,
25 52:2,8,13,
21 57:7

**Tips/cash** 51:3

**titles** 35:6

**today** 5:20,23,
24 6:5

**together** 20:22
29:18 52:24

**told** 11:10
18:11,14 20:20
24:3 29:23
31:8 34:2,20
36:8 39:5 40:6
53:21 54:4,7
56:2

**Tom** 15:17
45:5,6,12,13

**too** 16:2 36:21

**took** 9:5

**topics** 12:21

**total** 34:8

**towards** 25:6
27:17,19 32:5
45:2

**trace** 26:22

**train** 9:16 10:8
11:3,17 12:13
16:1 17:20

34:15 53:13,16

**trained** 16:5
17:12,19 19:18
31:5 32:10
34:1 52:17
53:8,10,24
54:4

**trainee** 14:6
31:22,25
32:11,23

**trainees** 12:17,
19 13:18 14:8
18:2,15 21:4
29:8 52:10

**trainees'** 52:6

**trainer** 31:22

**training** 9:21,
10:24 11:15,19
12:4,14 14:9
15:24 16:1
17:10,20,21,
22,25 19:5,13,
14,16,21 20:3,
7 22:9 23:6
29:23 32:20
34:12 51:15,21
57:3

**transcribable**
5:4

**tray** 12:25 13:3

**turn** 33:14
58:12

**turning** 46:7
48:23 50:16

**twice** 13:10

**two** 48:18

**typically** 30:7



DAVID KUBIAK, et al. vs. S.W. COWBOY, et al.
RYAN E. MARCUM on 01/10/2014

DEPOSITION OF
Index: uh-huh..would

---

**U**

uh-huh  5:1 25:11 42:3 47:22 48:25 54:1

uh-uh  5:1

unable  45:10

unaware  53:6, 7,18 54:3,17

under  4:16 46:24 51:3

undergo  17:10

underneath  42:6 49:3

understand  18:21 19:1 38:18

until  8:4,9 9:19 53:6

up  10:13 13:9, 23 25:22 26:6 31:11 34:7,9 39:24 49:7 52:14 56:23 57:2 58:1,14

us  21:23 31:15

use  40:24 50:8

used  43:11 46:3 48:20 49:19

usually  22:17, 18 30:15 54:11

---

**V**

very  4:19 18:11 22:20 25:21

---

30:14,17 31:3 56:9

voiding  42:19

voluntariness  19:4,12,20

voluntary  20:24 21:12 22:3 39:22 52:18,23 53:6,14,19,23 54:3 56:2,3

vote  39:5

---

**W**

W-a-r-d  45:14

waiting  32:6

Wally  16:5,6

want  24:6 40:21 56:14

wanted  10:9 33:8,9

Ward  45:12,14

wash  37:24,25 39:2 44:16

washing  38:2,5

wasn't  14:16 39:3 49:8 54:17 57:1

watch  11:23 20:14

way  13:20 26:8 31:18 41:19 53:12,22 55:7, 8,9,25 56:4,17, 19

we'll  5:10 19:25 40:24 41:3

---

Wednesday  47:25 48:1

week  47:20 57:22,23 58:12

weekend  25:21 26:19

weeks  45:21 48:18 49:17,21 50:4

Wegner  7:19

weight  55:13

welcome  10:14

well  11:17 12:2 18:8 19:5,23 20:20 21:2 22:13,16,18 24:23 30:17 37:23 51:1 55:16 56:9

went  12:14 15:25 22:15 26:7

weren't  11:25

what's  22:19

whatever  34:20 38:8 39:18 57:24 58:2,14

whatsoever  35:24

where  7:2 13:25 14:2,3 18:15 27:10,20 30:3 46:13,24 47:7 48:11,24

wherever  44:5 58:11

whether  20:24 21:1 24:18

---

53:21 57:1

which  8:1 12:24 13:1 18:14 27:23 37:21 55:4 57:10

while  8:15 32:3 37:17 45:9 57:2

White  7:18,19

who  7:17 9:7, 22 10:2,4 13:8 14:14,20 15:2, 7,11,19 17:12 23:23 25:13 26:10,13 29:7, 13,21 32:14 33:18 34:24 35:1,3 38:20 42:4, 43:17,20, 23 44:1,22 45:12 53:16

who's  29:8 44:19 47:5 55:17

whoever  18:13, 16 53:10 54:12

whole  20:10 25:17 34:21

whom  34:23

whose  13:8

why  7:9,20,22 9:21 21:5 24:1 30:11,23 36:5 37:2 38:5,15, 20 49:5 55:21 56:11 57:1,2

will  4:21

Williams  4:5,7

---

19:9,13,17,21, 25 25:18 40:23 41:3,8,10 45:18 46:12 48:16 49:13 58:16

willing  39:2

wine  31:10 56:12

winter  25:8

withheld  35:12

witness  4:2 43:9

Wolfe  15:10 16:18

words  24:25 26:5

work  7:3 8:1,3, 8 9:12 37:19, 21 45:11 51:22,24

worked  7:4,6, 24 8:4,19 9:9 29:10,11, 30:13,14 35:3, 4 37:18 55:17

working  6:25 7:2 8:15 9:4 11:12 25:6,10 27:17,18,21 29:9 30:16 34:25 35:2,7 37:12,17 38:21 41:11 45:3,4,6 51:11,14 53:11 55:25

works  12:9 22:20

would  5:13



DAVID KUBIAK, et al. vs. S.W. COWBOY, et al.
RYAN E. MARCUM on 01/10/2014

DEPOSITION OF
Index: wouldn't..yours

7:18 9:19 12:4,
7,12,13,14,17
13:12,19 14:1,
9,10,11,22
15:17 17:24
18:8,19 19:6
20:9,13,14,17
21:3 22:15,17,
23 23:2 24:23
25:6,9 26:5
27:7,17 32:3,5,
6,10,11,14,16
33:6, 34:7,8,9,
10,15,21,22
35:12 36:6,8,9,
12,14 37:2,4,5,
6 38:9,15,21
39:15,17,20,24
40:5 41:15,19
42:16,19,20,22
44:10,16 45:2,
4 47:6,7,15
51:5,11,12
52:24 53:7,19
54:3,17 55:3,4,
5,16 56:4,10,
11,12,15 57:6,
9,10,14,19,20,
21,24 58:3,7,
10,11,12

**wouldn't** 25:8
54:6,25 56:18

**write** 23:23
33:10 34:8
37:2 54:14
57:6,14,19,20,
21,24

**writing** 24:2

**written** 11:5
49:10 58:15

**wrong** 12:7
39:23 47:12

49:7

**wrote** 34:6 37:7
39:18, 50:23
51:2

———————

Y

———————

**yeah** 34:8
50:20

**year** 8:24,25
9:5

**years** 11:13

**yell** 13:10

**you're** 4:15
11:19 19:15
22:21 39:9
51:20

**you've** 8:23
32:10 41:1
51:17

**yours** 50:12



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

Suite 300, The Elks Building
207 North Laura Street
Jacksonville, FL 32202
904.783.3300
www.DiscoveryLit.com