**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

DAVID KUBIAK, individually and on
behalf of all other similarly situated
employees, et al.,

                  Plaintiffs,

v.                                       Case No. 3:12-cv-1306-J-34JRK

S.W. COWBOY, INC., a Florida
Corporation, d/b/a Saltwater
Cowboys, et al.,

                  Defendants.

_____/

# O R D E R

    **THIS CAUSE** is before the Court on (1) Defendants' Motion for Summary

Judgment (Doc. 165; Defendants' Motion), filed on October 30, 2015; and (2) Plaintiffs'

Motion for Summary Judgment (Doc. 167; Plaintiffs' Motion), filed on October 30, 2015.

On November 25, 2015, Defendants filed Defendants' Response in Opposition to

Plaintiffs' Partial Motion for Summary Judgment (Doc. 173; Defendants' Response), and

Plaintiffs filed Plaintiffs' Response in Opposition to Defendants' Motion for Summary

Judgment (Dkt. 165) (Doc. 180; Plaintiffs' Response). Accordingly, this matter is ripe for

review.

## I.    Background Facts[1]

    Saltwater Cowboys and Creekside Dinery are seafood restaurants in St.

---

[1] Because this case is before the Court on cross-motions for summary judgment, the Court will,
when addressing the merits of either party's motion, view the facts presented in the light most favorable to
the party opposing summary judgment. The Court will so note its perspective when appropriate. The facts
recited in this section are either undisputed, or any disagreement has been indicated. See T-Mobile South
LLC v. City of Jacksonville, Fla., 564 F. Supp. 2d 1337, 1340 (M.D. Fla. 2008).

Augustine, Florida.[2] Doc. 79 ("Third Amended Complaint") ¶¶ 46, 50; Doc. 86 ("Answer") ¶¶ 46, 50. Plaintiffs all worked as servers at one or both of those restaurants between 2006 and 2013.[3] At both restaurants, "front-of-the-house" managers supervise the servers. Saltwater Cowboys Depo. at 20; Creekside Dinery Depo. at 8, 10. Those managers are responsible for opening the restaurant; overseeing, hiring, firing, scheduling, directing, and releasing servers and other non-kitchen employees (including expediters,[4] hosts/hostesses, and bussers); counting opening and closing money; and handling voids. Doc. 181-1 (deposition of Creekside Dinery manager Sloan Doucette; "Doucette Depo.") at 52–53; Doc. 113 (deposition of Saltwater Cowboys manager Jennifer Bryant; "Bryant Depo.") at 32–36. Kitchen managers oversee the kitchen and its staff and are responsible for scheduling, supervising, directing, hiring, and firing "back-of-the-house" employees such as cooks and other kitchen staff. Saltwater Cowboys Depo. at 20; Creekside Dinery Depo. at 15, 18; Doc. 181-11 (deposition of Saltwater Cowboys

---

[2] "Saltwater Cowboys" is the trade name under which Defendant S.W. Cowboy, Inc., operates; "Creekside Dinery" is the trade name under which Defendant Creekside Dinery, Inc., operates (together, the "Restaurant Defendants"). Both restaurants are owned by Defendants Peter Lawlor, Scott Singleton, William White, Terry Richardson, Rochelle Drouillard, and Judy Wegner ("Owner Defendants"). Doc. 110 ("Saltwater Cowboys Depo.") at 11; Doc. 111 ("Creekside Dinery Depo.") at 6–7, 35.

[3] The named Plaintiffs are (1) David Kubiak, who worked from March 2008 through April 2012, Doc. 107 (deposition of David Kubiak; "Kubiak Depo.") at 13, 30; (2) Joseph Keating, who worked from February 2011 through May or June 2013, Doc. 106 (first deposition of Joseph Keating; "Keating Depo. I") at 16, 85; (3) Jason Crowling, who worked from April 2008 through January 2013, Third Amended Complaint ¶ 37; Answer ¶ 37; Doc. 101 (first deposition of Jason Crowling; "Crowling Depo. I") at 17, 39–40; (4) Steven Patterson, who worked from March or April 2009 to January 2013, Doc. 109 (deposition of Steven Patterson; "Patterson Depo.") at 13, 16–17; (5) Matthew Dillon, who worked from January 2006 through January 2013, Doc. 102 (first deposition of Matt Dillon; "Dillon Depo. I") at 18, 20; (6) William Little, who worked from Spring 2006 through Summer 2012, Doc. 108 (deposition of William Little; "Little Depo.") at 18, 22; (7) Jose Farinos, who worked from October 2008 through January 2013, Doc. 103 (deposition of Jose Farinos; "Farinos Depo.") at 21, 52; (8) Michael Hoolahan, who worked from April 2012 through May 2013, Doc. 105 (deposition of Michael Hoolahan; "Hoolahan Depo.") at 13, 58; and (9) Richard Harvey, who worked from April 2011 through June 2012, Doc. 74-1 at 2; Doc. 104 (deposition of Richard Harvey; "Harvey Depo.") at 20.

[4] An expediter is an employee who garnishes plates, organizes tickets, inspects trays of food to ensure accuracy, calls for servers to deliver the food or delivers the food if no server is available, and communicates with kitchen staff on behalf of servers. Saltwater Cowboys Depo. at 37.

kitchen manager Bryan Pannone; "Pannone Depo.") at 28–29. Kitchen managers also assist in food preparation. Pannone Depo. at 54.

The restaurants required servers to contribute to a tip pool that included the bussers and bartenders. Saltwater Cowboys Depo. at 70; Creekside Dinery Depo. at 36. In compensating the servers, the restaurants took a "tip credit" against the restaurants' minimum-wage obligations based on a portion of the tips each server received.[5] See Saltwater Cowboys Depo. at 29; Creekside Dinery Depo. at 24, 32; see also, e.g., Doc. 100-2 at 1 (affidavit from Saltwater Cowboys server Lance Alexander explaining wages he received, including tip credit). At the end of every shift, each server would obtain a server checkout showing that server's sales, payments, number of items ordered, tips required to be paid into the busser/bartender tip pool, cash owed to the restaurant, and credit-card tips. Saltwater Cowboys Depo. at 30–31; Creekside Dinery Depo. at 67–68. Each server also completed a tip-allocation form and then checked out with a front-of-the-house manager. Saltwater Cowboys Depo. at 32–33, 36–37; Creekside Dinery Depo. at 42–43. The tip-allocation sheet contains a table with seven rows—one for each day of the week— and seven columns, which were headed "[charge] tips/[charge] sale"; "cash tips/cash sale"; "bar/bus"; "kitchen"; "expo"; "net tips"; and "date/initials." See, e.g., Doc. 183-19 (Tip Allocation Sheets from Saltwater Cowboys).

The servers at Fiddler's Green, a since-closed restaurant also owned and operated by the Owner Defendants, voted to tip the kitchen employees at a recommended rate of

---

[5] The "tip credit" refers to the process under 29 U.S.C. § 203(m) whereby an employer is permitted to "pay [a tipped] employee a cash wage below the minimum wage, so long as the employer supplements the difference with the employee's tips." See Rubio v. Fuji Sushi & Teppani, Inc., No. 6:11-cv-1753-Orl-37TBS, 2013 WL 230216, at *2 (M.D. Fla. Jan. 22, 2013) (unpublished). Under section 203(m)(1), the employer must pay a cash wage "not less than the cash wage required to be paid such employee on August 20, 1996," or $2.13. See Montano v. Montrose Rest. Assocs., Inc., 800 F.3d 186, 188 (5th Cir. 2015).

25 cents per dinner. See Saltwater Cowboys Depo. at 66. This practice of tipping kitchen employees (reduced to a recommended 20 cents per dinner) carried over to Saltwater Cowboys and Creekside Dinery. See Doc. 100-3 ("Owners' Affidavits") at 1–2, 4–5, 7–8, 10–11, 13–14, 26–27. The parties disagree as to whether contributions to the Kitchen Tip Pool were voluntary or mandatory. Defendants contend that participation in the Kitchen Tip Pool was voluntary. See id. They have presented 55 affidavits from servers who averred that they knew the Kitchen Tip Pool was voluntary. See Docs. 67, 100-2, 115, 117, 120–22 (servers' affidavits). In contrast, each named Plaintiff testified that he believed contributions to the pool were mandatory. See Crowling Depo. I at 39; Dillon Depo. I at 38–39; Farinos Depo. at 76–78; Harvey Depo. at 19–20; Doc. 105 Hoolahan Depo. at 28, 32; Keating Depo. I at 43–44, 46; Kubiak Depo. at 57–59, 62–65; Doc. 108 Little Depo. at 51, 54; Patterson Depo. at 30–33. Dillon, Farinos, Keating, Little, and Patterson also asserted that managers told them that the Kitchen Tip Pool was mandatory. See Dillon Depo. I at 39; Farinos Depo. at 77; Keating Depo. I at 44; Little Depo. at 56–58; Patterson Depo. at 35. And Hoolahan, Crowling, Little, and Patterson asserted that front-of-the-house managers would correct a server's kitchen-tip allocations if the server failed to use the standard formula of 20 cents per entrée. See Hoolahan Depo. at 33–34; Doc. 176 (second deposition of Crowling; "Crowling Depo. II") at 11–12; Little Depo. at 52–54; Patterson Depo. at 33–34. Saltwater Cowboys assistant manager Jessica Barnes-Turner stated that she did not know prior to December 2012 "if [contribution to the Kitchen Tip Pool] was mandatory or not." Doc. 169 (deposition of Jessica Barnes-Turner; "Barnes-Turner Depo.") at 58–59. Saltwater Cowboys assistant manager Melissa Wolfe stated that she was not told "one way or the other" whether she

had a choice to contribute to the Kitchen Tip Pool. Doc. 181-6 (deposition of Melissa Wolfe; "Wolfe Depo.") at 37–39.

After receiving contributions to the Kitchen Tip Pool each night, a front-of-the-house manager would put the tips in an envelope and give the envelope to a kitchen manager. Saltwater Cowboys Depo. at 39–40; Creekside Dinery Depo. at 84. Every week (at Saltwater Cowboys) or every other week (at Creekside Dinery), the kitchen manager would distribute the Kitchen Tip Pool money to kitchen employees. Saltwater Cowboys Depo. at 56–58; Creekside Dinery Depo. at 19. When a kitchen employee failed to come in for a shift or arrived significantly late, the kitchen manager sometimes would withhold or reduce that employee's share of the Kitchen Tip Pool. Doc. 86 ("Answer") ¶¶ 26, 32, 41, 80; Pannone Depo. at 38; Doc. 181-9 (deposition of Creekside Dinery kitchen manager Kelvin Jackson; "Jackson Depo.") at 30–31. While Plaintiffs were aware that tips collected for the kitchen went to the kitchen staff, they had differing understandings, if any, as to who distributed those funds and on what basis. See Doc. 101 Crowling Depo. I at 61–62; Crowling Depo. II at 32–33, 35–37; Doc. 175 (second deposition of Matt Dillon; "Dillon Depo. II") at 16–17, 20; Keating Depo. I at 36–37; Doc. 174 (second deposition of Keating; "Keating Depo. II") at 17–18; Farinos Depo. at 79; Harvey Depo. at 38–39; Kubiak Depo. at 69; Patterson Depo. at 36. Additionally, on four occasions between November 30, 2007, and February 1, 2013, the kitchen manager distributed less than the total collected for the kitchen tip pool to the kitchen employees. See Doc. 183 (showing that (1) during the week of October 10, 2008, kitchen employees received $62.10 less than the total contributed to the Kitchen Tip Pool; (2) during the week of October 2, 2009, kitchen employees received $83.51 less than the total contributed to the Kitchen Tip Pool;

(3) during the week of July 9, 2010, kitchen employees received $158.60 less than the total contributed to the Kitchen Tip Pool; and (4) during the week of May 20, 2011, kitchen employees received $51.40 less than the total contributed to the Kitchen Tip Pool).[6]

On November 30, 2012, Kubiak filed this lawsuit against Saltwater Cowboys. Doc. 1. Crowling, Keating, and Patterson filed their consents to join the lawsuit on December 4, 2012. Doc. 3. Shortly after that, on January 17, 2013, the Owner Defendants held a meeting with the Saltwater Cowboys staff to discuss the lawsuit. Saltwater Cowboys Depo. at 148, 150–54. The Owner Defendants prepared remarks, which Singleton, as president, delivered.[7] Id. at 195–200; see Doc. 185-2 (prepared remarks).

After the meeting, Singleton and Bryant met with Crowling and told him that the owners had discovered that Crowling had wrongfully taken a "double bump" from a customer. Bryant Depo. at 137, 139–44; Saltwater Cowboys Depo. at 181–88; Crowling Depo. I at 17–18. A double bump occurs when a server fails to inform a party that an automatic gratuity had been added to the bill, and the customer thereafter provides an additional tip to the server. Bryant Depo. at 130. Singleton told Crowling that the Owners had called the customer, who told them Crowling had not informed him of the automatic gratuity, Saltwater Cowboys Depo. at 185–88, as required by Saltwater Cowboys policy, Bryant Depo. at 131; Crowling Depo. I at 18. Singleton and Bryant then told Crowling that he was fired based on that violation of company policy. Crowling Depo. I at 17–18. Also

---

[6] Plaintiffs assert that those four occasions are just examples, see Plaintiffs' Response at 5, but that is the only evidence of discrepancies that Plaintiffs identified, and they have not advised the Court where it might find evidence of any other occurrence. See Rule 56(c)(1)(A), (c)(3) (stating that a party must support its arguments by "citing to particular parts of materials in the record," and that a court need consider "only the cited materials"). The Court need not "undertak[e] an independent search of the record." Rule 56(c)(3) advisory committee's note 2010 Amendments.

[7] They gave the same prepared remarks during a staff-wide meeting at Creekside Dinery. Creekside Dinery Depo. at 75–78.

after the meeting, Bryant wrote up Keating for sitting at the hostess stand. Bryant Depo. at 146; see Doc. 165-6 at 1. One month later, on February 13, 2013, Bryant again wrote Keating up, this time for failing to show up for a shift or call in to advise he would be absent. Doc. 165-6 at 2. Keating testified that, following the January 17 meeting, he was not allowed to train new employees and was scheduled as a host on a couple of occasions, Keating Depo. I at 85, although he did not get paid extra when he did train. Id. A few months later, Keating left his employment of his own accord because he received a full-time offer at a different job and because he believed the work environment at Saltwater Cowboys would become more awkward following a mediation in this case. Id. at 85–86.

## II.    Procedural History

Kubiak filed the original complaint in this case on November 30, 2012. Between December 2012 and October 2013, Crowling, Keating, Patterson, Dillon, Little, Farinos, Hoolahan, and Harvey filed notices of consent to join the lawsuit as opt-in plaintiffs. Docs. 3-2, 3-3, 3-4, 6-1, 12-1, 16-1, 57-1, 74-1. On November 15, 2013, Plaintiffs, with the consent of Defendants, see Doc. 77 at 10, filed the Third Amended Complaint. In it, Plaintiffs allege that Defendants owe them back pay for the difference between their wage and the full minimum wage because Defendants operated an invalid tip pool, thereby precluding them from using the tip credit to satisfy their minimum-wage obligations. See generally Third Amended Complaint. In Count I, Plaintiffs allege that Defendants unlawfully took a tip credit in violation of 29 U.S.C. § 203(m) by requiring them to participate in a tip pool with employees who did not customarily receive tips, including cooks and dish washers. Id. ¶¶ 98–102. In Count II, Plaintiffs allege that Defendants

wrongfully retained Plaintiffs' tips by including kitchen managers in the Kitchen Tip Pool. Id. ¶¶ 103–07. In Counts IV and V, Plaintiffs assert identical claims under the FMWA, Fla. Stat. § 448.110.[8] Id. ¶¶ 113–24. In Count III of the Third Amended Complaint, Plaintiffs added a new claim alleging that Defendants violated the FLSA by improperly exercising "dominion and control" over the Kitchen Tip Pool and "directing the distribution of tip pool funds in accord with [their] own incentive and disciplinary policies." Id. ¶¶ 108–12. In Count VI, Plaintiffs present an identical claim under the FMWA. Id. ¶¶ 125–30. Additionally, in Counts VII and VIII, Plaintiffs Crowling and Keating each allege that Defendants retaliated against him based on his involvement in this lawsuit, in violation of the Florida Private Whistleblower Protection Act, Fla. Stat. § 448.102 ("FWA"), and the FLSA's anti-retaliation provision, 29 U.S.C. § 215(a)(3), respectively. Id. ¶¶ 131–46.

On January 31, 2014, Plaintiffs filed Plaintiffs' Amended and Restated Motion for Declaration of a Class Action as to Minimum Wage Claims Pursuant to Rule 23(b)(3);

---

[8] The difference in language between Counts I and IV, on one hand, and Counts II and V, on the other, suggests that Plaintiffs could have based Counts II and V on the theory that the kitchen managers, as functional employers, could not share in a mandatory tip pool. See, e.g., Chung v. New Silver Palace Rest., Inc., 246 F. Supp. 2d 220, 229 (S.D.N.Y. 2002). Indeed, in the Third Amended Complaint, Plaintiffs alleged that kitchen managers were "employers" under the FLSA. Third Amended Complaint ¶ 82. However, in their response to Defendants' Motion, Plaintiffs do not argue that the kitchen managers are functional employers. Instead, they unequivocally contend that Counts II and V are based on the same legal theory underpinning Counts I and IV (inclusion of non-tipped employees in a mandatory tip pool), see Plaintiffs' Response at 2, and they argue that "the record evidence establishes that the Plaintiffs' contribution to the Kitchen Tip Pool was mandatory, and that Plaintiffs were required to share tips with … kitchen managers. Thus[,] because the Kitchen Tip Pool included employees who do not customarily receive tips[,] Defendants' Motion must fail with respect to Counts I, II, IV, and V," see id. at 3. Additionally, Defendants argue in Defendants' Motion that the kitchen managers are not the functional employers of the servers under the FLSA, and Plaintiffs do not even address, much less dispute, this point. They argue only that evidence of the mandatory nature of the Kitchen Tip Pool defeats summary judgment. Of course, even if Plaintiffs' potential theory (that the kitchen managers were employers) failed, it is undisputed that the kitchen managers were not eligible to participate in a mandatory tip pool because they were not employees who "customarily and regularly receive tips." See Doc. 124 at 15 ("the kitchen employees who received tips from the pool" did not work in occupations that are customarily and regularly tipped). Thus, Counts II and V are interpreted as asserting the claims Plaintiffs identify in Plaintiffs' Response. See Plaintiffs' Response at 2–3.

Motion to Conditionally Certify a Collective Action Pursuant to 29 U.S.C. § 216(b) and Motion for Equitable Tolling of the Statute of Limitations. Doc. 98. On June 12, 2014, the Court granted in part and denied in part that motion. Doc. 123 ("Class-Certification Order") at 46–48. Specifically, the Court granted class certification as to Count VI based on a common question involving "whether the employees retained tips, or whether any control that may have been exercised by the [Defendants] violated the requirements for use of the Tip Credit." Id. at 36. The Court certified the following class as to Count VI:

> All current and former employees of Saltwater Cowboys and Creekside Dinery restaurants who work(ed) as a server, waiter or waitress (or any other job title performing essentially the same job function as a Server) at any time between November 30, 2007[,] and February 1, 2013, who participated in the Kitchen Tip Pool, and was paid a reduced minimum wage through the use of a tip credit of $3.02 per hour.

Id. at 47.[9] On June 27, 2014, Defendants filed Defendants' Rule 23(c)(1)(C) Motion to Alter or Amend Class Certification Order (Doc. 124), which the Court denied on March 11, 2015 (Doc. 143).

On April 3, 2015, the Court conducted a hearing on the joint proposed class notice. Doc. 150 (minutes from hearing). At the hearing, the Court adopted the parties' proposed class-notice plan and allowed potential class members up to July 10, 2015, to notify the Court of their desire to opt out of the class. See Doc. 151 (April 6, 2015, order resolving remaining conflicts as to class notice); Doc. 153 at 36 (transcript of hearing) (indicating that class notice would be mailed 35 days from Court's order approving class notice and a 60-day opt-out period would follow). The notice advised that if a potential class member

---

[9] Although the Court denied the motion to the extent that it sought certification of a collective action as to the FLSA claims and a class action as to the FMWA claims other than Count VI, the Court permitted the opt-in plaintiffs (Patterson, Dillon, Little, Farinos, Hoolahan, and Harvey) to participate as named plaintiffs. See Class Certification Order at 27, 47.

did not opt out, he or she would "stay[ ] in the Class" and "be legally bound by all of the Orders the Court issues and judgments the Court makes in the class action." Doc. 147 at 6. The Court also gave Defendants 60 days following the close of the opt-out period to conduct limited discovery to test the newly added class claim set forth in Count VI.[10] Doc. 153 at 35–36. A total of 18 potential class members opted out of the lawsuit within the opt-out period, see Doc. 185-7, leaving a class of approximately 220[11] servers. See Defendants' Motion at 19; Plaintiffs' Response at 16.[12]

On January 28, 2016, at the pretrial conference in this case, the Court announced

---

[10] Following a discovery dispute that resulted in Defendants not obtaining any discovery during the original extended discovery period, the Court permitted Defendants to redepose three named Plaintiffs and to depose four passive class members by November 13, 2015. Doc. 164. Defendants redeposed Plaintiffs Crowling, Keating, and Dillon, see Docs. 174–76, and deposed passive class members Ryan Rossback, Timothy Rhoden, and Katrina Davis, see Docs. 177–79. The parties were unable to conduct the deposition of the fourth selected passive class member, Mallory Morse, within the discovery period. See Doc. 186 at 2.

[11] The parties provide differing numbers for the final class: Defendants say there are 222 members, whereas Plaintiffs say there are 224 members. Neither party has provided a definitive list of class members, so the Court cannot determine which number is correct, and it has no bearing on the Court's evaluation at this stage of the proceedings.

[12] Each of the three passive class members deposed indicated prior to the deposition that the server wished to opt out of the lawsuit. See Doc. 177 at 4; Doc. 178 at 4; Doc. 179 at 4. Based on those statements, Plaintiffs' counsel objected to the depositions, arguing that the depositions were irrelevant and outside the scope of the Court's order. See Doc. 177 at 4–5; Doc. 178 at 4–5; Doc. 179 at 4–5. In light of this expressed objection, on November 30, 2015, Defendants filed Defendants' Motion to Strike Plaintiffs' Objections. Doc. 186. With respect to the Motion to Strike, the Court notes that Plaintiffs did not object to the use of the depositions in any filings with the Court. See generally Plaintiffs' Response. At most, they indicated in Exhibit 10 to their Response that the deposed class members "sought to opt out of the class due to undue pressure and/or coersion [sic]." See Doc. 185-7. That statement is not sufficient to constitute an objection to the use of the depositions. As such, Plaintiffs' objections are not before the Court, which might explain why Plaintiffs opted not to respond to the Motion to Strike. But regardless of the reason, no response was filed.

Nevertheless, even if Plaintiffs' objections were properly before the Court, they would be due to be overruled. Plaintiffs objected to the depositions based on the contention that the depositions were irrelevant and outside the scope of the Court's order permitting limited discovery because the deponents were no longer class members in light of their expressed desire to opt out of the class. See Doc. 177 at 4–5; Doc. 178 at 4–5; Doc. 179 at 4–5. But the July 10, 2015, opt-out deadline passed well before the November 2015 depositions at which the class members expressed a desire to opt out. Moreover, to date none of these class members, or anyone on their behalf, has asked to allow them to opt out belatedly. Therefore, they are still class members, and their deposition testimony is relevant and within the scope of the Court's order. In light of this, the Court will grant the Motion to Strike.

its intended resolution of the parties' various pending motions. In doing so, the Court also stated its intention to enter a written order, which the Court does here. As stated at the pretrial conference, to the extent the Court's previous discussion or analysis of the claims in this action differs in any way from that set forth in this Order, it is withdrawn and should be disregarded.  It is the Court's written Order that sets forth the Court's final analysis.

## III.   Standard of Review

Under Rule 56, Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Rule 56(c)(1)(A).[13] An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant. See Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment."

---

[13] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 advisory committee's note 2010 Amendments.

The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id. Thus, case law construing the former Rule 56 standard of review remains viable and is applicable here.

Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)). "Where the nonmoving party has failed to make a sufficient showing 'to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,' there exist no genuine issues of material fact." Mize, 93 F.3d at 742 (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).

## IV.    Discussion

The Fair Labor Standards Act ("FLSA") requires employers to pay employees a minimum hourly wage of $7.25. 29 U.S.C. § 206(a). In Florida, the Florida Minimum Wage

Act ("FMWA") expressly adopts many of the statutory and regulatory provisions of the

FLSA.[14] Section 203(m) of the FLSA defines "wage" and states:

> In determining the wage an employer is required to pay to a tipped employee,[15] the amount paid such employee by the employee's employer shall be an amount equal to—
>
> > (1) the cash wage paid such employee which for purposes of such determination shall be not less than the cash wage required to be paid such an employee on August 20, 1996; and
> >
> > (2) an additional amount on account of the tips received by such employee which amount is equal to the difference between the wage specified in paragraph (1) and the wage in effect under section 206(a)(1) of this title.
>
> The additional amount on account of tips may not exceed the value of the tips actually received by an employee. The preceding 2 sentences shall not apply with respect to any tipped employee unless such employee has been informed by the employer of the provisions of this subsection, and all tips received by such employee have been retained by the employee, except that this subsection shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips.

29 U.S.C. § 203(m). Thus, "an employer may pay an employee a cash wage below the

minimum wage, so long as the employer supplements the difference with the employee's

tips; this is known as an employer taking a 'tip credit.'"  Rubio, 2013 WL 230216, at *2

(citing 29 U.S.C. § 203(m)). An employer seeking to take a tip credit must show that (1) the

---

[14] The Florida Constitution establishes and guarantees a minimum wage in Florida and grants the Florida Legislature the authority to establish appropriate measures for its implementation. Fla. Const. art. X, § 24; see also Hanna v. CFL Pizza, LLC, No. 6:11-cv-1837-Orl-22DAB, 2012 WL 515875, at *3 (M.D. Fla. Jan. 30, 2012) (unpublished), adopted, 2012 WL 513017 (M.D. Fla. Feb. 16, 2012) (unpublished). The FMWA "provide[s] measures appropriate for the implementation of" art. X, § 24, and incorporates the exemptions and restrictions set forth in sections 213 and 214 of the FLSA.  Fla. Stat. § 448.110(2) and (3). Relevant here, section 448.110(3) of the FMWA provides that "employers shall pay employees a minimum wage . . . [adjusted annually] for all hours worked in Florida." See Fla. Stat. § 448.110(3) and (4). While similar, the FLSA and the FMWA are not identical. For example, the FMWA provides for a longer statute of limitations than the FLSA: five years for willful violations and four years for all other violations. See Hanna, 2012 WL 515875, at *3–4.

[15] Under the FLSA, "'[t]ipped employee' means any employee engaged in an occupation in which he customarily and regularly receives more than $30 a month in tips." 29 U.S.C. § 203(t); 29 C.F.R. § 531.50(b).

employee at issue is a tipped employee, (2) the employer informed the employee of the tip-credit provision,[16] and (3) the employee retained all tips he received, except when an employer requires an employee to participate in a tip pool with other employees who customarily and regularly receive tips. Cumbie v. Woody Woo, Inc., 596 F.3d 577, 580 (9th Cir. 2010). If an employer fails to satisfy any of these preconditions, the employer may not claim the tip credit, regardless of whether the employee suffered actual economic harm as a result. Garcia v. Koning Rest. Int'l L.C., No. 12-CV-23629-HUCK, 2013 WL 8150984, at *4 (S.D. Fla. May 10, 2013) (unpublished); see also Chung v. New Silver Palace Rest., Inc., 246 F. Supp. 2d 220, 229 (S.D.N.Y. 2002) (employer must satisfy prerequisites "even if the employee received tips at least equivalent to the minimum wage").

Because section 203(m) limits participation in mandatory tip pools to employees who "customarily and regularly receive tips," a valid tip pool generally does "not include employees who do not customarily and regularly received [sic] tips, such as dishwashers, cooks, chefs, and janitors." U.S. Dep't of Labor, Wage and Hour Division, "Fact Sheet # 15: Tipped Employees Under the Fair Labor Standards Act (FLSA)" at 1, available at http://www.dol.gov/whd/regs/compliance/whdfs15.pdf ("Fact Sheet No. 15"); see also Bennett v. Hayes Robertson Grp., Inc., 880 F. Supp. 2d 1270, 1278 (S.D. Fla. 2012); Ash v. Sambodromo, 676 F. Supp. 2d 1360, 1369 (S.D. Fla. 2009). However, a tipped employee may voluntarily choose to share tips with an otherwise ineligible employee so long as that tip-sharing is done without coercion by the employer.

---

[16] To provide sufficient notice, the employer "must inform its employees that it intends to treat tips as satisfying part of the employer's minimum wage obligations." Vancamper v. Rental World, Inc., No. 6:10-cv-209-Orl-19KRS, 2011 WL 1230805, at *6 (M.D. Fla. March 31, 2011) (unpublished) (internal quotation and citation omitted).

> [I]t does not appear that the Congress, even in requiring as a general principle that tipped employees retain all their tips, intended to prevent tipped employees from deciding, free from any coercion whatever and outside of any formalized arrangement or as a condition of employment, what to do with their tips, including sharing them with whichever co-workers they please.

Roussell v. Brinker Int'l, Inc., 441 F. App'x 222, 230 (5th Cir. 2011) (quoting Dep't of Labor Field Operations Handbook § 30d04(c) (Dec. 9, 1988), available at http://www.dol.gov/whd/FOH/FOH_Ch30.pdf).

Department of Labor regulations address the tip credit and tip pooling in more detail. Title 29 C.F.R. § 531.52 explains that tips "are the property of the employee whether or not the employer has taken a tip credit" and that an employer "is prohibited from using an employee's tips, whether or not it has taken a tip credit, for any reason other than that which is statutorily permitted in section 3(m): As a credit against its minimum wage obligations to the employee, or in furtherance of a valid tip pool." Title 29 C.F.R. § 531.54 then explains how an employer must account for tips in applying sections 203(m) and 203(t). Specifically, it explains:

> Where employees practice tip splitting, as where waiters give a portion of their tips to the busboys, both the amounts retained by the waiters and those given the busboys are considered tips of the individuals who retain them, in applying the provisions of sections [203(m)] and [203(t)]. Similarly, where an accounting is made to an employer for his information only or in furtherance of a pooling arrangement whereby the employer redistributes the tips to the employees upon some basis to which they have mutually agreed among themselves, the amounts received and retained by each individual as his own are counted as his tips for the purposes of the Act.

Title 29 C.F.R. § 531.59 explains that, "[w]ith the exception of tips contributed to a valid tip pool as described in § 531.54, the tip credit provisions of section [203(m)] also require employers to permit employees to retain all tips received by the employee." With regard to the retention requirement, the Department of Labor Field Operations Handbook states:

> [T]he effect of the language of [§ 203(m)] precludes an agreement between an employer and a "tipped employee" that any part of the tips received by such employee belongs to the employer and must be turned over to the employer. … Further, the specific language added to [§ 203(m)] reinforces the intent of Congress that … the employer and employee cannot agree to … waive such employee's right to retain all tips received.

Dep't of Labor Field Operations Handbook § 30d01(a) (Dec. 9, 1988), available at http://www.dol.gov/whd/FOH/FOH_Ch30.pdf ("DOL Field Operations Handbook"); see also Fact Sheet No. 15. Thus, the "FLSA prohibits any arrangement between the employer and the tipped employee whereby any part of the tip received becomes the property of the employer." Fact Sheet No. 15. With this legal framework, the Court will turn to the parties' competing motions for summary judgment.

## A. Defendants' Motion

Defendants seek entry of summary judgment as to all claims raised in the Third Amended Complaint. See generally Defendants' Motion. As to Counts I, II, IV, and V, Defendants contend that participation in the Kitchen Tip Pool was in actuality voluntary and that Plaintiffs failed to point to any objective evidence to the contrary. Defendants' Motion at 5–8. As such, Defendants contend that Plaintiffs were permitted to retain their tips as required by section 203(m) because they were free to contribute to the Kitchen Tip Pool or not contribute to it. Id. Turning to Counts III and VI, Defendants argue that distribution of a voluntary tip pool by kitchen managers does not violate the FLSA, and that the kitchen managers were not acting on Defendants' behalf in administering the Kitchen Tip Pool. Id. at 8–19. With regard to the individual claims of Crowling and Keating, Defendants assert that they had a legitimate, nonretaliatory reason for firing Crowling and that summary judgment is due to be granted as to Keating's claims because he suffered no adverse employment action. Id. at 24–25. As to all of Plaintiffs' claims, Defendants

assert that even if any claims survive summary judgment, the Owner Defendants cannot be held individually liable because they had no involvement in the day-to-day operations of the restaurants. Id. at 22–23. Finally, with respect to the class claim in Count VI, Defendants argue that any class members who failed to properly provide pre-suit notice in accordance with Fla. Stat. § 448.110(6)(a) cannot pursue an FMWA claim. Id. at 19–22.

In response to Defendants' Motion, Plaintiffs assert that a genuine factual dispute exists as to Counts I, II, IV, and V with respect to the critical issue of whether participation in the Kitchen Tip Pool was mandatory or voluntary. Plaintiffs' Response at 10–12. As to Counts III and VI, they contend that the Kitchen Tip Pool was not a valid voluntary tip pool because it was not based on any mutual agreement between the employees, it constituted an unlawful agreement to transfer ownership of tips to Defendants, and Defendants' exercise of dominion and control over the tip pool before the servers received any money prevented Plaintiffs from retaining all of their tips. Id. at 3–10. As to the individual claims of Crowling and Keating, Plaintiffs argue that genuine issues of material fact exist as to whether the the reasons for firing Crowling and writing Keating up were mere pretext for unlawful retaliation. Id. at 18–20. With regard to the issue of individual liability, Plaintiffs assert that the Owner Defendants exercised sufficient control over the day-to-day operations of the restaurants to qualify as employers. Id. at 12–14. And last, as to the FMWA pre-suit notice requirement, Plaintiffs assert that the passive class members were not required to provide pre-suit notice. Id. at 14–18.

### 1.    Counts I, II, IV, and V

The Court first addresses Plaintiffs' claims in Counts I, II, IV, and V of the Third

Amended Complaint—that the Kitchen Tip Pool was invalid because it included employees who do not customarily and regularly receive tips (including cooks, dishwashers, and kitchen managers). See Third Amended Complaint ¶¶ 98–107, 113–24. The parties agree that those employees participated in the tip pool and that such employees cannot be included in a mandatory tip pool. The parties further agree that Defendants took a tip credit against their minimum-wage obligations as to the servers and that the servers were "tipped employees" as defined in section 203(t).[17] As such, the critical dispute as to these claims is whether the Kitchen Tip Pool was mandatory or voluntary.

A genuine factual dispute exists as to whether the Plaintiffs in this action participated in the Kitchen Tip Pool voluntarily or if such participation was mandatory. As an initial matter, each named Plaintiff testified that he believed contributions to the pool were mandatory. See Crowling Depo. I at 39; Doc. 102; Dillon Depo. I at 38–39; Farinos Depo. at 76–78; Harvey Depo. at 19–20; Doc. 105; Hoolahan Depo. at 28, 32; Keating Depo. I at 43–44, 46; Kubiak Depo. at 57–59, 62–65; Doc. 108; Little Depo. at 51, 54; Patterson Depo. at 30–33. In sharp contrast to those assertions, Defendants provided affidavits from 55 servers averring that they knew contributions to the Kitchen Tip Pool were voluntary. See Docs. 67, 100-2, 115, 117, 120–22 (servers' affidavits). Defendants also contend that Plaintiffs have failed to identify objective evidence supporting their subjective belief that the Kitchen Tip Pool was mandatory and that no such evidence exists.[18] However, this argument simply ignores the record before the Court.

---

[17] Notably, Plaintiffs do not contend that Defendants failed to provide the notice of their intent to take the tip credit, as required by section 203(m). See generally Plaintiffs' Motion; Plaintiffs' Response.

[18] The Defendants cite no authority for such a requirement.

Plaintiffs point to substantial evidence which, if accepted by a jury, would support a finding that participation in the Kitchen Tip Pool was mandatory, including (1) testimony that some Plaintiffs were expressly told by managers that the Kitchen Tip Pool was mandatory, see Dillon Depo. I at 39; Farinos Depo. at 77; Keating Depo. I at 44; Little Depo. at 56–58; Patterson Depo. at 35; (2) testimony that front-of-the-house managers would correct or change servers' kitchen-tip allocations if the server failed to allocate tips to the Kitchen Tip Pool using the standard formula of 20 cents per entrée, see Hoolahan Depo. at 33–34; Crowling Depo. II at 11–12; Little Depo. at 52–54; Patterson Depo. at 33–34; and (3) testimony from two assistant managers that the managers themselves were not aware of whether the Kitchen Tip Pool was voluntary, see Barnes-Turner Depo. at 58–59; Wolfe Depo. at 37–39. On this record, Plaintiffs have provided evidence sufficient to create a jury question as to whether participation in the Kitchen Tip Pool at the Defendant restaurants was mandatory. Thus, as disposition of the claims in Counts I, II, IV, and V depends on resolution of a disputed fact as to each Plaintiff, Defendants' Motion as to these Counts is due to be denied.

## 2.    Counts III and VI

Turning to Counts III and VI, Defendants contend that the FLSA and FMWA do not govern the operation and distribution of proceeds of a voluntary tip pool. They further assert that, to the extent servers received their tips and voluntarily contributed them to the Kitchen Tip Pool, they "retained" their tips, and that evaluation of each server's wishes as Plaintiffs contend is necessary requires an individualized determination not suitable for class-wide adjudication. Defendants further argue that the kitchen managers were not acting as employers or otherwise as Defendants' agents in distributing the proceeds of

the Kitchen Tip Pool and that any amount distributed to the kitchen employees was insufficient to effectively incentivize or discipline them. Additionally, as to the class claim in Count VI, Defendants assert that the class members failed to provide adequate notice as required under Fla. Stat. § 448.110(6)(a), and, thus, they are entitled to judgment in their favor as to the class members.

Plaintiffs oppose entry of summary judgment in favor of Defendants as to Counts III and VI and have moved for partial summary judgment in their own favor as to Count VI.[19] Although stated in various ways, Plaintiffs' arguments against entry of summary judgment for Defendants and for summary judgment in their favor boil down to three theories. First, they argue that Defendants exercised dominion and control over the Kitchen Tip Pool. Next, they argue that because the Kitchen Tip Pool proceeds were distributed by the kitchen managers in accordance with Defendants' incentive and disciplinary goals, they became property of the employer. Last, they argue that the Kitchen Tip Pool could not be a valid voluntary tip pool because the kitchen managers distributed the proceeds as they saw fit, and the servers and kitchen staff did not have an agreement as to how the proceeds would be distributed (by whom and according to what formula) or who would receive them. And as to the class claim, Plaintiffs contend that they have provided sufficient notice to satisfy the requirements of Fla. Stat. § 448.110(6)(a).

Before addressing the parties' respective arguments, the Court notes that the basis of the claims in Counts III and VI is that "Defendants have wrongfully retained tips by exercising dominion and control over the tip pool and directing the distribution of the tip

---

[19] Although Plaintiffs seek summary judgment only as to Count VI, see Plaintiffs' Motion at 1–2, 15, both Counts III and VI are based on the same legal theory and evidence. Thus, the Court will consider Plaintiffs' Motion as requesting summary judgment as to Count III as well.

pool funds in accord with its [sic] own incentive and disciplinary policies." See Third Amended Complaint ¶¶ 110, 127. Indeed, in seeking class certification, Plaintiffs pointed to evidence that the kitchen managers had failed to distribute all of the proceeds of the Kitchen Tip Pool on certain occasions and that the kitchen managers had withheld tips from certain kitchen employees as a discipline. The suggestion to the Court was that these instances indicated that Defendants were retaining the withheld tips or that the tips were being surrendered to Defendants for their use. Without question, even if the Kitchen Tip Pool was voluntary, if Defendants themselves received any portion of the proceeds, the Kitchen Tip Pool would violate the retention requirement of the FLSA. This is so because the FLSA prohibits any agreement whereby the employees' tips become property of the employer. See DOL Field Operations Handbook § 30d01(a); Fact Sheet No. 15. It was on this basis that the Court certified the claim in Count VI to proceed on a class-wide basis. See Class Certification Order at 36. Thus, the claim before the Court in Counts III and VI is that, even if participation in the Kitchen Tip Pool was voluntary, the tip pool was invalid because of the control exercised or obtained over those funds by Defendants.[20]

---

[20] In both of the cases cited in the Class Certification Order, the courts based their conclusions on the possibility that the employer had itself "retained" proceeds from a mandatory tip pool. See Williams-Green v. J. Alexander's Rest., 277 F.R.D. 374, 381 (N.D. Ill. 2011); Perez v. Prime Steak House Rest. Corp., 939 F. Supp. 2d 132, 139–40 (D.P.R. 2013). The Court observed that "it is possible that an employer's retention of a portion of the proceeds of a tip pool may constitute impermissible participation in the tip pool." Class Certification Order at 36. The Court reiterated that observation in its Order denying the Defendants' Motion for Reconsideration, see Doc. 143 at 5 ("[E]ven assuming the Kitchen Tip Pool was voluntary, Defendants admit that they have retained employees' tips by virtue of the kitchen managers withholding tips from kitchen employees for disciplinary reasons."), and the cases the Court cited in that order stand for the same basic proposition: that an employer's interference with an employee's right to retain his tips through the employer's own retention or use of the proceeds of a mandatory tip pool is unlawful, see Dorsey v. TGT Consulting, LLC, 888 F. Supp. 2d 670, 681 (D. Md. 2012); Whitehead v. Hidden Tavern, Inc., 765 F. Supp. 2d 878, 882–83 (W.D. Tex. 2011); Davis v. B&S, Inc., 38 F. Supp. 2d 707, 712, 714, 717 (N.D. Ind. 1998); Brennan v. Haulover Shark & Tarpon Club, Inc., No. 74-1276-Civ, 1986 WL 587, at *16 (S.D. Fla. Jan. 27, 1986) (unpublished). Thus, the Court's prior decisions on class

The existence of a tip pool is relevant in the FLSA context only to the extent that it interferes with an employee's ability to retain all of the employee's tips. <u>See</u> 29 U.S.C. § 203(m) (the tip-credit provision "shall not apply with respect to any tipped employee unless … <u>all tips received by such employee have been retained by the employee</u>, except that this subsection shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips" (emphasis added)). Otherwise, the FLSA does not mention tip pools. Thus, Plaintiffs' claims in Counts III and VI turn on the question of whether, under the facts before the Court, the servers at the Defendant Restaurants were permitted to retain their tips as required by law. In support of these claims, Plaintiffs suggest that Defendants have violated the retention requirement because Defendants themselves have in some way received or exercised control over the servers' tips.

Upon review of the record in this action, the Court finds Plaintiffs' contention to be without factual support. Plaintiffs point to no testimony or evidence that any Defendant, whether it be a Restaurant Defendant or an Owner Defendant, ever received a portion of the Kitchen Tip Pool. Rather, the undisputed evidence reflects that, once the Kitchen Tip Pool was established, Defendants were not directly involved in its operation. Instead, the kitchen managers were solely responsible for distributing Kitchen Tip Pool proceeds among the kitchen staff.[21] <u>See</u> Owners' Affidavits at 2, 5, 8, 11, 14, 27; Saltwater Cowboys

---

certification were also premised on the understanding that the evidence would show that the Defendants retained some of the Kitchen Tip Pool proceeds.

[21] The Court observes that kitchen manager Kelvin Jackson testified that, when he started as a manager, former owner John Wierda, who died in 2005, might have explained to Jackson that the proceeds generally had been distributed based on the number of hours a kitchen employee worked. Jackson Depo. at 24–25. He also testified that Singleton had asked about the frequency of the distribution for payroll purposes. <u>Id.</u> at 46–47. Neither of those statements suggests that Defendants had any involvement in operation of the Kitchen Tip Pool at any point during the relevant time frame (beginning Nov. 30, 2007), particularly in light of Jackson's testimony that no one monitors how he runs the pool. <u>Id.</u> at 47–48. This

Depo. at 39–40, 56–58; Creekside Dinery Depo. at 19, 84. Plaintiffs point to no affirmative evidence to the contrary.[22]

Not having direct evidence that any Defendant received or obtained any portion of the Kitchen Tip Pool proceeds, Plaintiffs point to four occasions within the class period on which the amounts contributed to the Kitchen Tip Pool exceeded the amounts reportedly distributed to the kitchen employees as perhaps supporting an inference that Defendants retained, or exercised dominion and control over, a portion of the Kitchen Tip Pool proceeds. See Doc. 183 at 1.[23] However, with respect to this discrepancy, Singleton testified on behalf of Saltwater Cowboys that he was unaware that such discrepancies existed, did not understand why they existed, and believed that all amounts received into the Kitchen Tip Pool should have been distributed. See Saltwater Cowboys Depo. at 111–15. Additionally, the kitchen manager at Creekside Dinery explained that he rolled over any leftover amount into the following week's pool. See Jackson Depo. at 34–35. And the kitchen manager at Saltwater Cowboys testified that he routinely reported less than the full amount he had distributed from the Kitchen Tip Pool. See Pannone Depo. at 40–41.

---

testimony provides no basis for the contention that any Defendant exercised dominion and control by directing distribution of the proceeds in accordance with their own incentive and disciplinary policies.

[22] Notably, although Plaintiffs moved for summary judgment on Count VI, they do not argue in Plaintiffs' Motion that the kitchen managers were functional employers in relation to the servers or identify any evidence that would support such a finding. See generally Plaintiffs' Motion. More importantly, Defendants did argue in Defendants' Motion that the kitchen managers' actions could not be imputed to Defendants. See Defendants' Motion at 16–17. Plaintiffs failed to respond to that contention or point to any evidence that the kitchen managers were employers with respect to the servers, who worked in the front of the house, not the kitchen. See generally Plaintiffs' Response. As such, Plaintiffs have abandoned any claim that the kitchen managers were functional employers. See Case v. Eslinger, 555 F.3d 1317, 1329 (11th Cir. 2009) (failure to respond to an argument raised in a motion for summary judgment results in a waiver or abandonment of the issue); see also Johnson v. Bd. of Regents of Univ. of Ga., 263 F.3d 1234, 1264 (11th Cir. 2001).

[23] Although they contend that those examples are merely representative, they have not identified any evidence that could reveal additional occasions on which the amounts contributed and distributed differed.

Plaintiffs cite no contrary evidence.   Moreover, Plaintiffs point to no evidence that suggests that any undistributed funds ever went to Defendants or were used by Defendants in any manner. In light of Defendants' affirmative testimony, the fact that, on four occasions over a five-year period, the amount servers contributed to the Kitchen Tip Pool exceeded the amount kitchen employees reportedly received is no more than a mere scintilla of evidence and does not create an issue of fact as to whether <u>Defendants themselves</u> retained the difference or exercised dominion and control over proceeds from the Kitchen Tip Pool.[24]

Plaintiffs also argue that they did not retain their tips because Defendants made the Kitchen Tip Pool deduction before the server physically received his or her pay. However, the language of section 203(m) itself, as interpreted by the Department of Labor, supports a contrary conclusion. The sole exception in section 203(m) to the retention requirement is for valid <u>mandatory</u> tip pools involving "employees who customarily and regularly receive tips." Where participation in a tip pool is mandatory, the employee is required to contribute, and thus is not permitted to retain that portion of tips. Notwithstanding the limitation applicable to mandatory tip pools, the Department of Labor has concluded, and the parties have never disputed, that nothing in the FLSA prohibits purely voluntary tip-pooling arrangements involving any other employee.[25] <u>See</u> Dep't of Labor Field Operations Handbook § 30d04(c) (Dec. 9, 1988), <u>available at</u> <u>http://www.dol.gov/whd/FOH/FOH_Ch30.pdf</u>); <u>see also</u> Defendants' Motion at 2;

---

[24] Plaintiffs' citations to <u>Brennan</u> and <u>Dorsey</u> are unavailing. As previously noted, both cases involved mandatory tip pools in which the <u>employer</u> retained a portion of the tip-pool proceeds. <u>See</u> <u>Dorsey</u>, 888 F. Supp. 2d at 681; <u>Brennan</u>, 1986 WL 587 at *16.

[25] Of course, as discussed, an employer may not participate in any tip pool, even a voluntary one. <u>See</u> <u>Davis</u>, 38 F. Supp. 2d at 714–15.

Plaintiffs' Motion at 10–11. If the FLSA expressly exempts only mandatory tip pools from the retention requirement, but employees may nevertheless participate in voluntary tip pools, it follows that such voluntary arrangements do not violate the retention requirement because an employee has been permitted to retain his tips <u>before</u> opting to participate in the voluntary pool.

Moreover, where an employee makes a voluntary contribution to a tip pool, there is no legal distinction between the employee deducting the contribution before physically receiving that money and the employee first receiving the money and then contributing a portion of that money to the pool. To suggest otherwise ignores basic principles of property law, which do not require actual possession. <u>See, e.g.</u>, <u>Calderon v. Witvoet</u>, 999 F.2d 1101, 1107 (7th Cir. 1993) ("A revocable power to appoint one's income to a designated party is the functional equivalent of cash."); <u>Brennan v. Veterans Cleaning Serv., Inc.</u>, 482 F.2d 1362, 1369 (5th Cir. 1973) ("When an employer has paid a third party at the employee's request, the employee has had the use of the money for a purpose of his choosing.").  In such a circumstance, but for the employee's decision to make that contribution and direct the employer to pay that portion of the server's tips to the voluntary tip pool, the employee's tips would be owed by the employer to the employee. <u>Williams v. Jacksonville Terminal Co.</u>, 315 U.S. 386, 397 (1942) ("In businesses where tipping is customary, the tips, in the absence of an explicit contrary understanding, belong to the [tipped employee]."). Thus, to the extent that an employee voluntarily contributes to a tip pool, the employee has exercised legal ownership rights in that money because the employee has made the independent decision to share a portion of it with others. Plaintiffs point to no authority suggesting that, if an employee voluntarily

parts with a sum of money owed to that employee before physically receiving it, that employee never actually had ownership of it in the first place.

Plaintiffs further contend that <u>any</u> exercise of discretion by the kitchen managers, whether authorized by a particular server or not, violated section 203(m). To support that contention, Plaintiffs cite the Department of Labor's Fact Sheet No. 15 and Field Operations Handbook at § 30d01(a), both of which state in essence that section 203(m) effectively prohibits any arrangement or agreement between an employer and employee whereby any portion of the employee's tips becomes the property of the employer. <u>See</u> Plaintiffs' Motion at 14; Plaintiffs' Response at 9–10; Fact Sheet No. 15 at 2; DOL Field Operations Handbook § 30d01(a). However, citation to that authority does little to advance Plaintiffs' claims.

Preliminarily, the Court notes that the facts do not support the contention that, because kitchen managers distributed the tip proceeds, the tips became the property of the employer. As noted, there is no evidence that Defendants ever exercised control over the tips. And there is no evidence that Defendants ever acted as if or believed they had the right to use Kitchen Tip Pool proceeds for any purpose other than that directed by the server—to be distributed to the kitchen staff. The Court also notes that Defendants do not take a tip credit on kitchen employees, so it cannot even be said that they use those tips to satisfy their other minimum-wage obligations. At most, kitchen managers had discretion to distribute as the kitchen managers saw fit—but that does not make the tips property of Defendants.[26]  Indeed, even an employer's participation in distributing the proceeds of an

---

[26] There is evidence that Defendants received some incidental benefit from the Kitchen Tip Pool. <u>See, e.g.</u>, Saltwater Cowboys Depo. at 80; Pannone Depo. at 48–49; Jackson Depo. at 51 (discussing Kitchen Tip Pool's incidental benefit to restaurants). However, the same could be said of any tip pool. As such, that tangential, indirect benefit cannot invalidate an otherwise valid arrangement. Moreover, Plaintiffs

otherwise valid tip pool where the employer retains no portion of it would not be sufficient to support a finding that the employee and employer agreed that the tips would become the employer's "property."

Plaintiffs also cite Davis v. B&S, Inc., 38 F. Supp. 2d 707, 714 (N.D. Ind. 1998), as supporting their claims, but a review of the facts in Davis discloses that it is inapposite. Citing the DOL Field Operations Handbook, Davis reiterates the general principle that "'employers' are not entitled to participate in tip pool arrangements with employees." Id. Notably, Davis involved a tip pool in which the general manager received a portion of the tip proceeds. Id. at 709–10. The court noted that Davis could prevail on his claim only if the general manager was an employer under the FLSA. Id. at 715. Because there was a question of fact as to whether the general manager was acting as an employer or a tipped employee when he shared in the tip pool, the court denied summary judgment. Id. at 716–17. Thus, Davis was a case involving the claim that an employer himself was receiving tips from the tip pool. Such is not the case here.

Next, Plaintiffs contend that the kitchen managers' exercise of discretion, when contrary to a server's intent in contributing to the pool, effectively prevented the servers from "retaining" their tips (insofar as they were not permitted to use their tips exactly as they saw fit). In other words, Plaintiffs contend that, regardless of the voluntary nature of the contribution at the time it was made, the kitchen managers' distribution of the Kitchen Tip Pool without input from the servers effectively nullified the voluntariness of the decision. That argument extends too far beyond the purpose of the FLSA and FMWA.

---

have identified no evidence suggesting that Defendants used the Kitchen Tip Pool proceeds to pay for their expenses, and it is undisputed that they do not take the tip credit for kitchen employees. See Third Amended Complaint ¶ 85 ("Defendants do not claim a tip credit for Kitchen Staff"); Answer ¶ 85 (admitting that allegation).

See Brooklyn Sav. Bank v. O'Neil, 324 U.S. 697, 706–07 (1945) ("The legislative history of the [FLSA] shows an intent on the part of Congress to protect certain groups of the population from substandard wages and excessive hours which endangered the national health and well-being and the free flow of goods in interstate commerce…. To accomplish this purpose[,] standards of minimum wages and maximum hours were provided."). An employee who is given complete control over how to use any earned tips receives the full benefit of the FLSA's and FMWA's protections in that the employee retains all tips not subject to a valid mandatory tip pool and receives at least the minimum wage. At most, Plaintiffs' allegations may suggest that kitchen managers misused the servers' Kitchen Tip Pool contributions when they distributed the proceeds in a manner that was inconsistent with servers' wishes. But that alleged misuse does not change the fact that Plaintiffs were permitted to retain their tips in the first place; they chose to contribute to the Kitchen Tip Pool based on, at worst, a misunderstanding as to how that tip pool would operate. This does not amount to a violation of the FLSA or the FMWA with respect to the Plaintiff servers.

Further, the Court declines to accept Plaintiffs' contention that the Kitchen Tip Pool is invalid because the servers did not have a specific agreement with the kitchen employees as to how, when, to whom, or on what basis the proceeds of the pool would be distributed. Notably, each Plaintiff server who discussed this matter in deposition testified that he or she knew the money marked in the kitchen slot on the Tip Allocation Sheet went to the kitchen employees. They did not know how it was distributed, who distributed it, or any criteria that may have been used, but they knew it went to the kitchen staff. As one court noted:

> [J]ust as agreements can be express or implied in other contexts, the tip pool context often involves implied agreements. Evidence of such an implied agreement can involve either the specifics of a particular workplace or common industry practice.

Turner v. Millennium Park Joint Venture, LLC, 767 F. Supp. 2d 951, 955 (N.D. Ill. 2011). Here, the allocation of tips by a server in the "kitchen" slot of the Tip Allocation Sheet, if not an express agreement, at worst establishes an implied agreement that the sum noted be distributed to kitchen employees. Plaintiffs point to no authority that persuasively holds that, where a tipped employee voluntarily contributes to a tip pool, that employee must have the type of specific agreement which Plaintiffs suggest with each non-customarily tipped employee who receives a portion of the tips.[27]

In support of their contention that, regardless of whether some servers made voluntary contributions to the Kitchen Tip Pool, it nevertheless was invalid because it did not involve a mutual agreement among the employees, Plaintiffs cite 29 C.F.R. § 531.54. But section 531.54 has limited relevance here because, contrary to Plaintiffs' assertions, it does not purport to provide criteria for the validity of voluntary tip pools. Rather, the

---

[27] Plaintiffs cite Reich v. Priba Corp., 890 F. Supp. 586, 596 (N.D. Tex. 1995), which does state that "[t]he tipped employees must agree on the distribution of the [tip] pool for the pool to be deemed valid." See Plaintiffs' Motion at 12. To the extent Plaintiffs cite Priba for the proposition that the tipped employees' agreement—here, that of the servers—had to go beyond knowing that the tips went to the kitchen, Priba is not persuasive authority. Preliminarily, the Court notes that the Priba court specifically relied on the record, which disclosed that none of the tipped employees knew which employees shared in the tip pool or the purpose of the pool. Priba, 890 F. Supp. at 596. Here, the record reflects that the servers knew the proceeds marked for the kitchen went to the kitchen employees. Moreover, Priba apparently involved a mandatory tip pool. See id. (employer "failed to prove … the existence of a valid tip pool arrangement between employees as defined by … § 203(m)" (emphasis added)); see also id. at 595 (stating that employer deducted 20 percent of credit-card tips to cover both credit-card fees and tip pool among other tipped employees). In that regard, it is premised on the questionable conclusion that an employee who is required to participate in a tip pool must nevertheless agree as to how that tip pool is administered. While the Priba court cited Barcellona v. Tiffany English Pub, Inc., 597 F.2d 464, 466–67 (5th Cir. 1979), for that conclusion, Barcellona held only that there had been no agreement between an employer and employees to transfer ownership of tips to the employer. See id. Thus, neither Priba nor Barcellona supports the proposition that all employees must agree with the non-tipped employees as to the method and terms of distribution of a voluntary tip pool for that pool to be valid.

portion of the regulation to which Plaintiffs cite explains how an employer must calculate a tipped employee's wages when tip-sharing occurs. In other words, it does not state that a voluntary tip pool <u>must</u> be "a pooling arrangement whereby the employer redistributes the tips to the employees upon some basis to which they have mutually agreed among themselves." Instead, it states that <u>if</u> employees share tips among themselves pursuant to some arrangement, the employer must account for tips as to each employee in the agreed manner. In that case, tips paid over to the non-tipped employee must be reported as tips to that employee, not to the contributing server. This Court cited the definition in section 531.54 for what it is: a helpful description of a voluntary tip pool. However, the undersigned is unaware of any court that has held that a voluntary tip pool <u>must</u> satisfy the "mutual agreement" described in section 531.54 in order to comply with the retention requirement of section 203(m). In any event, because the Court finds that any Plaintiff who voluntarily contributed to the Kitchen Tip Pool "retained" his tips within the meaning of section 203(m), what happened to those contributions thereafter, and whether it was in line with Plaintiffs' subjective intent, has no effect on Defendants' compliance with their FLSA and FMWA obligations. As such, Defendants were not prohibited from taking the tip credit as to the servers. In consideration of the foregoing, Plaintiffs' Motion is due to be denied, and Defendants' Motion is due to be granted to the extent Defendants seek summary judgment as to the claims set forth in Counts III and VI of the Third Amended Complaint.[28]

---

[28] Because the Court finds summary judgment is due to be entered in Defendants' favor as to Counts III and VI, the Court need not address Defendants' remaining arguments.

Defendants recently moved for decertification of the class as to Count VI, <u>see</u> Motion to Alter/Amend Order to Decertify Class (Doc. 187), and Plaintiffs responded, <u>see</u> Plaintiffs' Response in Opposition to Defendants' Motion to Decertify Class (Dkt. 187) (Doc. 190). Because the Court has

### 3.    Counts VII and VIII

In Counts VII and VIII, Crowling and Keating allege that Defendants retaliated against them for participating in this lawsuit, in violation of the FWA and FLSA. Third Amended Complaint ¶¶ 131–46. The FWA prohibits an employer from taking "any retaliatory personnel action against an employee because the employee has … [o]bjected to, or refused to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation." Fla. Stat. § 448.102(3). The FLSA prohibits any person from "discharg[ing] or in any other manner discriminat[ing] against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to [the FLSA]." 29 U.S.C. § 215(a)(3). In analyzing retaliation claims under those statutes, courts apply the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–04 (1973). See Sierminski v. Transouth Fin. Corp., 216 F.3d 945, 950 (11th Cir. 2000) (FWA)[29]; Wolf v. Coca-Cola Co., 200 F.3d 1337, 1342–43 (11th Cir. 2000) (FLSA). Under that framework, a plaintiff must first establish a prima facie case of retaliation, which requires a showing that (1) the plaintiff engaged in protected activity; (2) the plaintiff subsequently suffered an adverse employment action by the defendant; and (3) a causal connection existed between the plaintiff's activity and the defendant's adverse action. Wolf, 200 F.3d at 1342–43. That prima facie showing creates a presumption that the defendant unlawfully retaliated against the plaintiff, and the burden shifts to the defendant to produce evidence

---

determined that summary judgment is due to be granted in Defendants' favor as to Count VI, the Motion to Decertify will be denied as moot.

[29] Although the court in Sierminski acknowledged that it found the McDonnell Douglas framework applicable to FWA claims only because there was no guiding case law from Florida, at least one Florida appellate court has since endorsed use of that framework for FWA claims. See Rustowicz v. N. Broward Hosp. Dist., 174 So. 3d 414, 419 (Fla. 4th DCA 2015).

supporting that it took the adverse action for a legitimate, nonretaliatory reason. Id. at 1343; Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997). If the defendant satisfies its burden of production, the presumption of retaliation disappears, and the plaintiff then must produce evidence that the proffered legitimate reason was mere pretext for retaliation. Wolf, 200 F.3d at 1343; Combs, 106 F.3d at 1528. When deciding a motion for summary judgment in a case in which the defendant has proffered nonretaliatory reasons for its actions, the court "must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's … reasons to permit a reasonable factfinder to conclude that [those reasons] were not what actually motivated its conduct." Combs, 106 F.3d at 1538 (internal quotation marks omitted). A plaintiff may show pretext by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Id. Ultimately, in a retaliation case the plaintiff must present "proof that the desire to retaliate was the but-for cause of the challenged employment action." Univ. of Texas Sw. Med. Ctr. v. Nassar, 133 S.Ct. 2517, 2528 (2013)[30]; see also Wolf, 200 F.3d at 1343.

---

[30] In Nassar, the Supreme Court addressed the causation standard applicable to retaliation claims under Title VII. See Nassar, 133 S.Ct. at 2523. It concluded that such claims require proof of but-for causation because (1) Title VII's anti-retaliation provision prohibits taking an adverse employment action "because" of certain criteria; (2) the court had previously interpreted the same "because of" language in the ADEA as requiring proof of but-for causation; and (3) it found no "meaningful textual difference" between the two statutes. Id. at 2528. The same reasoning applies here: The FLSA's anti-retaliation provision prohibits an employer from terminating or discriminating against an employee "because such employee has" engaged in the identified protected activity. See 29 U.S.C. § 215(a)(3) (emphasis added). There is no meaningful basis on which to distinguish the language in Title VII's anti-retaliation provision and the language in the FLSA's provision. Cf. Munroe v. PartsBase, Inc., No. 08-80431-CIV, 2008 WL 4998777, at *2 (S.D. Fla. Nov. 20, 2008) (unpublished) (citing cases for the proposition that "FLSA retaliation claims are governed by the same legal analysis applicable to retaliation claims under Title VII." (internal quotation marks omitted)). Indeed, the Eleventh Circuit has long held that a plaintiff must establish but-for causation to support a retaliation claim under the FLSA, see Reich v. Davis, 50 F.3d 962, 965–66 (11th Cir. 1995), and some courts have expressly applied Nassar to FLSA-retaliation claims, see, e.g., Prosser v. Thiele Kaolin Co., No. 5:14-cv-21(CAR), 2015 WL 5769233, at *14 n.109 (M.D. Ga. Sept. 30, 2015) (to be

Crowling and Keating bring their state-law retaliation claims under the FWA, apparently based on the contention that Defendants violated that statute in retaliating against them for asserting their rights under the FLSA. See Third Amended Complaint ¶¶ 131–38. It is unclear whether Crowling and Keating may bring retaliation claims under the FWA based on their assertion of rights under the FLSA, given that the FLSA has its own anti-retaliation provision. The FWA defines "law, rule, or regulation" as "any statute or ordinance or any rule or regulation adopted pursuant to any federal, state, or local statute or ordinance applicable to the employer and pertaining to the business," Fla. Stat. 448.101(4), a broad definition which presumably includes the FLSA. However, it is possible that the FWA claim is preempted by the FLSA's anti-retaliation provision since the FLSA covers the same alleged conduct underlying Crowling's and Keating's FWA claims. Compare Anderson v. Sara Lee Corp., 508 F.3d 181, 194 (4th Cir. 2007) (holding that contract, negligence, and fraud claims based on violations of FLSA were precluded based on obstacle preemption), with Bouaphakeo v. Tyson Foods, Inc., 564 F. Supp. 2d 870, 884–86 (N.D. Iowa 2008) (finding FLSA does not preempt duplicative state-law claim, but acknowledging cases finding duplicative claims preempted). Nevertheless, because Defendants have not argued that the FWA claims are preempted, because

---

published); Miller v. Metrocare Servs., No. 3:13-CV-1984-D, 2015 WL 477233, at *5 (N.D. Tex. Feb. 5, 2015) (unpublished); Mould v. NJG Food Serv., Inc., 37 F. Supp. 3d 762, 778 n.11 (D. Md. 2014).

Neither the Supreme Court nor the Eleventh Circuit has clarified the stage at which the "but-for" standard applies. See Prosser, 2015 WL 5769233, at *12 n.97 (citing cases); compare Perry v. Rogers, — F. App'x —, 2015 WL 5692236, at *7 (11th Cir. Sept. 29, 2015) (applying Nassar at pretext stage), with Palmer v. McDonald, 624 F. App'x 699, 703 (11th Cir. 2015) (applying Nassar at prima facie stage). The Court need not decide whether Crowling and Keating must establish that the desire to retaliate was the but-for cause of Defendants' actions against them at the prima facie stage or the pretext stage because, as discussed infra, Keating has failed to establish the existence of an adverse employment action, and Crowling has failed to come forward with sufficient evidence to allow a reasonable jury to conclude that Defendants' proffered reasons for investigating and firing him are pretext for unlawful discrimination.

ordinary preemption is not jurisdictional, see Blab T.V. of Mobile, Inc. v. Comcast Cable Commc'ns, Inc., 182 F.3d 851, 855 (11th Cir. 1999), and because, as discussed infra, Defendants are entitled to summary judgment on all retaliation claims, the Court need not engage in preemption analysis.

Defendants do not dispute that Crowling and Keating engaged in protected activity by participating in this lawsuit, which alleged violations of the FLSA. See Defendants' Motion at 24–25. However, they do contend that Keating cannot establish that he suffered an adverse employment action. An "adverse employment action" in the context of a retaliation claim is conduct "which has a materially adverse effect on the plaintiff, irrespective of whether it is employment or work-place related." See Crawford v. Carroll, 529 F.3d 961, 973 (11th Cir. 2008) (citing Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67–68 (2006)).[31] Conduct is "materially adverse" in the retaliation context if it "might have dissuaded a reasonable worker from making or supporting" an FLSA claim. See Burlington, 548 U.S. at 68 (internal quotations omitted). However, the anti-retaliation provision "protects an individual not from all retaliation, but from retaliation that produces an injury or harm," such that "petty slights, minor annoyances, and simple lack of good manners" are generally not sufficient. Id.

Keating relies only on a write-up he received the day of the staff-wide meeting. See Plaintiffs' Response at 18–20.[32] Indeed, he testified that he left his job of his own

---

[31] Although Burlington addressed adverse employment actions in the context of Title VII retaliation claims, as discussed supra at note 29, FLSA and Title VII retaliation claims generally are governed by the same legal analysis. Other courts have applied Burlington to FLSA retaliation claims. See, e.g., Manley v. DeKalb Cnty., Ga., 587 F. App'x 507, 512 (11th Cir. 2014); Bartolon-Perez v. Island Granite & Stone, Inc., 108 F. Supp. 3d 1335, 1338–39 (S.D. Fla. 2015); Johnson v. Advertiser Co., 778 F. Supp. 2d 1270, 1278–79 (M.D. Ala. 2011).

[32] Keating also attached to his response to Defendants' Motion a second write-up, from February 13, 2013, for failing to show up for a shift or call in to advise he would be absent. See Doc. 185-9 at 2.

accord, see Keating Depo. I at 85–86, and he has not identified any evidence that the write-up caused any adverse consequences.[33] A write-up alone, without any indication that it was accompanied by a reduction in pay, benefits, responsibilities, or some other adverse effect, is insufficient to establish an adverse employment action. See Manley, 587 F. App'x at 513; Johnson, 778 F. Supp. 2d at 1279. Such an action, without more, would be insufficient to "dissuade[ ] a reasonable worker from making or supporting a charge" against an employer. Cf. Burlington, 548 U.S. at 68. As such, Defendants are entitled to summary judgment as to Keating's claims under Counts VII and VIII.

As to Crowling, the parties focus on two possible adverse employment actions: (1) Defendants' investigation of Crowling's alleged double bump, and (2) Crowling's termination.[34] See Defendants' Motion at 24–25; Plaintiffs' Response at 18–20. The more

---

Despite that, he specifically discusses only the January 17, 2013, write-up in response to Defendants' Motion. See Plaintiffs' Response at 18–20. Even if he had discussed the second write-up, he did not plead that write-up as an adverse employment action in the Third Amended Complaint, and he cannot amend his allegations in response to a motion for summary judgment. Regardless, the second write-up does not qualify as an adverse employment action for the same reason the first write-up is not an adverse employment action.

In addition to the January 17, 2013, write-up, Keating also alleged that he had "been subjected to harassment during each" shift following the January 17, 2013, meeting. Third Amended Complaint ¶¶ 136, 144. However, he does not rely on such alleged harassment as an independent adverse employment action in his response to Defendants' Motion, see Plaintiffs' Response at 18–20, and he has not alleged or described any facts explaining how he was harassed. As such, the Court will not consider his vague allegations of harassment in deciding whether summary judgment as to his retaliation claims is warranted. See Fed. R. Civ. P. 56(c)(1)(A), (c)(3) (stating that a party must support its arguments by "citing to particular parts of materials in the record," and that a court need consider "only the cited materials").

[33] Keating testified that, after the January 17, 2013 meeting, he was not allowed to train new servers and was scheduled to host on a couple of occasions, which he had never previously been scheduled to do. Keating Depo. I at 85. He testified that servers were not paid extra to train. Id. However, Keating did not allege that being scheduled to host or not scheduled to train new servers constituted adverse employment actions in the Third Amended Complaint, see generally Third Amended Complaint, or cite that testimony in his Response to Defendants' Motion, see Plaintiffs' Response at 18–20. He also did not connect either of those actions to his write-ups. See id. As such, the Court does not consider those actions in evaluating Keating's claims. See Fed. R. Civ. P. 56(c)(1)(A), (c)(3).

[34] Crowling was also written up on January 17, 2013, for being outside the fence while clocked in. Doc. 165-5. Although he attached the write-up to his response to Defendants' Motion, see Doc. 185-9 at 1, he did not identify it as an adverse employment action in the Third Amended Complaint or suggest in Plaintiffs' Response that it was a separate adverse employment action, see Plaintiffs' Response at 18–20. Regardless, as discussed, the write-up on its own would not constitute an adverse employment action.

obvious action—Crowling's termination—certainly qualifies as an adverse employment action. Additionally, Crowling has presented some evidence of a causal connection between his participation in the lawsuit and his termination, as required for his prima facie case. Specifically, he has shown that he was fired shortly, one month, after Defendants learned of his involvement in this lawsuit,[35] and on the same day that Singleton delivered prepared remarks to the Saltwater Cowboys staff expressing displeasure about the lawsuit. See Doc. 7 at 1 (stating that Saltwater Cowboys was served on December 15, 2012); Crowling Depo. I at 17 (stating that he was fired on January 17, 2013). In response to this prima facie showing, Defendants assert that they fired Crowling not because of his involvement in this lawsuit, but because he was responsible for accepting a double bump. Saltwater Cowboys Depo. at 181–82; Bryant Depo. at 130.

Upon review of the record, the undersigned concludes that Crowling has failed to come forward with evidence that "cast[s] sufficient doubt on [Defendants'] … reason[ ] to permit a reasonable factfinder to conclude that [that reason was] not what actually motivated" their decision to terminate him. See Combs, 106 F.3d at 1538 (quoted). Preliminarily, the Court notes that Crowling suggests that he was fired not for the double bump, but instead for "a variety of unspecified reasons that have occurred through the years." See Plaintiffs' Response at 19. In doing so, he relies on a passage from Singleton's corporate-representative testimony discussing Crowling's issues throughout his employment. However, although Singleton and Bryant testified that Crowling had had

---

Indeed, because Crowling was fired later that same night for a different reason, he would not be able to show that the write-up had any materially adverse effect absent some evidence that he suffered some additional consequence during that final shift (which he has not identified).

[35] Although Crowling was not a named Plaintiff in the original Complaint, see Complaint at 1, the complaint stated in a footnote that he had filed a Notice of Consent to Join, see id. at 2 n.1. That notice was filed on December 4, 2012. See Doc. 3-2.

issues throughout his employment, both testified that the double bump was the reason for his termination, the "straw that broke the camel's back." Saltwater Cowboys Depo. at 189–91; Bryant Depo. at 140–42.  Singleton further testified that there was no other reason for Crowling's termination, "that was the reason he was terminated, because of the double bump." Saltwater Cowboys Depo. at 191. Crowling points to no evidence to the contrary. Crowling cannot create an issue of fact on the question of pretext by attempting to recharacterize Defendants' reason for taking the employment action about which he complains.

Although Crowling points to no evidence suggesting that he was not responsible for the double bump, see generally Plaintiffs' Response, in a declaration Crowling generally denied ever failing to advise a customer of the automatic gratuity.[36] However, Crowling cites no evidence suggesting that Defendants did not genuinely believe he did commit the charged infraction. See Gaddis v. Russell Corp., 242 F. Supp. 2d 1123, 1148 (M.D. Ala. 2003) (plaintiff challenging an employer's proffered reason for adverse action "must produce evidence that creates a triable issue of fact as to the truthfulness" of that reason; "thus, the question of whether an employer's honest belief has a basis in fact is not a proper question to be considered on summary judgment."), aff'd, 88 F. App'x 385 (11th Cir. 2003); see also E.E.O.C. v. Total Sys. Servs., Inc., 221 F.3d 1171, 1176–77 (11th Cir. 2000). "'An employer who fires an employee under a mistaken but honest impression that an employee violated a work rule is not liable for discriminatory conduct.'"

---

[36] Crowling also testified that he "always [told] customers" when there was an automatic gratuity on the bill, although he could not be sure that he never missed one.  Crowling Depo. I at 19–21.  Although he makes some other allegations in the Third Amended Complaint, he cannot rest on allegations in a complaint in opposing summary judgment.  And regardless, Crowling does not cite those statements in his response to Defendants' Motion and does not argue that Defendants' Motion should be denied based on the factual falsity of their proffered reason for firing him. See Plaintiffs' Response at 18–20.

Hudson v. Blue Cross Blue Shield of Ala., 431 F. App'x 868, 869 (11th Cir. 2011) (internal alteration omitted; quoting Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1363 (11th Cir. 1999)).

It is undisputed that Crowling knew taking a double bump was a fireable offense, see Crowling Depo I at 20–21, that the customer advised Singleton that Crowling had failed to alert the customer to the automatic gratuity, causing a double bump, see Saltwater Cowboys Depo. at 185–88, and that Defendants had recently fired at least one other employee with no connection to this lawsuit—Vance Tomlinson, a server at Creekside Dinery—for similar[37] conduct, see Doc. 165-4; Saltwater Cowboys Depo. at 186; Bryant Depo. at 138.[38] Moreover, Saltwater Cowboys' "Wait Staff Rules/Guidelines"

---

[37] Tomlinson's conduct may not have been identical to Crowling's because the evidence suggests that, in addition to accepting the double bump without informing the customer of the automatic gratuity, he also had improperly added the automatic gratuity to the bill. See Doc. 165-4. Nevertheless, the write-up states that Tomlinson was fired because of the double bump. Moreover, as discussed infra, other evidence establishes that servers responsible for double bumps are to be fired.

[38] Notably, although it is Saltwater Cowboys' company policy that an employee who accepts a double bump be fired, it appears that on one prior occasion server Jose Farinos engaged in such conduct but escaped termination. With respect to this incident, Bryant testified:

Q   So, despite whether or not a server says, I told the patron about the mandatory gratuity, if the patron says, no, he didn't tell me, you automatically believe the patron, is that correct?

A   Yes.

Q   And is the server always fired?

A   Yes. Well, one time he was not.

Bryant Depo. at 133–34. She then explained that, without her knowledge, a customer had previously complained about a double bump involving Farinos, but "Jessica [Barnes-Turner], my assistant manager, made him pay it back and didn't tell the rest of us about it, and he should have been fired then but didn't get fired because she chose not to fire him and hide it under the table." Id. at 134. Bryant testified that she was not aware of Barnes-Turner's action until Farinos was terminated. Id. at 150. Similarly, Singleton was unaware of it. See Saltwater Cowboys Depo. at 202–06. Crowling does not rely on the Farinos incident as evidence that Defendants would not have fired him for the same offense but for his participation in this lawsuit. See Plaintiffs' Response at 18–20. Not only did Crowling agree that double bumping was a fireable offense, but the undisputed evidence shows that it was Saltwater Cowboys' company policy to fire a server who accepted a double bump, and Singleton and Bryant had not been aware of the only time that policy

state that failure to inform a customer of an automatic gratuity "will result in termination." Doc. 165-3 at 4. Crowling points to no evidence suggesting that, having determined that he accepted a double bump, Defendants would not have fired him for that offense but for their desire to retaliate against him for his involvement in the lawsuit. Cf. Nassar, 133 S.Ct. at 2528. Although Singleton's prepared remarks—given on the same night Crowling was terminated and implicitly referencing him—reveal the Owner Defendants' discontent about the lawsuit at the time, see generally Doc. 185-2, they do not counter the undisputed evidence that Saltwater Cowboys' policy was to terminate any server who accepted a double bump and that Saltwater Cowboys believed Crowling did so.

A closely related but less obvious potential adverse employment action is Defendants' investigation of Crowling's double bump. The double bump investigation was not prompted by a customer complaint; rather, the double bump was identified independently by the Owners. See Saltwater Cowboys Depo. at 186–88 (indicating that Singleton called the customer and suggesting that the customer had been unaware of the double bump beforehand). An investigation of an employee can be an adverse action if it results in a significant change in the employee's conditions or status of employment or otherwise has a materially adverse effect on the employee. See Mullins v. City of N.Y., 626 F.3d 47, 54 (2d Cir. 2010) (internal investigation was adverse employment action

---

had not been followed—the prior incident involving Farinos—until the restaurant discovered Farinos's second infraction and fired him for it.

Moreover, that Crowling was disciplined by Singleton and Bryant, whereas Farinos had been disciplined by Barnes-Turner for his first double bump, undermines any contention that Farinos would be a good comparator for purposes of Crowling's retaliation claim. Cf. Silvera v. Orange Cnty. Sch. Bd., 244 F.3d 1253, 1261 n.5 (11th Cir. 2001) ("[D]ifferences in treatment by different supervisors or decision makers can seldom be the basis for a viable claim of discrimination." (citing cases) (alteration added)). The undisputed evidence here goes beyond simply establishing that Farinos and Crowling were disciplined by different people; it establishes that Farinos had been disciplined in a manner inconsistent with Saltwater Cowboys policy, without the knowledge or approval of the people who disciplined Crowling.

because it carried possibility of termination, it postponed one officer's retirement, and it was noted in personnel file, which affected employees' level of discipline for future infractions); <u>Vandesande v. Miami-Dade Cnty.</u>, 431 F. Supp. 2d 1245, 1254 (S.D. Fla. 2006). Here, it is undisputed that Defendants' investigation of the double bump ultimately led to Crowling's termination. The close temporal proximity between Crowling's joining the lawsuit and the investigation, along with the Owner Defendants' prepared remarks demonstrating their discontent about the lawsuit, <u>see</u> Doc. 185-2, are sufficient to allow a reasonable jury to conclude that the investigation may have been causally related to Crowling's participation in the lawsuit. As such, Crowling has pointed to sufficient evidence to satisfy his prima facie case of retaliation.

In response to Crowling's prima facie showing, Defendants have produced evidence of their legitimate business reasons for taking the challenged action. They state that they were investigating all servers after an incident involving Tomlinson in early January 2013 in which the customer had called to complain about Tomlinson accepting a double bump. Saltwater Cowboys Depo. at 186, 191–92; Bryant Depo. at 138, 152. Additionally, Singleton testified that the Owners were examining records of servers' charge tips "to come up with our calculations for the percentages that they make." Saltwater Cowboys Depo. at 203.[39]

In support of his contention that Defendants' stated legitimate business reasons for undertaking the investigation are a mere pretext for unlawful retaliation, Crowling argues that the alleged double bump occurred "months before" his termination, there was

---

[39] The Owner Defendants reviewed the records showing the percentages servers received in charge tips in connection with preparation of their remarks for the January 17, 2013, meeting. <u>See</u> Doc. 185-2 at 2, 6.

no prior customer complaint, and the Owners took the "unprecedented" step of calling the customer to inquire about the double bump. <u>See</u> Plaintiffs' Response at 19. He further asserts that Defendants testified that they targeted him. <u>See</u> <u>id.</u> Preliminarily, the Court notes that while Crowling argues in Plaintiffs' Response that the double bump occurred "months before" his termination, and that Defendants testified that they targeted him as a result of the lawsuit, he provides no record citations to any evidence supporting these arguments.[40]

As to Defendants' initiation of the investigation, Crowling has pointed to no evidence undermining Defendants' proffered reasons for doing so. Where the reason proffered by an employer "is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." <u>See</u> <u>Chapman v. AI Transport</u>, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc). Crowling has failed to rebut Defendants' reasons. He points to no evidence disputing that Defendants reviewed records of all servers, or their stated reasons for doing so. Moreover, the temporal proximity between Crowling's joining the lawsuit and the investigation is not evidence of pretext in this case because the incident involving Tomlinson occurred in early January 2013, <u>see</u> Doc. 165-4, and the decision to look through servers' charge tips to calculate the percentages they earned was related to the prepared remarks Singleton gave later that month, <u>see</u> Saltwater

---

[40] With respect to the timing of the double bump, Crowling's testimony from his first deposition suggests that the double bump in fact had occurred about three weeks before his termination. <u>See</u> Crowling Depo. I at 21–22 (asking Crowling whether he had served Jason Blair—the customer Singleton had called to confirm Crowling's double bump, <u>see</u> Saltwater Cowboys Depo. at 184–85—on December 29, 2013 (he likely meant 2012, as Crowling was terminated in January 2013, and the deposition took place in October 2013)). Moreover, Singleton testified that he probably had been looking through records from December 2012 when he discovered Blair's receipt. Saltwater Cowboys Depo. at 203.

Cowboys Depo. at 203; Doc. 185-2 at 2, 6 (remarks prepared for January 17, 2013, meeting stating, "We've estimated the waitstaff [sic] makes approx[imately] $20 an hour after tip out," and "while looking through the charge tips to come up with an estimate of the percentages that customers tip the waitstaff [sic] we have come across some serious irregularities"). As such, both of the proffered explanations are consistent with the timing of Defendants' investigation of charge records.

Singleton's prepared remarks at the meeting also do not undermine Defendants' explanations for their investigation. That the Owner Defendants apparently were angry about the litigation does not render their proffered explanations for investigating charge-tip records weak, implausible, or incoherent, nor does any such anger demonstrate any inconsistencies or contradictions in those explanations. Cf. Combs, 106 F.3d at 1538. In other words, even accepting that Defendants were unhappy about the lawsuit, that fact does not make it any less likely that they were reviewing the charge-tip records due to the Tomlinson incident or other reasons unrelated to any retaliatory animus.

Additionally, the possibility that Defendants were investigating the FLSA claims brought by Crowling and others when they found the double bump does not render their further investigation into the double bump retaliatory. Even if Defendants were investigating the factual basis of the claim raised by Plaintiffs, that does not mean Defendants set out to investigate Crowling with the intent to retaliate against him. Instead, it would indicate that Defendants began a review of records for that unrelated purpose and discovered the double bump in the process. Cf. Nassar, 133 S.Ct. at 2528 (plaintiff must show that the "desire to retaliate was the but-for cause of the challenged employment action" (emphasis added)).

Crowling also contends that the "unprecedented" measure Defendants took to investigate the potential double bump is evidence of pretext. Plaintiffs' Response at 19 (citing depositions of Doucette, Barnes-Turner, and Wolfe). However, the evidence does not support the characterization of this step as "unprecedented." The only testimony as to whether calling a customer to investigate a potential double bump was common practice at Saltwater Cowboys came from the corporate-representative deposition of Saltwater Cowboys. In response to the question, "When Nancy [Gardner, a bookkeeper at Saltwater Cowboys, see Saltwater Cowboys Depo. at 43] or Jennifer [Bryant] find a potential double bump, do they make a practice of calling the customer?" Singleton explained, "Only if the customer happens to leave their telephone number." Saltwater Cowboys Depo. at 188. Thus, far from being unprecedented, the evidence of record discloses that either Gardner or Bryant would call a patron if they discovered a potential double bump and if that patron left his or her telephone number on the receipt. He further testified that Crowling's patron had left his telephone number on the receipt. Id. at 188–89. That Doucette, the manager at Creekside Dinery, testified that she did not call patrons to investigate a potential double bump, see Doucette Depo. at 114–15, does not undermine Singleton's testimony about the practice at Saltwater Cowboys. Also, Barnes-Turner's and Wolfe's testimony does not undermine Singleton's testimony. Barnes-Turner testified to her belief that "[t]here's no way to" call a patron to follow up on potential double bumps, see Barnes-Turner Depo. at 65–66, which simply reflects her experience that most customers do not leave a telephone number and so cannot be contacted. She also testified that "[n]o one" checks to ensure that there are no double bumps and that she did not "know of any regular procedure where owners will check for double bumps," id. at 70,

but her testimony, as an assistant manager, does not undermine Singleton's testimony about the duties of the front-of-the-house manager or bookkeeper or his testimony about what those employees would do if they did discover a double bump. As for Wolfe, she clarified that although she personally had never called patrons, she had "no idea" whether Owners ever checked for double bumps, see Wolfe Depo. at 19–20. Thus, Crowling fails to point to evidence suggesting that Defendants singled him out or went to greater lengths to investigate him or persons who were participating in the lawsuit. Indeed, Crowling has not identified any evidence suggesting that Defendants would not have employed the same methods to investigate the alleged double bump but for his participation in this lawsuit. Cf. Nassar, 133 S.Ct. at 2528. Again, he has failed to demonstrate any "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Defendants' explanation for why Singleton called the customer to investigate Crowling's alleged double bump. See Combs, 106 F.3d at 1538 (quoted).

In short, Defendants have proffered two nonretaliatory explanations for initiating their investigation: They were examining servers' charge tips in January 2013 both to look for double bumps by any server following the Tomlinson incident (and thereby preempt additional customer complaints) and to calculate how much servers earn in tips. Crowling has pointed to no evidence that would demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [those explanations] for [Defendants'] action[s] that a reasonable factfinder could find these reasons "unworthy of credence." See Combs, 106 F.3d at 1538.[41] Notably, "a reason is not pretext for discrimination unless

---

[41] That Singleton offered two different reasons for investigating servers' charge tips also does not support a finding of pretext. The reasons are not inconsistent—Singleton's testimony suggests that the Owners had been searching through records for both reasons at the same time—and both are supported by other evidence. See Bryant Depo. at 138–39 (stating that the Owners had investigated double bumps

it is shown both that the reason was false and that discrimination was the real reason." Lee v. U.S. Steel Corp., 450 F. App'x 834, 839 (11th Cir. 2012) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993)); see also Alvarez v. Royal Atl. Devs., Inc., 610 F.3d 1253, 1267 (11th Cir. 2010); Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala., 446 F.3d 1160, 1162–63 (11th Cir. 2006). Crowling has failed to do so. He identifies no evidence suggesting that Defendants initiated their investigation as a means of retaliating against him; that they investigated only Crowling and other Plaintiffs; or that they found but did not investigate potential double bumps involving other employees not involved in the lawsuit. Therefore, he has not created a genuine dispute of fact as to whether Defendants' desire to retaliate against him for his participation in this lawsuit was the but-for cause of their investigation.

Because Crowling has not come forward with sufficient evidence to permit a reasonable jury to disbelieve Defendants' proffered reasons for investigating and terminating him, Defendants are entitled to summary judgment as to his claims in Counts VII and VIII.

### 4.    Individual Liability of Owner Defendants

With respect to all of Plaintiffs' claims, Defendants argue that the Owner Defendants cannot be held individually liable along with the Restaurant Defendants because the Owner Defendants are not "employers" within the meaning of the FLSA and FMWA. Defendants' Motion at 22–23. They contend that the Owner Defendants delegated their authority to the managers; the Owner Defendants' sole operational

---

at Saltwater Cowboys and Creekside Dinery following the Tomlinson incident); Doc. 185-2 at 2, 6 (prepared remarks for January 17, 2013, meeting indicating that the Owners had examined servers' charge tips to calculate how much they earned).

involvement was limited to purchasing food and managing the managers; and the Owner Defendants do not supervise, direct, hire, or fire employees or process payroll. Id. Plaintiffs respond that at least one Owner Defendant was present at each restaurant to supervise day-to-day operations, and the Owner Defendants made the decision to use the tip credit at both restaurants; maintained records of servers' tips; participated in hiring and firing of servers; were responsible for implementing the Kitchen Tip Pool at both restaurants; and were involved in determining distribution of Kitchen Tip Pool proceeds. Plaintiffs' Response at 12–14.

The FLSA defines an "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). An officer or owner who is either "involved in the day-to-day operation [of a corporate entity] or [has] some direct responsibility for the supervision of the employee" can be held jointly and severally liable as an employer under the statute. Alvarez Perez v. Sanford-Orlando Kennel Club, Inc., 515 F.3d 1150, 1160 (11th Cir. 2008). "[W]hile control need not be continuous, it must be both substantial and related to the company's FLSA obligations." Lamonica v. Safe Hurricane Shutters, Inc., 711 F.3d 1299, 1314 (11th Cir. 2013).

A genuine dispute exists as to whether the Owner Defendants may be held jointly and severally liable as employers. Indeed, in their respective filings, the parties point to substantial conflicting evidence. The Owner Defendants cite testimony suggesting that they were not involved in the operation of the Kitchen Tip Pool, see Saltwater Cowboys Depo. at 68, 72, 76, 104, 114, 123–24, 139, 158; Creekside Dinery Depo. at 84–90, and that the managers, rather than the Owners, directly supervised the servers, see Saltwater Cowboys Depo. at 24–25, 29–30; Creekside Dinery Depo. at 9, 11–13, 30–32. Plaintiffs

cite testimony that the Owner Defendants were involved in the restaurants' efforts to comply with the FLSA, Doc. 181-18 (deposition of Singleton individually; "Singleton Depo.") at 28–29; Saltwater Cowboys Depo. at 218; at least one Owner Defendant was present at each restaurant each day,[42] Bryant Depo. at 15–16; Doc. 181-19 (deposition of Creekside Dinery assistant manager Terri Ackerman; "Ackerman Depo.") at 27; Creekside Dinery Depo. at 9; Singleton participated in Crowling's termination (and other Owner Defendants participated in the investigation of double bumps), Crowling Depo. I at 17; Saltwater Cowboys Depo. at 188; the Owner Defendants decided to bring the Kitchen Tip Pool to Saltwater Cowboy and Creekside Dinery, Doc. 100-3 at 1, 4, 7, 10, 13, 26 (Owner affidavits stating that because servers worked at multiple restaurants, "we instituted the voluntary kitchen tip pool at all locations"); former owner John Wierda had explained to Jackson generally how distribution of the Kitchen Tip Pool worked when Jackson started as a manager, Jackson Depo. at 24–25; and Singleton had asked Jackson how frequently Jackson distributed the Kitchen Tip Pool proceeds, Id. at 46–47. In light of that conflicting evidence, a genuine dispute exists as to the degree of control the Owner Defendants exercised over the Restaurant Defendants' operations and over the servers. The Owner Defendants are not entitled to summary judgment on that basis.

## V.    Conclusion

In light of the foregoing, Defendants' Motion is due to be granted in part and denied in part, Plaintiffs' Motion is due to be denied, Defendants' Motion to Strike Plaintiffs'

---

[42] Although Defendants contend that Jennifer Bryant's testimony regarding the Owner Defendants' daily supervision of the restaurants actually referred only to "the ultimate authority the Owners had as corporate officers," see Defendants' Motion at 23 n.9, her testimony on that point is not so clear as to preclude a reasonable factfinder from concluding that the Owner Defendants, as a group, supervised the day-to-day operations at the restaurants, particularly in light of the other evidence cited which suggests a greater level of involvement.

Objections is due to be granted, and Defendants' Motion to Alter/Amend Order to Decertify Class is due to be denied as moot. Accordingly, it is hereby

**ORDERED:**

1.      Defendants' Motion to Strike Plaintiffs' Objections (Doc. 186) is **GRANTED**.

2.      Defendants' Motion for Summary Judgment (Doc. 165) is **GRANTED, in part, and DENIED, in part.**

      a.      The Motion is **GRANTED** to the extent that judgment will be entered in favor of Defendants and against all Plaintiffs as to Counts III and VI of the Third Amended Complaint and in favor of Defendants and against Plaintiffs Joseph Keating and Jason Crowling as to Counts VII and VIII of the Third Amended Complaint.

      b.      The Motion is otherwise **DENIED.**

3.      Plaintiffs' Motion for Summary Judgment (Doc. 167) is **DENIED**.

4.      The Court will defer entry of judgment in favor of Defendants as to Counts III, VI, VII, and VIII pending resolution of all remaining claims.

5.      Defendants' Motion to Alter/Amend Order to Decertify Class (Doc. 187) is **DENIED AS MOOT**.

**DONE AND ORDERED** in Jacksonville, Florida, this 18th day of February, 2016.

MARCIA MORALES HOWARD
United States District Judge

lc21
Copies to counsel of record